# In the United States Court of Federal Claims

No. 11-492 C
Filed: July 22, 2015

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| \* | Breach of Contract; |
| \* | Cardinal Change; |
| \* | Contract Disputes Act, |
| \* |   41 U.S.C. §§ 601–613; |
| MERIDIAN ENGINEERING COMPANY, \* | Duty of Good Faith and Fair Dealing; |
| \* | Federal Acquisition Regulations: |
| Plaintiff, \* |   31.205-33 ("Professional and Consultant |
| \* |     Service Costs"); |
| v. \* |   52.211-10 ("Commencement, Prosecution, and |
| \* |     Completion of Work"); |
| THE UNITED STATES, \* |   52.233-1 ("Disputes"); |
| \* |   52.236-2 ("Differing Site Conditions"); |
| Defendant. \* |   52.242-14 ("Suspension of Work"); |
| \* |   52.243-4 ("Changes"); |
| \* |   52.248-3 ("Value Engineering—Construction"). |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Michael H. Payne**, Cohen Seglias Pallas Greenhall & Furman PC, Philadelphia, Pennsylvania, Counsel for Plaintiff.

**Gregg P. Yates**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

## MEMORANDUM OPINION AND FINAL ORDER

**BRADEN,** *Judge*.

Meridian Engineering Company ("Meridian") is an engineering and construction firm in Tucson, Arizona, specializing in heavy civil, structural, and industrial construction. On September 21, 2007, the Army Corps of Engineers ("USACE," "Army Corps," or "Corps") awarded Meridian a $5.8 million contract to complete a flood control project in Nogales, Arizona including demolition, excavation, and construction.

After work at that site commenced, numerous problems arose and, on July 29, 2011, Meridian filed a Complaint in the United States Court of Federal Claims alleging a breach of contract seeking damages of $7.6 million. After trial, Meridian filed an Amended and Second Amended Complaint, adding a new breach of contract claim and a claim for the breach of the duty of good faith and fair dealing.

To facilitate review of this Memorandum Opinion And Final Order, the court has provided the following outline:

**I.      RELEVANT FACTUAL BACKGROUND.**

      **A.      In 2007, The United States Army Corps Of Engineers Awarded Plaintiff A Contract To Construct The Chula Vista Project.**

      **B.      On January 9, 2008, Construction Commenced.**

      **C.      In July 2008, The "Monsoon Season" Began.**

      **D.      In October 2008, Structural Failures Impacted The Union Pacific Railroad Track And Construction Was Suspended.**

      **E.      In March 2009, The United States Army Corps Of Engineers Began To Scale Back The Chula Vista Project.**

**II.     PROCEDURAL HISTORY.**

**III.    DISCUSSION.**

      **A.      Jurisdiction.**

      **B.      Contract Disputes Act.**

      **C.      Standing.**

      **D.      Standard Of Review.**

      **E.      Whether Plaintiff Is Entitled To Damages For The Breach Of Contract Claims Alleged In The May 19, 2014 Second Amended Complaint.**

            **1.      Whether Plaintiff Is Entitled To Recover Costs To Protect Its Workers From Hazardous Conditions (Count 1).**

                  **a.      Plaintiff's Argument.**

                  **b.      The Government's Response.**

                  **c.      The Court's Resolution.**

            **2.      Whether Meridian Is Entitled To Costs For Differing Site Conditions In The Channel And At The Sewer Line (Counts 2 and 5).**

                  **a.      Plaintiff's Argument.**

                  **b.      The Government's Response.**

          c.       **The Court's Resolution.**

**3.**      **Whether Plaintiff Is Entitled To Recover Costs Incurred Because Of The Railroad Right-Of-Way Delay (Count 3).**

**4.**      **Whether Plaintiff Is Entitled To Recover Costs For Delays Incurred As A Result Of Flood Events (Count 4).**

          a.       **Plaintiff's Argument.**

          b.       **The Government's Response.**

          c.       **The Court's Resolution.**

**5.**      **Whether Plaintiff Is Entitled To An Adjustment For The Unpaid Contract Quantities (Count 6).**

          a.       **Plaintiff's Argument.**

          b.       **The Government's Response.**

          c.       **The Court's Resolution.**

**6.**      **Whether Plaintiff Is Entitled To Costs For The To Suspension Of Work (Count 7), Channel Fill (Count 8), And Interim Protection (Count 9).**

          a.       **Plaintiff's Argument.**

          b.       **The Government's Response.**

          c.       **The Court's Resolution.**

**7.**      **Whether Plaintiff Is Entitled To Costs Regarding The Punchlist (Count 10).**

          a.       **Plaintiff's Argument.**

          b.       **The Government's Response.**

          c.       **The Court's Resolution.**

**8.**      **Whether Plaintiff Is Entitled To Recover Costs For The North Bridge VECP (Count 11).**

          a.       **Plaintiff's Argument.**

          b.       **The Government's Response.**

          c.       **The Court's Resolution.**

**F.**     **Whether Plaintiff Is Entitled To Recover Preparation Costs For A Request For Equitable Adjustment (Count 12).**

      **a.**     **Plaintiff's Argument.**

      **b.**     **The Government's Response.**

      **c.**     **The Court's Resolution.**

**G.**     **Whether The Government Violated The Duty Of Good Faith And Fair Dealing (Count 14).**

      **1.**     **Plaintiff's Argument.**

      **2.**     **The Government's Response.**

      **3.**     **The Court's Resolution.**

**IV.**     **CONCLUSION.**

\* \* \*

## I.     RELEVANT FACTUAL BACKGROUND.[1]

### A.     In 2007, The United States Army Corps Of Engineers Awarded Plaintiff A Contract To Construct The Chula Vista Project.

In April 1994, the USACE issued a Design Memorandum for a flood control project in Nogales, Arizona, known as the Chula Vista Project ("Project"). JX1. In 2004, Congress approved funding for the Project and, on August 22, 2007, the USACE issued a request for proposal. JX17-1.

On May 29, 2007, the USACE issued IFB No. W912PL-07-B-0005 ("Solicitation"). JX2. Next, the USACE solicited bids for a firm fixed-price contract and requested prices for a base bid and three separate options. JX2. These options included: Section 2300(a) concerning earthwork (JX2-339); Section 2130 concerning the standards for dewatering (JX7; JX2-329); and Section 1355 concerning environmental protection issues (JX5-11).

---

[1] The relevant facts cited herein were derived from: trial proceedings in Tucson, Arizona from January 27–30, 2014 ("TR 1–1227") and in Washington, D.C. from March 24–27, 2014 ("TR 1228–2292"); trial exhibits admitted into evidence, *i.e.*, JX1-1–190-1; PX1-1–394; DX1-1–612-9; and an April 28, 2014 hearing to supplement expert testimony ("TR 2293–2434"). The witnesses who testified on behalf of Meridian's case-in-chief are listed with their job descriptions and transcript cites in Court Exhibit A, attached hereto. The witnesses who testified on behalf of the Government's case-in-chief are listed with their job descriptions and transcript cites in Court Exhibit B, attached hereto. A chronology of the events discussed in the relevant factual background is in Court Exhibit C, attached hereto.

On September 21, 2007, the USACE awarded Contract No. W912PL-07-C-0025 ("Contract") to Meridian. JX193-1. The Contract was for a "base bid," but included "options" for potential cost increases and anticipated time extensions. JX193. A map of the Project's work site, Court Exhibit D, follows.

Court Exhibit D



PX375 (Pl. Dem. Ex. B).

On October 27, 2007, Meridian requested electronic copies of drawings and survey files from the USACE, but did not receive them. JX110-3.

On November 13, 2007, the USACE issued a Notice to Proceed. DX15-1; PX386. On the following day, Meridian and the USACE attended a preconstruction conference where Meridian was advised that only the contracting officer ("CO") and the administrative contracting officer were authorized to "commit any money for the [G]overnment." DX726-3. The USACE also advised Meridian that there may be chromium, a heavy metal, at the Chula Vista site, but more information would be forthcoming. DX726-5, 13; PX133. Meridian again asked the USACE to provide the requested electronic drawing and survey files. DX726-4; PX3-4.

By November 19, 2007, Meridian planned to begin staking[2] the site.  PX3-3; DX726-3.  But, the USACE failed to deliver the required surety files by that date.  PX134.  Nevertheless, Meridian agreed to begin "dewatering and mobilization."  PX3-3; DX726-3.

On November 26, 2007, Meridian submitted a Water Diversion Plan for the Project that the USACE approved the next day.  JX51-1–8.  On that date, the USACE also advised Meridian that chromium at the Chula Vista site was "extremely low, less than the soil remediation standards for the State of Arizona, and less than any applicable water standards, except for drinking water."  JX53-1.  Meridian's November 27, 2007 meeting minutes also indicate that the USACE reported that heavy metals were a "non-issue."  JX113-2.

On December 4, 2007, Meridian notified the USACE that it was still waiting for drawings and survey files, and their absence adversely impacted Meridian's ability to perform a site survey and staking.  PX134.  Meridian also informed the USACE that, if the delay continued, it could impact the Project schedule and budget.  PX134.  On December 11, 2007, at a weekly construction meeting with Meridian and the USACE, a representative from Santa Cruz County[3] stated that hazardous substances, including heavy metals and water-borne pathogens, may be present at the site.  JX110-7.  The next day, Meridian submitted a Request for Information ("RFI") (RFI-0008) to the USACE to verify this information.  JX110-7.  On December 14, 2007, the USACE replied, referring to the section of the Contract labeled "Water Quality."  JX110-7.[4]

On December 14, 2007, the USACE exercised "Option 1" to relocate the North Bridge and construct a new ramp.  JX116-2.  Option 1 modified the Contract by adding 120 days to the schedule.  JX116-2.

---

[2] "Staking" consists of construction surveying, where reference points and markers are placed to guide the construction of structures such as roads or buildings.  These markers usually are placed according to a coordinate system selected for the project.  *See* U.S. DEP'T OF AGRIC., NATURAL RES. CONSERVATION SERV., NAT'L ENG'G MANUAL (3d ed., July 2010), at 111.

[3] The Chula Vista site was within Santa Cruz County, Arizona.  JX2.

[4] Section 01355 3.3.4 Water Quality provides:

Within the project area there are water quality issues resulting from the site proximity to the international border with Mexico.  Inadequate sewage collection facilities in Nogales, Sonora may result in the release of raw sewage which can flow across the border via Nogales Wash.  Water sample testing in November 2004 within the active wash bed indicated the presence of fecal coliforms.  Runoff from storms shall be controlled, retarded, and diverted to protected drainage courses by means of diversion ditches, benches, berms, and by any measures required by area wide plans under the Clean Water Act.

JX2-282; *see also* JX110-7 (citing JX2-282).

On December 19, 2007, Meridian submitted two additional RFIs to the USACE: RFI-10, again requesting the electronic version of the Project plans; and RFI-11, noting that the class of pipe listed in the USACE's plans and specifications "is not typically used in a sanitary sewer application." JX110-9–10.

On December 28, 2007, the USACE responded to RFI-10, by informing Meridian that "As-Built" drawings were delivered to Meridian's outbox at the USACE office. JX110-10.[5]   On January 7, 2008, Meridian submitted an Initial Project Schedule to the USACE. JX78-517–31.

On January 8, 2008, Meridian sent Serial Letter H-1 to notify the USACE that "the design condition has and continues to prevent Meridian from reasonably prosecuting the work. . . .  There remain numerous unresolved conditions . . . impacting Meridian's ability to plan the work." PX137.  Serial Letter H-1 reserved Meridian's right to seek a Request for Equitable Adjustment ("REA") for delays and differing site conditions encountered.  PX137.

### B.      On January 9, 2008, Construction Commenced.

From January 9 to 21, 2008, Meridian cleared and grubbed the channel area, assembled the diversion and dewatering system and commenced channel excavation. JX78-517–31. On January 21, 2008, Meridian began to install the diversion and dewatering system.  PX9.

On January 12, 2008, the USACE acknowledged that it provided Meridian with incomplete survey information about site survey criteria, but insisted there were no differing site conditions. PX 138.  Nevertheless, Meridian's REA had to be resubmitted to include an itemized breakdown of costs and schedule impacts.  PX138.  Throughout January 2008, Meridian continued to discuss site survey issues with the USACE during weekly construction meetings. JX114-2; JX115-1.  On January 23, 2008, Meridian submitted RFI-13 regarding fiber optic cables and, on January 31, 2008, Meridian submitted RFI-14 regarding stationing.  JX110-12–13.

On February 1, 2008, Meridian submitted an initial sewer shoring and sheeting plan to the USACE.  DX54-1.  On that same day, Meridian began dewatering and water diversion system construction across the channel.  PX11.[6]   On February 4, 2008, Meridian began subgrade preparation in the Blue Section.  JX78-495.

On February 11, 2008, Meridian began excavation in the Purple Section and installation of 4-inch and 6-inch pumps to dewater the subgrade in the Blue Section in preparation for the

---

[5] December 28, 2007, however, was the "Early Finish" date for starting the diversion system and was the earliest date by which Meridian could examine subsurface flows at the site. JX28-35.  The "Late Finish" date was January 22, 2008.  JX28-35.

[6] The USACE, however, did not approve Meridian's shoring and sheeting plan until March 4, 2008.  DX54-2.

construction of French Drain[7] dewatering system that was scheduled to begin one week later. JX78-483; *see also* Court Exhibit C.  On February 20, 2008, Meridian also prepared the subgrade of the Purple Section, while continuing to prepare the subgrade on the Blue Section.  JX78-467; PX14-16; *see also* Court Exhibit C.  On February 21, 2008, Meridian installed additional dewatering pumps in the Blue Section (JX78-463; PX14–16), but encountered softer-than-anticipated soils during the subgrade preparation in the Purple Section from Station 14+75 to 15+75.  PX16; *see also* Court Exhibit C.  Preparation also continued from Station 15+40 to 16+00.  PX16–17; *see also* Court Exhibit C.  On February 29, 2008, however, boils[8] appeared in the Blue Section from Station 12+50 to 9+00, resulting in slope failure at the channel invert site.  PX20.

On March 3, 2008, Meridian's construction effort continued, as it expanded the French Drain system in the Blue Section and commenced French Drain construction in the concrete area of the Purple Section.  JX78-445.  But, on that date, Meridian also encountered groundwater and the trench boxes at the site reached a depth of approximately fifteen feet.  PX30.  On March 4, 2008, Meridian submitted a shoring and sheeting plan.  JX54.

On March 10, 2008, Meridian sent Serial Letter 7285-6 (H-5) to notify the USACE of the February 29, 2008 slope failure and informed the USACE about the springs, subsurface flows, and clay layers that Meridian contended were differing site conditions.  JX55.  Prior to the weekly meeting on March 11, 2008, Meridian engaged ConformaTech, Inc. ("Conforma") to recover and analyze samples to assess soil properties at the finished subgrade-elevation within the rectangle channel invert area, between stations 14+50 and 15+80.  JX56.  On March 18, 2008, Meridian sent Serial Letter 7285-8 (H-7)[9] to notify the USACE of Conforma's subgrade soil analysis indicating the soil may have presented a stability issue.  JX56.  On March 20, 2008, Meridian excavated the jack and bore pit at Station 283+50.  PX24.

On March 25, 2008, Meridian sent Serial Letter 7285-10 (H-9) to notify the USACE that additional water migrated into the work area and was considered by Meridian to be a differing site condition.  JX57.  On April 1, 2008, the USACE responded that site dewatering was Meridian's responsibility, but that it would issue a RFP for an increase in pipe size. JX159.  On April 3, 2008, Meridian encountered groundwater when the trench boxes were fifteen feet deep.  PX30.

---

[7] A French drain is a trench with a perforated pipe surrounded by porous aggregate that creates an area where water will "find relief and . . . accumulate in, so that it can then be pumped off."  2/21/14 TR at 122 (Payne).

[8] "Boiling is evidenced by an upward water flow into the bottom of the cut.  A high water table is one of the causes of boiling.  Boiling produces a 'quick' condition in the bottom of the cut, and can occur even when shoring or trench boxes are used."  U.S. DEP'T OF LABOR, OCCUPATIONAL SAFETY & HEALTH ADMIN., *OSHA Technical Manual, Section V: Chapter 2.V.F, available at* https://www.osha.gov/dts/osta/otm/otm_v/otm_v_2.html (last visited July 22, 2015).

[9] H-8 is not in the record.

On April 7, 2008, Meridian began post-subgrade preparation of the riprap[10] area of the Blue Section.  JX78-365.  On April 8, 2008, at station 281+46, Manhole 68A, Meridian began to excavate the jack and bore pit.  PX32.  But, groundwater from a nearby stream filled the manhole boxes.  PX32.  On April 9, 2008, Meridian also completed subgrade preparation of the concrete channel in the Purple Section by placing geotextile in the channel invert from station 16+02 to station 14+50.  PX78-359.  On April 14, 2008, the USACE directed Meridian to stop work on the east side of the riprap channel, because of an anticipated RFP to add a reinforced concrete access ramp in the flood control channel.  PX35-2.  On April 15, 2008, Meridian began construction of the channel invert forms between stations 16+02 and 14+50.  JX78-353.  On April 15, 2008, the USACE issued RFP-005, requesting that Meridian provide an estimate for that addition.  JX160.

On April 17, 2008, the USACE issued Modification R3[11] to increase the subdrain pipe diameter from four inches to eight inches.  JX118.  On the same day, Meridian sent Serial Letter 07285-015 (H-18) to the USACE, listing project delays to date and their specific causes, including the delay in receiving the electronic site survey drawings, and submitting a REA for all of these delays.  PX146.  But, the REA was denied, because "a reasonable contractor should have anticipated this rocky condition based on the site visit and analysis of soil logs[.]"  DX100-1.

In response, on April 17, 2008, Meridian stopped using the jack and bore method of the sewer pipe installation, because it encountered "unexpected rock-like soils."  DX102-1.

On April 18, 2008, Meridian submitted a Value Engineering Change Proposal ("VECP")[12] regarding reconstruction of the North Bridge.  JX118.  On April 22, 2008, Meridian placed riprap in the channel invert at station 9+00 in the Blue Section.  PX38.  On April 24, 2008, Meridian began to pour concrete on the bottom of the channel invert from station 16+02 to station 15+42 in the Purple Section.  PX39.  On April 25, 2008, Meridian submitted a proposal to the USACE in response to RFP-005, but noted that the proposed addition of the ramp "had already had" an

---

[10] Riprap, or zone 3 rockfill, is the most common cover material for embankment dams.  Riprap consists of shot rock, rock armor or rubble, and is rock or other material used to armor shorelines, streambeds, bridge abutments, pilings and other shoreline structures against scour and water or ice erosion.  *See* U.S. ARMY CORPS OF ENG'RS, COASTAL ENG'G TECH. NOTE-III-1, RIPRAP REVETMENT DESIGN 1 (1985).

[11] In their briefs, the parties refer to the modifications in many formats, *e.g.*, "R3," R-3," and "R0003."  For consistency and ease of reference, the court has changed all modification references, including those in quotations, to the "R3" format.

[12] *See* 48 C.F.R. § 52.248-3(b) (VECP is "a proposal that—(1) Requires a change to this, the instant contract, to implement; and (2) Results in reducing the contract price or estimated cost without impairing essential functions or characteristics; *provided*, that it does not involve a change—(i) In deliverable end item quantities only; or (ii) To the contract type only.") (emphasis added).  This "contract change requirement can be the addition of the VECP to the contract, with attendant savings.  VECPs are applicable to all contract types, including contracts with performance-based specifications."  OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, CIRCULAR NO. A-131 (REVISED), VALUE ENG'G (2013), at 4.

adverse impact on the project schedule.  PX147.  On April 28, 2008, Meridian began to pour concrete to create channel walls from station 15+42 to station 14+82 in the Purple Section.  PX40.

On May 1, 2008, the USACE sent Meridian Serial Letter C-0013, acknowledging receipt of the April 18, 2008 VECP.  JX50-27.  On May 6, 2008, Meridian submitted, a revised proposal in response to RFP-005, again emphasizing that this addition had already delayed the Project.  JX163.  On May 7, 2008, Meridian poured concrete in the bottom of the channel invert from station 14+82 to station 14+42 in the Purple Section.  PX78-293.  On May 8, 2008, the USACE unilaterally issued Modification R6/AD7, adding the new access ramp detailed in RFP-5, but stating that a "supplemental agreement modification will be issued to definitize the final price and if appropriate, time adjustment."  JX121-2.

On May 9, 2008, however, Meridian sent Serial Letter 7285-025 to notify the USACE that "close to the Union Pacific Railroad rails," Meridian encountered subsurface water flows entering the area from the eastern trench wall between stations 282+58 and 281+46.  DX131-1; DX440-3.  In addition, at station 281+52, where Meridian encountered subsurface water again where the Union Pacific railroad tracks had settled into the ground, so that Meridian ceased jack and bore excavation.  PX45.  Meridian's May 9, 2008 Daily Report also notes that the earthwork crew could not proceed with work until the USACE definitized the new access ramp subject to Modification R6/AD7.  PX45.

On May 14, 2008, the USACE issued RFP-8, requesting proposals for a soil investigation between stations 277+17 and 282+30.  JX165-1.  On May 15, 2008, the USACE issued unilateral, undefinitized Modification R7/AD10 authorizing Meridian to conduct soil investigations discussed in RFP-8.  JX122.  Thereafter, Meridian engaged a geotechnical engineering firm, Kleinfelder West, Inc. ("Kleinfelder"), to conduct this investigation.  JX122; DX175-4.  On that same day, the USACE sent Meridian Serial Letter C-16, acknowledging that the delays noted in Meridian's April 17, 2008 Serial Letter H-18 were justified.  JX166.  Thereafter, Meridian and the USACE negotiated the terms of a definitized modification.[13]  JX121.  On May 30, 2008, Meridian submitted a revised proposed cost and schedule, including the May 8, 2008 access ramp modification, R6/AD7.  PX389-18–19.  This revision increased the Contract price by $89,776.14 and extended performance by twelve calendar days.  PX389-18–19.  On May 30, 2008, Kleinfelder completed a geotechnical subsurface soil investigation at the sewer excavation site and issued a draft report to Meridian that identified the locations and depths of groundwater at the site.  DX175-10–11, 16.

On June 3, 2008, Meridian and the USACE convened a conference call to discuss options to manage the soft subsurface soil conditions near the sewer line, pursuant to Task 3 of the May

---

[13] "The term 'undefinitized contractual action' means a new procurement action entered into by the head of an agency for which the contractual terms, specifications, or price are not agreed upon before performance is begun under the action."  10 U.S.C. § 2326(g)(1).  Examples include: letter contracts; orders under basic ordering agreements; and provisioned item orders, for which the price has not been agreed upon before performance has begun.  *See* DEF. FED. ACQUISITION REG. SUPP., SUBPART 217.7401, UNDEFINITIZED CONTRACT ACTIONS (1998).

15, 2008 Modification R7/AD10 (authorizing Meridian to conduct a soil investigation).  DX174-2; DX176-1.

On June 4, 2008, the USACE sent Meridian Serial Letter C-19, providing comments on the VECP.  JX50-29.

On June 5, 2008, Meridian and the USACE executed bilateral Modification R8/AD7-1 that definitized R6/AD7.  JX123; PX389; DX183-3–4.  This Modification deleted work on a new access ramp, increased the Contract price by $89,776, extended the schedule by twelve calendar days, but included the following release:

> [T]he contract price is increased as indicated above, which reflects all credits due the Government and all debts due the Contractor.  It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the Contractor . . . for all costs and markups directly or indirectly attributable for the change ordered, for all delays related thereto, for all extended overhead costs, and for performance of the change within the time frame stated.[14]

JX123; PX389; DX183-3–4.  The USACE also issued a RFP for two methods to remediate saturated soil at the sewer line, including one utilizing two rows of sheet piling.  DX184-1–2.  On June 5, 2008, Meridian commenced installing the sewer line at station 287+96.  PX52.

On June 10, 2008, Meridian submitted a proposal in response to the June 5, 2008 RFP to remediate saturated soils, including a $1.44 million sheet piling option.  DX195-1–3.

From June 18–20, 2008, Meridian excavated the concrete section of the channel from station 16+02 to 17+22, in the Lime Green Section, pursuant to Option 1, that the USACE exercised.  JX78-178–87.  On June 20, 2008, the USACE issued Modification R10/AD11, in response to Meridian's proposal to remediate saturated soil in the area of the sewer line.  JX125; DX666-6–7.  Although Modification R10 was not definitized, it directed Meridian to execute the two-sheet piling proposal between stations 279+00 and 282+00, and increased the Contract price by $937,009.  JX125; DX666-6–7.

On June 24, 2008, Meridian completed riprap work in the Blue Section.  JX78-167–69.  On June 26, 2008, Meridian began subgrade preparation of the concrete section from stations of 16+02 to 16+97 in the Lime Green Section, pursuant to Option 1.  JX78-161.[15]

On June 27, 2008, the USACE issued bilateral Modification R9/AD10-1 to definitize the May 15, 2008 Modification R7.  JX124-2.  Modification R9 increased the Contract price by $23,107 to complete a soil analysis and prepare a workplan to address the saturated condition of

---

[14] Identical release language was used in most bilateral modifications.

[15] June 26, 2008 was the original date that of the channel invert work was to be completed.  JX28-52.

the subsurface, but also included a mutual release of liability. JX124-2. On that same day, another flood event occurred at the work site. PX53.

### C.   In July 2008, The "Monsoon Season" Began.[16]

On July 3, 2008, Meridian poured new concrete in the channel bottom of the Purple Section. PX54. From July 6 to 11, 2008 and on July 14, 2008, the site experienced flooding. PX56–61.

On July 10, 2008, Kleinfelder completed a geotechnical assessment and issued a report on the soil in the sewer line area. PX209; DX210-5.

On July 14, 2008, the USACE executed bilateral Modification R11/AD12 by increasing the Contract price by $24,216 and extending the time for performance by three calendar days to allow additional geotechnical testing to be conducted at the North Bridge area, per the April 18, 2008 VECP. JX126.

On July 21, 2008, Meridian began to install the two-sheet pile wall and, on July 29, 2008, Meridian began pouring concrete at the right channel wall between stations 14+42 and 14+82 of the Purple Section. JX78-90–91, 107.

Between August 3 and September 26, 2008, the worksite experienced forty-seven days of flooding out of fifty-four. PX62–102. This slowed construction efforts at station 282+15, where the sewer excavation was ongoing. PX85–91.

On August 11, 2008, Kleinfelder performed another soil analysis and released a report, pursuant to Modification R11. JX167.

On August 12, 2008, Meridian requested additional funds to pay Giken, Ltd. ("Giken") to remove boulders that were slowing construction, but the USACE denied this request, because the existence of boulders was considered a known condition. DX228-1; 1/30/14 TR 1178 (Martinez). In response, Giken abandoned the installation of sheet wall after installing only one row. DX228-1; 1/30/14 TR 1178 (Martinez).

On August 13, 2008, the USACE and Meridian discussed the costs associated with Modification R10 concerning the installation of the two-sheet piling. PX212. On August 20, 2008, installation of the sheet pile wall was terminated. PX73.

From late August 2008 to early September 2008, Meridian encountered soil conditions that matched the USACE's specifications and made progress, despite additional weather interruptions. JX78-1–76; JX79-362–77; PX78–81. On September 4, 2008, the USACE and Meridian executed

---

[16] Monsoons are a common occurrence at the project site during the summer months. *See* 1/27/14 TR 231 (Sutton) (Q: "Mr. Sutton, the monsoon season is from the middle of June until the last half of September, correct?"  A: "Typically, from the 4th of July.").

bilateral Modification R12/AD14 extending the Contract by nine calendar days to account for weather delays in July 2008, but also included a mutual release of liability. JX127-2.

On September 9, 2008, the USACE issued Modification R16/AD11-1 to address saturated soil conditions. JX131-1–3. Modification R16 definitized Modification R10 (authorizing the installation of the two-sheet pile pipe), by deleting one of the two required rows and reducing Meridian's total compensation for Modification R10 from the original proposed price of $1,440,000 to $1,128,729. JX131-1–3. Modification R16 also extended the Contract by twenty calendar days, but included a mutual release of liability. JX131-1–3. The next day, at the USACE's suggestion, Meridian also poured concrete at the bottom of the excavation to stabilize the sewer pipe foundation. PX89. This effort, however, was unsuccessful.

On September 11, 2008, the USACE acknowledged that Meridian experienced unexpected groundwater. PX89; PX90-1. On September 12, 2008, Meridian and the USACE met to discuss solutions to the saturated soil conditions in the sewer excavation area. 3/25/14 TR 1841–42 (Chickey). During that discussion, a USACE geotechnical engineer, Stephen Chickey recommended that Meridian's Project Manager, Mark Branson, and Quality Control Manager, David Maximoff, excavate below the sewer pipe and reinforce the subsurface with a woven geotextile fabric and gravel. 3/26/14 TR 1883 (Chickey); DX651-128 (whiteboard photograph).

On September 12, 2008, the USACE issued bilateral modification R13/AD16 to address delays experienced by Meridian in May and June 2008, extended the schedule by four calendar days, but included a mutual release of liability. JX128-2. On September 15, 2008, the USACE released bilateral modification R17/AD13 to address additional costs and delays "directly or indirectly attributable" to flawed survey data. JX132-2. Modification R17 specifically increased the Contract price by $108,377, extended the schedule by sixty calendar days, and again contained a mutual release of liability. JX132-2.

On September 19, 2008, Meridian began implementing the design that Mr. Chickey recommended on September 12, 2008. PX96; PX213–14. On September 22, 2008, the USACE issued the Koplin Recommendation Memorandum ("Koplin Memorandum") that formalized Mr. Chickey's September 12, 2008 recommendations. PX214; DX263-1–3. The USACE also executed bilateral Modification R15/AD17 to account for weather delays in August, extended the contract schedule by twelve calendar days, and included a mutual release of liability. JX130-1–2.

On September 23, 2008, Messrs. Chickey, Branson, and Maximoff met to discuss implementation of the Koplin Memorandum and progress at the worksite. DX440-107; DX255-1; PX100; PX216; 1/28/14 TR 394–96 (Branson). Messrs. Branson and Maximoff understood the Koplin Memorandum to permit the sewer construction to proceed in wet soil, but Mr. Chickey stated that the trench had to be dewatered. DX440-107; DX255-1; PX100; PX216; 1/28/14 TR 394–96 (Branson). Mr. Chickey provided more explicit guidance on the materials recommended, and Mr. Maximoff took notes reflecting his understanding that the "trench [was] to be completely dewatered." DX440-107; DX255-1; PX100; PX216; 1/28/14 TR 394–96 (Branson).

On September 24, 2008, Meridian began installing sections of the sewer pipe between Manholes 68A1 and 68A, without dewatering the trench. JX79-305, 309, 313, 317, 321 (Quality

Control Reports for September 24–30, 2008).  Although Meridian Quality Control Reports indicated that the water in the trench was slightly above the top of the sewer pipe, it reflected that the installation was proceeding in compliance with the Koplin Memorandum.  JX79-305, 309, 313, 317, 321 (Quality Control Reports for September 24–30, 2008); DX651-127; 1/29/14 TR 757 (Maximoff); 3/26/14 TR 1883–88 (Chickey).

On September 24 and 25, 2008, the USACE executed bilateral Modifications R18/AD18 and R19/AD19.  JX133-1–2; JX134-1–2.  Modification R18 provided an additional $578,009 for revisions to the North Bridge design, extended the schedule by twenty-seven calendar days, and included a mutual release of liability.  JX133-1–2.  Modification R19 added seventy-five linear feet of channel invert and wall to the base bid, added $1,198,500, extended the schedule by ninety calendar days, and included a mutual release of liability.  JX134-1–2.

On September 26, 2008, flood water at the worksite began to recede, but progress was delayed through October 3, 2008 "due to the ground conditions caused by the recent flooding." PX105; *see also* PX106–108.

On October 3, 2008, Meridian determined that subsurface water caused the misinstallation of several runs of sewer pipe, requiring Meridian to "rework the affected areas."  JX79-294 (October 3, 2008 Quality Control Report).  On October 12, 2008, the worksite experienced another flood event.  PX112.

On October 15, 2008, Meridian completed pouring concrete in the channel walls and invert in the Purple Section.  PX114.  On October 20, 2008, Meridian completed the reinstallation of the reinforced concrete pipe between stations 281+46 and 281+52.  PX115.  On that same day, Meridian began installation of the geotextile and filter rock between stations 16+02 and 16+77 and completed the subgrade preparation of the Lime Green section, as required by Option 1.  PX115. Meridian also commenced installation of ductile iron pipe at station 281+40.  PX115.  On October 27, 2008, Meridian began pouring concrete in the channel bottom of the concrete area in the Lime Green Section, as required by Option 1.  JX79-208–21.

### D.   In October 2008, Structural Failures Impacted The Union Pacific Railroad Track And Construction Was Suspended.

On October 28, 2008, the sheet pile wall that Meridian installed at station 281+25, near the trestle bridge of the Union Pacific Railroad ("UPRR"), was "showing signs of settlement," *i.e.*, bending.  PX119; DX282-2 (USACE email).  The UPRR attributed this to Meridian's construction. DX282-2 (USACE email); DX291-2 (letter from law firm representing UPRR); DX277-1 (UPRR handwritten order).  Accordingly, the UPRR requested that Meridian cease work in the area and submit a new plan.  DX282-2; DX291-2; DX277-1.

On November 1, 2008, Meridian finished pouring concrete on the eastern half of the channel invert, between stations 16+20 and 16+97 in the Lime Green Section, as required by Option 1.  PX120-1–3.  From November 4–7, 2008, Meridian poured concrete in the channel walls of the Lime Green Section between stations 16+02 and 16+97, as required by Option 1.  JX79-177–94.

14

On November 7, 2008, to address the problem near UPRR's tracks, Meridian submitted a new shoring plan to the USACE and the UPRR that involved sliding shoring boxes into place with an excavator, while another excavator simultaneously added backfill for support. DX297-11–13. On November 14, 2008, however, the USACE became aware that Meridian was not complying with the new shoring plan and requested that Meridian submit a revised shoring plan. 3/24/14 TR 1241 (Martinez); DX304-1; DX301-2–3. Thereafter, Meridian submitted Addendum 1 to the November 7, 2008 shoring plan, acknowledging deviations from the original plan, because of the "sloughing of the adjacent soils," and proposed a new shoring box installation procedure. 3/24/14 TR 1241 (Martinez); DX304-1; DX301-2–3. During this time, Meridian continued to place concrete in the right channel walls of the Lime Green Section. JX79-118–158.

On November 17, 2008, the USACE determined that Meridian also was not adhering to the revised shoring plan submitted in Addendum 1 and ordered the suspension of work and submission of a new remedial action plan. 3/26/14 TR 1878–80 (Chickey); DX390-1–2. On November 25, 2008, Meridian acknowledged that the site workers did not follow the plan outlined in Addendum 1, but restated Meridian's confidence that the Addendum 1 plan would be successful, if followed. DX324-2–4.

On November 26, 2008, Meridian resumed installation of the sewer line, but its efforts again were hindered by a flood. PX123. In November and early December 2008, Meridian continued construction by placing concrete in the walls of the Lime Green Section, as required by Option 1. JX79-118–58.

On December 12, 2008, Meridian notified the USACE of movement, leakage, and cracks in the sewer pipe between stations 281+46 and 282+10, at Manhole 68A, that Meridian attempted to fix by injecting polyurethane grout outside of the pipe. DX331-1. On December 15, 2008, Meridian and the USACE issued quality control reports. DX333-1; DX334-1. Meridian's Quality Control Report indicated that the USACE Quality Assurance representative approved Meridian's sewer line construction between Manhole 68B and 68C; but the USACE's Quality Control report disagreed, reflecting that Meridian's "[Quality Control] report states that [it] did not have a problem in the above are[a,] which is wrong." DX333-1; DX334-1. On December 18, 2008, the USACE sent Meridian Serial Letter C-25, suspending all construction work in the area of the sewer line location. JX171-1. On that same day, Meridian sent the USACE Serial Letter 7285-56, with revisions to the VECP, consistent with the August 11, 2008 Kleinfelder soil analysis. JX50-234. On December 18–19, 2008, another flood event occurred. PX127; PX128.

On January 16, 2009, the USACE and Meridian jointly inspected the sewer pipe with the manufacturer, Hanson Pipe ("Hanson"). DX358-1–2. Hanson determined that the pipe between Manhole 68A and 68A-1 was misaligned, causing separations at the joints. DX358-1–2. Hanson also noted that the class of pipe installed was incorrect for the volume of fill that covered the pipe. DX358-1–2. On January 23, 2009, the Arizona Department of Environmental Quality ("ADEQ") recommended that the USACE consult with a local engineer familiar with local soil conditions to ensure that the proper type of pipe was used. PX361. As a result, the USACE's Project Manager acknowledged a design error in the pipe and advised his staff to keep ADEQ informed of potential solutions. PX361.

From January 20–27, 2009, Meridian continued other construction work, pouring concrete in the Purple Section and grouting the transition portion of the riprap areas in the Blue Section. PX129–30; *see also* Court Exhibit C.  But, on January 27, 2009, the USACE sent Serial Letter C-33, directing Meridian to suspend work on the Project and determine if the sewer pipe that had been laid could be salvaged.  JX172-1.  On January 28, 2009, Meridian encountered soft soils at Station 277+44.  JX80-130.  On January 30, 2009, Meridian completed the riprap grouting at Station 12+50.  PX130.

On February 3, 2009, the USACE issued unilateral Modification R21/AD21, directing Meridian to drill additional geotechnical borings, compensating Meridian an additional $23,572, extending the schedule by fourteen calendar days, and including a mutual release.  JX136-1–2.  On that same day, the USACE began a "Punchlist," citing three deficiencies in Meridian's work.  JX49-7.[17]

On February 5, 2009, the USACE denied Meridian's payment request #13 for $397,531.70, but instead paid only $89,256.82, citing the improper installation of the sewer pipe and open items on the Punchlist.  DX378-1.  Meridian accepted that payment, and signed a mutual release.  DX378-1.

On February 9, 2009, the USACE sent Meridian RFP-15, requesting a proposal for site suspension and demobilization.  JX162.  RFP-15 specified that the proposal must continue dewatering efforts and include a minimum staff of eight for safety and security.  JX162.

On February 10 and 12, 2009, Meridian sent Serial Letters 7285-63 and 7285-64 to the USACE.  JX50-264; JX173.  Serial Letter 7285-63 provided the USACE with a revision to the North Bridge culvert designs.  JX50-264.  Serial Letter 7285-64 responded to RFP-15, requesting proposals for suspension and demobilization.  JX173.  On February 24, 2009, in response to Serial Letter 07285-64, the USACE issued undefinitized and unilateral Modification R22 increasing the Contract amount by $169,315.52 for the suspension directed in the USACE's January 27, 2009 Serial Letter C-33 and included a unilateral release.  JX137.

---

[17] A "Punchlist" is a term used in the Unified Facilities Guide Specifications ("UFGS"), Quality Control § 01 45 00.00 20 (Nov. 2011), *available at* http://www.wbdg.org/ccb/DOD/ UFGS/UFGS%20COMPLETE.pdf (last visited July 22, 2015).  A Punchlist entails three inspections (the "Punch-Out Inspection," as specified in UFGS-1 § 1.14.1.  The first identifies work that must be completed or redone prior to the commencement of the second inspection.  The second inspection is the "Pre-Final" Inspection," as specified in UFGS-1, § 1-14.2.  The third is a "Pre-Final Punchlist" and provides items to be completed or redone prior to the "Final Acceptance Inspection" (defined in UFGS-1, § 1.14.3).  *See* UFGS-1 §§ 1-14.1–1-14.3.  Unresolved items not addressed by the third inspection are the contractor's responsibility.  *See* UFGS-1 § 1-14.3.

### E.    In March 2009, The United States Army Corps Of Engineers Began To Scale Back The Chula Vista Project.

On March 13, 2009, the USACE unilaterally issued modification R20, extending the schedule by five calendar days, because of weather delays experienced during the last four months of 2008.[18]  JX135-1–2.

On March 19, 2009, AMEC Geomatrix Consultants, Inc. ("AMEC"), an architect-engineering corporation that the USACE hired, issued a draft report on the status of the sewer pipe construction.  DX427-1.  On March 24, 2009, the USACE lifted the construction suspension via Serial Letter C-46.  JX174.  On that same day, the USACE issued unilateral Modification R23/AD24/AD25 that added channel backfilling tasks, deleted seventy-five feet of channel added by Modification R19, shortened the schedule by ninety days, and deducted $590,947 from the Contract price.  JX138; DX672-4.

In March 2009, the USACE discovered overpayments made to Meridian, so on April 22, 2009, the USACE's Project Manager began to reduce Meridian's work percentages, reflected in USACE's Resident Management System ("RMS").[19]  3/24/14 TR 1276 (Martinez).  The USACE tried to "issue a new pay estimate," but "the RMS system won't let you do that."  3/24/14 TR 1276 (Martinez).  Thus, the USACE changed the "percentages complete" within pay estimate number 15 instead of reissuing a new pay estimate.  3/24/14 TR 1276 (Martinez).

From March 26, 2009 to April 16, 2009, the USACE added nine items to the Punchlist.  JX49-8–9.  On March 31, 2009, the USACE sent Meridian RFP-21, requesting a cost estimate for interim protection work.  JX176.

On April 10, 2009, Meridian sent Serial Letter 7285-91 to the USACE, requesting compensation for several quantity overruns.  PX226.  On April 15, 2009, Meridian responded to RFP-21 in Serial Letter 7285-97 (H-87), including an estimated cost proposal.  JX178.

On April 22, 2009, the USACE issued unilateral Modification R25/AD27/AD28 adding $1,141,225 to the Contract for the interim protection plan, proposed by Meridian in Serial Letter 7285-97.  JX140-1–3.  Modification R25 also eliminated unfinished work that was part of Option 1, resulting in a net reduction of $2,929,000.73 from the September 21, 2007 Contract price of $5,783,188.00.  JX140-1–3.

On April 28, 2009, the USACE informed Meridian that the VECP would not proceed because of the Project suspension.  DX468-2–3.  Meridian requested compensation for the VECP

---

[18] Unlike the other bilateral weather-delay contract extensions, Meridian did not execute Modification R20, resulting in unilateral release.  JX135-1–2.

[19] RMS is part of a suite of computer programs that the USACE uses to facilitate quality management and contract administration and provides a USACE-approved method to plan, schedule, and control all aspects of construction.  *See* Resident Mgmt. Sys., U.S. Army Corps of Eng'rs, *available at* http://rms.usace.army.mil (last visited July 22, 2015).

design, which the USACE did not approve, stating that it was Meridian's responsibility and not part of the Contract.  DX468-2–3.

On May 1, 2009, Meridian sent the USACE Serial Letter 7285-102 (H-94) to update its response to the March 31, 2009 RFP-21 and to provide a cost estimate proposal for interim protection work.  PX230.

On May 6, 2009, Meridian sent the USACE Serial Letter 7285-105 (H-96) that: included payment request #15; informed the USACE that current modifications were insufficient to address Meridian's costs; and stated that funding was missing from the RMS for modifications specified in Modification R25 (backfill channel between 18+40 and 22+00) and Modification R27 (interim protection plan).  JX180.  Specifically, payment request #15 stated that 92% of the work was completed and demanded payment of $959,942.72.  DX484-9.

On May 11, 2009, the USACE issued unilateral Modification R28, reducing the payment for interim protection work from $1,141,225 to $516,516.64.  JX143.  On May 12, 2009, Meridian sent the USACE Serial Letter 7285-106 providing the USACE with an estimate of suspension costs.  PX231.  On May 13, 2009, the USACE rejected Meridian's May 6, 2009 request, but set a meeting at the worksite on May 18, 2009 to establish the final "credits and debits."  DX482-1.

Meridian and the USACE, however, failed to agree on payment request #15, and on June 2, 2009, the USACE unilaterally issued pay estimate #15 acknowledging 94% completion and paying Meridian an additional $640,146.52.  DX628-1.  The USACE, however, continued to identify Punch-out Inspection and the Pre-Final Inspection deficiencies, resulting in thirty-eight items being added to the Punchlist between the end of April 2009 and the end of July 2009.  JX49-9–12; DX612-6–7.

On June 5, 2009, AMEC released its final report evaluating the sewer pipeline that Meridian installed prior to the suspension.  JX52; JX194-3.  On June 8, 2009, the USACE and Meridian conducted a pre-final inspection of the Chula Vista Project.  DX612-6–7.

On July 30, 2009, the USACE issued Modifications R30 and R31.  JX145; JX146. Modification R30 unilaterally definitized R23, without materially altering its provisions, and added $6,466 to the Contract price.  JX145.  Modification R31 also definitized R22 (*i.e.*, the request for a suspension and demobilization proposal), added $476,630 to the Contract and extended the schedule by seventy-two calendar days, but included a mutual release.  JX146.

On July 31, 2009, Meridian sent Serial Letter 7285-128 (H-116) to the USACE with invoices for Modifications R22, R25, and R30, in addition to new estimates for work to be completed.  JX183.  On August 3, 2009, no agreement was reached on a definitization price, so the USACE unilaterally issued Modification R29 that definitized R25 (the interim protection proposal), and reduced the Contract price by $549,133.27.  JX144-2.  On August 11, 2009, another definitization agreement failed, and the USACE unilaterally issued Modification R32, definitizing R21 (requesting geotechnical test borings), and increasing the Contract by $1,734.  JX147-1–2.

On August 24, 2009, Meridian submitted a final $767,597.73 payment request (#16). DX572-207; 3/24/14 TR 1284 (Martinez). Meridian, however, did not confer with the USACE about the final closeout payment request. DX572-207, 3/24/14 TR 1284 (Martinez). On September 2, 2009, the USACE internally circulated a draft modification R33/AD33 for "flood event damage and subsurface water." PX377.

On September 10, 2009, the USACE sent Meridian Serial Letters C-81, C-82 and C-83, in which the USACE specified that the unilateral definitizations contained in Modifications R29, R30, and R31 did not preclude continuing negotiations to achieve a mutually agreed-upon definitization price. JX185–87.

On September 15, 2009, the USACE performed a third and final inspection ("Final Acceptance Inspection") of the Project site and issued a final Punchlist, including twenty-four deficiencies. JX49-12–14; DX612-7–9. On October 26, 2009, the USACE conducted an after-action review. PX7.

On April 2, 2010, Meridian submitted a consolidated REA to the USACE. JX177-1. On May 20, 2010, the USACE acknowledged receipt of the REA and indicated that it planned to make a decision on the REA by November 30, 2010. JX189-1.

No response was forthcoming, so Meridian converted the April 2, 2010 REA to a certified claim during the first week of January 2011. JX33.

On June 23, 2011, the USACE informed Meridian that only $746,577.23 was available to pay for the undisputed work and invited Meridian to submit a revised payment request. PX237. On July 14, 2011, Meridian submitted a revised payment request #16 for the full amount available: $746,577.23. JX190. The record does not indicate whether Meridian ever was paid this amount.

## II.   PROCEDURAL HISTORY.

On July 29, 2011, Meridian filed a Complaint in the United States Court of Federal Claims that was assigned to the Honorable Judge Christine O.C. Miller, alleging a breach of contract and requesting damages for: Health Hazards (Count 1); Unstable Soils and Excessive Subsurface Water (Count 2); Railroad Right of Way Delay (Count 3); Flood Events (Count 4); Sewer Relocation (Count 5); Unpaid Contract Quantities (Count 6); Suspension of Work (Count 7); Channel Fill (Count 8); Interim Protection (Count 9); Punch List (Count 10); North Bridge VECP (Count 11); and REA Preparation (Count 12). Compl. ¶ 324. On November 14, 2011, the Government filed an Answer. On January 5, 2012, the parties filed a Joint Preliminary Status Report. On January 6, 2012, the court adopted the parties' proposed discovery schedule.

On May 8, 2012, Meridian submitted a Motion For Partial Summary Judgment, arguing that it was entitled to $1,060,353.68 from unilateral modifications R25/28, R30, and R31. On May 15, 2012, Meridian filed a Motion To Amend its May 8, 2012 Motion For Partial Summary Judgment that the court granted on May 16, 2012. On June 8, 2012, the Government filed a Response. On June 25, 2012, Meridian filed a Reply. On September 27, 2012, Meridian's Motion For Partial Summary Judgment was denied.

On December 31, 2012, Meridian submitted a second Motion For Summary Judgment.  On February 15, 2013, the Government filed a Response.  On March 4, 2013, Meridian filed a Reply.

On January 28, 2013, the case was reassigned to the undersigned judge.

On September 9, 2013, the Government submitted a Proposed Pretrial Order.  On September 11, 2013, Meridian submitted a Proposed Pretrial Order, and on September 30, 2013, submitted a second Proposed Pretrial Order.

On January 20, 2014, the parties submitted proposed findings of fact and conclusions of law, witness lists, and exhibits lists.  On January 20, 2014, the Government submitted a Motion In Limine to exclude evidence of Meridian's financial records that were not produced in discovery.  On January 23, 2014, Meridian filed a Response to the Government's January 20, 2014 Motion In Limine.[20]

From January 27–30, 2014, trial was held in Tucson, Arizona.

On March 20, 2014, Meridian filed an Amended Complaint ("Am. Compl.").

On March 27–30, 2014, trial continued in Washington, D.C.  On April 28, 2014, a hearing on supplemental expert testimony was held in Washington, D.C.

On May 19, 2014, Plaintiff filed a Second Amended Complaint ("2nd Am. Compl.") that included new breach of contract claim and a claim for the breach of the duty of good faith and fair dealing.  Meridian also adjusted its total claim from $7,644,292.05 to $6,432,856.29.  On June 10, 2014, the Government filed an Answer.

On July 18, 2014, Meridian filed a Post-Trial Brief ("Pl. 7/18/14 Br.").  On September 18, 2014, the Government filed a Post-Trial Brief ("Gov't 9/18/14 Br.").  On October 3, 2014, Meridian filed Post-Trial Reply ("Pl. 10/3/14 Reply").  On December 9, 2014, the Government filed a Proposed Chronology ("Gov't Chron.").

## III.   DISCUSSION.

### A.   Jurisdiction.

The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."   28 U.S.C. § 1491(a)(1) (2006).  The Tucker Act, however, is "'only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages.'" *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (quoting *United States v. Testan*, 424 U.S.

---

[20] The Government's January 20, 2014 Motion In Limine is denied.

392, 398 (1976)).  Therefore, to satisfy the jurisdictional requirements of the Tucker Act, a plaintiff must identify and plead a constitutional provision, federal statute, independent contractual relationship, and/or executive agency regulation that provides a substantive right to money damages.  *See Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act itself."); *see also Roth v. United States*, 378 F.3d 1371, 1384 (Fed. Cir. 2004) ("Because the Tucker Act itself does not provide a substantive cause of action . . . a plaintiff must find elsewhere a money-mandating source upon which to base a suit.").

In this case, Meridian entered into Contract No. W912PL-07-C-0025 with USACE for the Project, and the May 19, 2014 Second Amended Complaint alleges that the USACE breached the Contract.  JX193-1.  Since the Second Amended Complaint alleges a contractual relationship with the Government and a breach of the implied duty of good faith and fair dealing, the court has jurisdiction to adjudicate Meridian's claims.

## B.    Contract Disputes Act.

If a plaintiff meets the jurisdictional requirements of the Tucker Act, the plaintiff also must satisfy compliance with the mandatory requirements of the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 601–613 (2006).[21]

To assert a claim under the CDA, a plaintiff must submit a written and certified claim to the Contracting Officer ("CO") and obtain a final decision on that claim.  *See M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010) (holding that the CDA "requires both a valid claim and a [CO's] final decision on that claim").  Although the CDA does not define the term "claim," the United States Court of Appeals for the Federal Circuit has defined a "claim" as a "written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain[.]"  *England v. Swanson Grp., Inc.*, 353 F.3d 1375, 1379 (Fed. Cir. 2004).

For claims over $100,000, Congress also requires that:

the contractor . . . certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the

---

[21] On January 4, 2011, Congress amended certain provisions of the CDA and recodified the Act at 41 U.S.C. §§ 7101–7109.  *See* Public Contracts Act of Jan. 4, 2011, Pub. L. No. 111-350, § 3, 124 Stat. 3677, 3816–26.  Although the Public Contracts Act repealed 41 U.S.C. §§ 601–613, any "rights and duties that matured, penalties that were incurred, and proceedings that were begun before the date of enactment of this Act" are still governed by these sections of the United States Code.  Pub. L. No. 111-350, § 7(b), 124 Stat. at 3855.

> contractor believes the [G]overnment is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor.

41 U.S.C. § 605(c)(1).  In addition, for claims over $100,000, a failure to "issue a decision" or "notify the contractor of the time within which a decision will be issued" within sixty days of receipt of the claim is "deemed to be a decision by the [CO] denying the claim[.]"  41 U.S.C. § 605(c)(2), (5).

On September 21, 2007, Meridian entered into Contract No. W912PL-07-C-0025 with the USACE for the Project.  JX193-1.  On April 2, 2010, Meridian submitted a consolidated REA to the USACE's CO, listing fourteen claims.  JX177-1.  On May 20, 2010, the USACE acknowledged receipt and responded that it would issue a decision by November 30, 2010.  JX189-1.  On January 7, 2011, Meridian filed a "Claim Overview" letter restating identical claims as the April 2, 2010 REA.  JX33.

Between January and June 2011, Meridian and the USACE engaged in discussions to resolve their dispute.  1/29/14 TR 862–65 (Haworth).  On June 23, 2011, the USACE issued a letter stating, "$746,577.23 remains available to pay for undisputed amounts for work that has been performed and that was required by the Contract," and invited Meridian to "submit another pay request if it so chooses."  PX237.  On July 14, 2011, Meridian submitted a "pay request," but the USACE's response was not forthcoming.  JX190; 1/29/14 TR 862–65 (Haworth).

On July 29, 2011 Complaint, "a 'deemed denial' appeal was taken . . . through the filing of the instant action in the United States Court of Federal Claims."  Pl. 7/18/14 Br. at 56.  As such, Meridian appears to invoke 41 U.S.C. § 605(c), providing that, for claims over $100,000, failure to "issue a decision" or "notify the contractor of the time within which a decision will be issued," *i.e.*, within sixty days of receipt of the claim, is "deemed to be a decision by the [CO] denying the claim[.]"  41 U.S.C. § 605(c)(2), (5).

None of Meridian's April 2, 2010, January 7, 2011, or July 14, 2011 communications with the USACE complied with 41 U.S.C. § 7103(b)(1)[22] or 48 C.F.R. § 33.207(c).[23]  JX33-18[24]; JX 177-1; JX190.  The United States Court of Appeals for the Federal Circuit, however, has held that "exact recitation of section 605(c) [predecessor to section 7103(b)(1)] is not required[, and instead, that] . . . . 'substantial compliance' suffices."  *Fischbach & Moore Int'l Corp. v. Christopher*, 987 F.2d 759, 763 (Fed. Cir. 1993) (quoting *United States v. Gen. Elec. Corp.*, 727 F.2d 1567, 1569 (Fed. Cir. 1984)); *see also Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed Cir. 1987) ("All that is required is that the contractor submit in writing to the [CO] a clear and unequivocal statement that gives the [CO] notice of the basis . . . of the claim.").

For these reasons, the court has determined that Meridian's claim was deemed denied on March 7, 2011 and that the jurisdictional requirements of the CDA have been satisfied.  *See Sikorsky Aircraft Corp. v. United States*, 773 F.3d 1315, 1322 (Fed. Cir. 2014).

## C.    Standing.

The United States Supreme Court has held that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  Standing must be determined "as of the commencement of suit."  *Rothe Dev. Corp. v. Dep't of Def.*, 413 F.3d 1327, 1334 (Fed. Cir. 2005) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n.5 (1992)).  The party invoking federal jurisdiction bears the burden of establishing standing. *See Lujan*, 504 U.S. at 560–61.  Specifically,

---

[22] Section 7103(b)(1), in relevant part, provides:

For claims or more than $100,000 made by a contractor, the contractor *shall* certify that—(A) the claim is made in good faith; (B) the supporting data are accurate and complete to the best of the contractor's knowledge and belief; (C) the amount requested accurately reflects the contract adjustment for which the contractor believes the Federal Government is liable; and (D) the certifier is authorized to certify the claim on behalf of the contractor.

41 U.S.C. § 7103(b)(1) (emphasis added).

[23] FAR 33.207, in relevant part, provides that "[t]he certification *shall* state as follows":

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

48 C.F.R. § 33.207(c) (emphasis added).

[24] Plaintiff states that this certification is from DFAR § 252.203-7002, but that regulation concerns informing employees about their whistleblower rights.

"a plaintiff must show [that] it has suffered an 'injury in fact' that is . . . concrete and particularized and . . . actual or imminent, not conjectural or hypothetical; . . . the injury is fairly traceable to the challenged action of the defendant; and . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 180–81 (2000) (internal citations omitted).

The May 19, 2014 Second Amended Complaint alleges that Meridian suffered monetary injury that is concrete, particularized, and fairly traceable to the USACE's actions. Any financial injury established by the Meridian also can be redressed by a monetary award. For these reasons, the court has determined that Meridian has standing to seek adjudication of the claims in the May 19, 2014 Second Amended Complaint.

## D.    Standard Of Review.

"A breach of contract claim requires two components: (1) an obligation or duty arising out of the contract and (2) factual allegations sufficient to support the conclusion that there has been a breach of the identified contractual duty." *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014) (citing *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989) ("To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach.")).

In addition, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981) ("RESTATEMENT"). "Failure to fulfill that duty constitutes a breach of contract, as does failure to fulfill a duty 'imposed by a promise stated in the agreement.'" *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014) (quoting RESTATEMENT § 235). "Both the duty not to hinder and the duty to cooperate are aspects of the implied duty of good faith and fair dealing." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 820 n.1 (Fed. Cir. 2010); *see also Metcalf*, 742 F.3d at 991 ("[W]hile the implied duty exists because it is rarely possible to anticipate in contract language every possible action or omission by a party that undermines the bargain, the nature of that bargain is central to keeping the duty focused on honoring the reasonable expectations created by the autonomous expressions of the contracting parties." (internal quotation marks and citation omitted)).

The implied duty of good faith and fair dealing, however, "'cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions.'" *Metcalf*, 742 F.3d at 991 (quoting *Precision Pine*, 596 F.3d at 831). "Although in one sense any 'implied' duty 'expands' the 'express' duties, . . . an act will not be found to violate the duty (which is implicit in the contract) if such a finding would be at odds with the terms of the original bargain[.]" *Id.* Therefore, the implied duty of good faith and fair dealing "is limited by the original bargain: it prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value." *Id.*

**E.    Whether Plaintiff Is Entitled To Damages For The Breach Of Contract Claims Alleged In The May 19, 2014 Second Amended Complaint.[25]**

    **1.    Whether Plaintiff Is Entitled To Recover Costs To Protect Its Workers From Hazardous Conditions (Count 1).**

        **a.    Plaintiff's Argument.**

Meridian argues that the Contract misrepresented the water quality and contamination levels as a result of the worksite's proximity to inadequate sewer facilities in Nogales, Mexico. Pl. 7/18/14 Br. at 12–14; *see also* Pl. 10/3/14 Reply at 2–6. On November 14, 2007, a USACE representative, specializing in environmental issues, Mike Fink, indicated that chromium was identified in the original Storm Water Pollution Prevention Plan ("SWPPP") permit[.]"[26] Pl. 7/18/14 Br. at 12. That SWPPP was prepared by Granite Construction Company for a nearby project, but Meridian was not informed about it. Pl. 7/18/14 Br. at 13.

On November 21, 2007, a Nogales Wash Channel Improvements Report concluded "there is no definitive proof that chromium is absent from the project site." DX19-5. If any significant reports conclusively establishing the lack of contaminants at the Project site existed, none were shared with Meridian. Pl. 10/3/14 Reply at 5 (citing JX110-7; JX113-2).

One week later, however, the USACE told Meridian "that there was no chromium in the waters of the channel and that heavy metals in the water were a non-issue," contradicting the SWPPP. 1/28/14 TR 664 (Maximoff). But, the USACE informed Meridian that "if chromium was, in fact, present in the subsurface excavations, no employees were to be exposed." Pl. 7/18/14 Br. at 13 (citing PX133-4; 1/28/14 TR 663 (Maximoff)).

By December 11, 2007, Meridian began to "encounter in its excavations a kind of soupy, foul material" that "raised concerns about . . . subsurface E. Coli contamination." Pl. 7/18/14 Br. at 13. Meridian requested more environmental quality information from the USACE, but received only a "cut and paste[d ] section of the Specifications addressing water quality." Pl. 7/18/14 Br. at 13 (citing JX110-7 (referring to the USACE's and Santa Cruz County representatives' warnings of the potential presence of heavy metals and water-borne pathogens within the Project's limits); 1/28/14 TR 666–68 (Maximoff)).

---

[25] Plaintiff's May 19, 2014 Second Amended Complaint lists fourteen claims. 2nd Am. Compl. ¶ 387. Only two of these claims present a viable cause of action: breach of contract; and breach of good faith and fair dealing. *See* 2nd Am. Compl. ¶ 387. The remaining twelve counts are subsumed within breach of contract. Each of those will be discussed in Plaintiff's breach of contract cause of action.

[26] "The SWPPP is a document prepared by a contractor for the owner and the ADEQ, when the contractor is grading an area to prevent pollution runoff from storms." Pl. 7/18/14 Br. at 13; *see also* 1/28/14 TR 664–65 (Maximoff).

The USACE's knowledge about the "potential presence of chromium . . . [and] direction to prevent [Meridian's] employee exposure to the contaminant, created an implied, or constructive, order for Meridian to take protective measures for its workers' safety." Pl. 10/3/14 Reply at 5; *see also* 1/28/14 TR 668–69 (Maximoff). Based on the possibility of contamination, Meridian "had all of its employees vaccinated for Hepatitis D, and set up stations so that all . . . employees could wash off their boots and the bottom of the soles of their shoes at the end of their shifts." Pl. 7/18/14 Br. at 13–14 (citing 1/28/14 TR 668 (Maximoff)). Workers were given "thick rubber gloves rather than leather gloves, . . . hand washing stations were set up[, and s]teps were taken to clean and pressure wash all of the equipment[.]" Pl. 7/18/14 Br. at 14 (citing 1/28/14 TR 668–69 (Maximoff)).

Meridian asserts that it "incurred in excess of $78,369.04 in damages" to protect against this unanticipated contamination that constituted a constructive change to the contract. Pl. 7/18/14 Br. at 14, 59–60.

### b.       The Government's Response.

The Government responds that the "site conditions here were consistent with the [C]ontract indications: sewage was present; chromium was not." Gov't 9/18/14 Br. at 73. Moreover, Meridian does not dispute the Government's evidence "that chromium levels at the [P]roject site were safe." Gov't 9/18/14 Br. at 74 (citing DX19-3; JX53-1). It is true that a USACE employee stated that chromium was identified at a nearby site, so Meridian was warned that, if chromium were encountered, "it cannot be exposed to anyone." PX133-4. But, this does not rise to the level of "defective specifications, misrepresentation, [or] nondisclosure" necessary for constructive change. Gov't 9/18/14 Br. at 74–75 (citing *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 678 (1994) ("Legal scholars have recognized five distinct types of constructive changes: (I) disputes over contract interpretation during performance; (II) Government interference or failure to cooperate; (III) defective specifications; (IV) misrepresentation and nondisclosure of superior knowledge; and (V) acceleration.")). Meridian cites "no authority to support liability when statements are truthful and *consistent* with actual conditions, but the contractor does not trust them." Gov't 9/18/14 Br. at 75 (emphasis added).

As for the presence of E. Coli, the Contract "represents 'water quality issues' and 'raw sewage' in the Nogales Wash 'flow,' along with 'fecal coliforms' in 'the active wash bed.'" Gov't 9/18/14 Br. at 73–74 (quoting JX5-11). The Contract also "promises 'biological water quality impacts' from storm water"; therefore, "sewage should have been expected in the subsurface water because it is fed and charged by surface water." Gov't 9/18/14 Br. at 74. Therefore, the Government contends that Meridian had a "pre-existing duty to take protective measures during channel construction[.]" Gov't 9/18/14 Br. at 74.

### c.       The Court's Resolution.

The issue is whether the USACE should be required to reimburse Meridian for costs incurred to protect its employees against contamination.

An implied-in-fact contract "is one founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from the conduct of the parties showing,

in light of the surrounding circumstances, their tacit understanding." *Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007). In this case, Meridian argues the USACE had an implied contract to reimburse for these costs, because a USACE employee stated that chromium was discovered at a nearby site, and later the USACE warned Meridian that, if chromium were discovered, employees should not be exposed. 1/28/14 TR 664 (Maximoff). These two facts, without more, do not evidence a "meeting of the minds" or a "tacit understanding," particularly since Meridian does not dispute that chromium levels at the site were safe. *Int'l Data Prods. Corp.*, 492 F.3d at 1325; DX19-3; JX53-1. The record reflects only that Meridian was warned of the risks if chromium were present. 1/28/14 TR 664 (Maximoff).

In the alternative, Meridian seeks to recover these costs as a cardinal change to the contract. *See Aydin Corp. v. Widnall*, 61 F.3d 1571, 1577 (Fed. Cir. 1995) ("Where it requires a constructive change in a contract, the Government must fairly compensate the contractor for the costs of the change."); *see also Info. Sys. & Networks, Corp. v. United States*, 81 Fed. Cl. 740, 746 (2008) ("A contractor is entitled to an equitable adjustment for a constructive change when it is required to perform more or different work not called for under the terms of its contract.").

> A constructive change entails two base components, the change component and the order or fault component. *Al Johnson Constr. Co. v. United States*, 20 Cl. Ct. 184, 204 (1990). The "change" component describes work outside of the scope of the contract, while the "order/fault" component describes the reason that the contractor performed the work. *Embassy Moving & Storage Co. v. United States*, 191 Ct. Cl. 537, 545 (1970); *Eggers & Higgins & Edwin A. Keeble Assocs., Inc. v. United States*, 185 Ct. Cl. 765, 785 (1968). Thus, if the Government either expressly or impliedly ordered work outside the scope of the contract, or if the Government otherwise caused the contractor to incur additional work, a constructive change arises for that work performed outside of the scope of the contract. *Lathan Co. v. United States*, 20 Cl. Ct. 122, 128 (1990)[.]

*Miller Elevator*, 30 Fed. Cl. at 678 (citing 1 Gov't Contract Changes § 10:9–11).

In this case, Meridian argues that the USACE misrepresented the possibility of on-site chromium by making contradictory statements. *Compare* Pl. 7/18/14 Br. at 13 (citing 1/28/14 TR 663) (The USACE "strictly advised Meridian that if chromium was, in fact, present in the subsurface excavations, no employees were to be exposed.") *and* Pl. 7/18/14 Br. at 12 (citing PX133-4) (A USACE representative "indicated that there was chromium identified in the original Storm Water Pollution Prevention Plan ("SWPPP") permit[.]"), *with* 7/18/14 Br. at 13 (citing JX113-2) (The USACE told Meridian that "there was no chromium in the waters of the channel and that 'heavy metals' were a 'non-issue.'").

As a matter of law, "it is valid to conclude that the Government's failure to disclose vital information is a form of defective specifications with the result that it is covered by the clauses that recognize defective specifications as constructive changes." 1 Gov't Contract Changes § 10:11. But here, the USACE did not fail to disclose. To the contrary, it disclosed that a nearby site contained chromium. PX133-4. And, it also disclosed that on-site chromium levels were safe. DX19-3; JX53-1. Meridian does not dispute the truth of either of these facts. Therefore, because

the Government did not misrepresent the actual conditions or fail to disclose any superior knowledge, a constructive change did not occur.

For these reasons, the court has determined that Meridian is not entitled to recover the costs to protect its employees from potentially hazardous conditions under an implied contract or cardinal change theory.

### 2. Whether Meridian Is Entitled To Costs For Differing Site Conditions In The Channel And At The Sewer Line (Counts 2 and 5).[27]

#### a. Plaintiff's Argument.[28]

Meridian argues that the USACE is responsible for differing site conditions in the channel and at the sewer line, causing delays and imposing unanticipated costs on Meridian for three reasons. First, Mark Sutton, the current President of Meridian Engineering Co., was more credible than the Government's witnesses (Ms. Martinez and Mr. Chickey) as to the issue of the "jack and bore" method. Pl. 10/3/14 Reply at 17. "Mr. Sutton testified that the 'jack and bore' method was abandoned[,] because Meridian encountered the soupy, contaminated materials in the manhole, and his subcontractor reasonably refused to continue with the 'jack and bore' for safety reasons." Pl. 10/3/14 Reply at 17. In contrast, the Government's witnesses simply speculated. Pl. 10/3/14 Reply at 17–18.

Second, the USACE instructed Meridian to install sewer pipe in wet soil. Pl. 10/3/14 Reply at 18 (citing PX216); *see also* Pl. 7/18/14 Br. at 24 (citing 1/28/14 TR 394 (Branson); PX216) ("[T]he [USACE] agreed to allow the sewer construction to proceed in the wet soil, without completely dewatering as the original Specifications required."). Moreover, because the USACE's on-site representatives, Mr. Chickey and Mr. Slack, "were vested with, and held themselves out to have, the requisite authority to direct Meridian to perform what they believed was required work at the site." Pl. 10/3/14 Reply at 18 (citing *Centre Mfg. Co. v. United States*, 183 Ct. Cl. 115, 126–28 (1968) (holding that a CO's instructions can bind a contractor)).

Third, the Government selectively cites evidence that Meridian failed to follow its shoring plan. Pl. 10/3/14 Reply at 19. In fact, Mr. Chickey, a geotechnical engineer, acknowledged that the shoring plan developed by Kleinfelder "look[ed] good on paper." 3/26/14 TR 1875 (Chickey). But, moving the shoring box in unstable, soupy soils "was simply not feasible," as the USACE recognized. Pl. 10/3/14 Reply at 19 (citing PX320 (Colonel Mangness) ("You can't build a sewerline in soup.")).

---

[27] Plaintiff's May 19, 2014 Second Amended Complaint lists sewer relocation separately as Count V. 2nd Am. Compl. ¶¶ 164–225. But, because the parties' briefs jointly discuss differing site conditions and sewer relocation, the court addresses Counts 2 and 5 together in this section.

[28] Plaintiff's July 18, 2014 Post-Trial Brief does not cite a single statute or case in support of Counts 2 or 5. Pl. 7/18/14 Br. at 14–30. Because Plaintiff's October 3, 2014 Reply sets forth a more cogent argument with legal citations, the court's discussion focuses on it, but has supplemented with facts discussed in Plaintiff's July 18, 2014 Post-Trial Brief.

### b.     The Government's Response.

The Government responds that that Meridian's claim fails, because there were "no differing site conditions at the channel or sewer line," Gov't 9/18/14 Br. at 43; and "the parties agreed to a modification to address [the saturated soil condition] as a differing site condition," Gov't 9/18/14 Br. at 62.

As an initial matter, "[a] reasonable contractor would have foreseen large amounts of groundwater throughout the channel in light of the environmental and geographic features of the site." Gov't 9/18/14 Br. at 45.  "The site sits on a floodplain.  The very purpose of the project is to control flash floods[.]"  Gov't 9/18/14 Br. at 45.  "[T]he project sits between two active waterways, and indeed, the channel construction itself takes place within the confines of one of them.  Surface water is a certain indicator of subsurface water."  Gov't 9/18/14 Br. at 45.

The Government also criticizes Meridian's geotechnical expert, Dr. Mahar, because he only "reviewed ten subsurface explorations [and] reasoned that only these ten explorations were relevant[.]" Gov't 9/18/14 Br. at 47 (citing 4/4/14 Mahar Narr. at 5).  In addition, Dr. Mahar based his analysis on two data points and "exclude[d] the contrary indications of all other explorations[.]" Gov't 9/18/14 Br. at 47–48.  In addition, Meridian has "misread" *Renda Marine, Inc. v. United States*, 66 Fed. Cl. 639 (2006), where the *Renda Marine* court "merely found that . . . the two borings relied upon to support a differing site condition were closest to the site, but nonetheless 'provide[d] an incomplete account of the character of the minerals,' and that other borings, further away, provided a 'more complete picture.'"  Gov't 9/18/14 Br. at 48 (quoting *Renda Marine*, 66 Fed. Cl. at 687–88).  Meridian's differing site claim also fails, "because, as a project in a floodplain and an active waterway, to look at two downstream explorations for subsurface conditions to the exclusion of every other exploration upstream is not reasonable." Gov't 9/18/14 Br. at 48–49 (citing *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1346 (Fed. Cir. 1998) ("The reasonableness of reliance upon borings taken from a distance from a project site cannot be determined based on a bright line rule, but must rather be determined based on the geologic and topographic features present in each case.")).

In addition, other plan documents gave notice of saturated soils.  "The specifications warn specifically that Meridian would encounter 'unsatisfactory material,' [that] falls outside the [American Society for Testing and Materials] standard for suitable construction material and 'unstable material,' which is 'too wet to properly support the utility pipe[.]'"  Gov't 9/18/14 Br. at 49.  In addition, the specifications also "disclose[] groundwater under the channel" and "require Meridian to submit a dewatering plan."  Gov't 9/18/14 Br. at 45 (citing JX7-3, at ¶ 1.3.4; JX8-6–8, at ¶¶ 1.5, 3.2.4).  Also, "the plan drawings warn that subsurface, saturated soil conditions should be expected throughout the site[.]"  Gov't 9/18/14 Br. at 49–50 (citing JX25-1 (GCV03 at Test Hole 89-4) (showing alluvial soils)).  Those drawings "give notice of the 'artesian condition' in the channel[.]"  Gov't 9/18/14 Br. at 46 (citing 1/27/14 TR 120–25 (Sutton)).  Therefore, Meridian should have expected saturated soils, because the plan drawings show alluvial soils that "are deposited by flowing water and extend over very large areas" and are "in a flowing condition."  Gov't 9/18/14 Br. at 50 (citing 3/23/14 Chickey Narr. at 13; JX25-1 (GCV03 soil characteristics)).  In addition, the plan drawings "depict a higher groundwater level impounded behind the banks of the Nogales Wash than under the channel floor."  Gov't 9/18/14 Br. at 46–47 (citing JX42-1; JX26-1; 1/30/14 TR 1093–94 (Martinez)).  Likewise, upstream soil data showed unstable, saturated

conditions that a reasonable contractor would have considered.  Gov't 9/18/14 Br. at 51 (citing JX8-5).[29]

Therefore, "there was no differing site condition at the sewer line because the contract documents gave notice of the saturated soils in this area."  Gov't 9/18/14 Br. at 52.  A site visit also would have "revealed saturated groundwater at the trestle bridge at station 23+00."  Gov't 9/18/14 Br. at 53.  Meridian also "should have expected saturated soils over a wide area near B3 and B4," because a "huge stratum of 45-feet of black, saturated alluvial soils" is located "just 150 feet away from the trestle bridge where Meridian encountered its worst conditions."  Gov't 9/18/14 Br. at 54.  Mr. Sutton "testified that [although] he considered B2 and B3 in preparing his bid, but did not consider them notice of conditions at the sewer."  Gov't 9/18/14 Br. at 54.  Therefore, it was unreasonable for Meridian "to assume that [nearby saturated soils] ended abruptly where the borings were taken, particularly in light of their proximity to the Nogales Wash."  Gov't 9/18/14 Br. at 54–55.

In sum, Meridian "had either actual or inquiry notice of the saturated soil conditions at both the channel and sewer, and did not require a geotechnical engineer to recognize it."  Gov't 9/18/14 Br. at 55.

The Government also argues that Meridian is "not entitled to compensation for [saturated soil conditions] for the additional reason that the May 30[, 2008] Kleinfelder Report gave Meridian perfect notice of the condition, and the parties agreed to a modification to address it as a differing site condition."  Gov't 9/18/14 Br. at 62.  Therefore, the parties reached accord and satisfaction as to the sewer line condition.  Gov't 9/18/14 Br. at 62 (citing *Bell BCI Co. v. United States*, 570 F.3d 1337, 1340–41 (Fed. Cir. 2009) (holding that an "[a]ccord and satisfaction occur 'when performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim'")).  Between May 15, 2008 and September 19, 2008, "the parties agreed to address the site condition at the sewer line in two 'two-part' modifications: (1) R7 and R9; and (2) R10 and R16."  Gov't 9/18/14 Br. at 62 (citing DX664-4–8; DX665-3–5; DX666-5–7; DX668-4–6).  Modification R7/R9 "gave Meridian $93,838 to do a 'sewer relocation supplemental soils investigation,' and 'develop [a] workplan by [a] licensed Geotechnical Engineer to correct or mitigate for unacceptable subsurface soil conditions[.]'"  Gov't 9/18/14 Br. at 62 (quoting DX664-6–7; DX665-4).  The R10/R16 modification "address[ed] the soil remediation utilizing the workplan," and "paid [Plaintiff] $1,128,729, which represents the full value of [Plaintiff's] initial proposed price of $1,444,202.36,

---

[29] The Government adds that the "After Action Review" document that Meridian cites is unreliable, "because it was the result of an informal discussion among a number of [USACE] and Santa Cruz County [representatives] to voice their opinions about the Chula Vista Project."  Gov't 9/18/14 Br. at 51–52.  "No formal document was ever produced and no conclusions were ever drawn" from the discussion's participants, many of whom "did not have personal knowledge about the project, but offered opinions of matters second or third-hand."  Gov't 9/18/14 Br. at 52.

less the value of a second sheetpile wall that [Plaintiff] failed to install." Gov't 9/18/14 Br. at 62 (citing DX669-4). That modification also contained a release:

> [T]he contract price is increased as indicated above, which reflects all credits due the Government and all debts due the Contractor. It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the Contractor . . . for all costs and markups directly or indirectly attributable for the change ordered, for all delays related thereto, for all extended overhead costs, and for performance of the change within the time frame stated.

DX669-6.

But, Modification R10/R16 was not an affirmative direction for work. Gov't 9/18/14 Br. at 63. Instead, it simply "addressed a condition, and did not direct a specific solution[.]" Gov't 9/18/14 Br. at 63. This is made clear by the fact that Meridian "was paid to retain a geotechnical engineer to propose a workplan to address the saturated soil condition, which its engineer, Kleinfelder, did." Gov't 9/18/14 Br. at 63 (internal citation omitted) (citing 1/30/14 TR 1145 (Martinez)).

Moreover, since R16 "contains a scrivener's error that conflicts with the release and should be reformed to eliminate the conflict." Gov't 9/18/14 Br. at 64. R10 "provided for initial funds for the soil remediation work . . . , and reflected an agreed-upon 20 calendar [day] extension for the project," and "definitize[d] R10." Gov't 9/18/14 Br. at 64. R10 also included Item 5 that provided: "Twenty days['] time extension for this change was agreed to by the Government and the contractor[;] however, the cost for this extension was not agreed to." DX666-7. R16 also contained this language, "but was a result of a [USACE] contract administration technician's error." Gov't 9/18/14 Br. at 64 (citing 1/29/14 TR 965 (Childers); 1/30/14 TR 1192–93 (Martinez)). Contemporaneous evidence established that the parties agreed to a full settlement for the saturated soil condition "at the sewer line." Gov't 9/18/14 Br. at 65 (citing 1/29/14 TR 961 (Childers); 1/30/14 TR 1191 (Martinez)).

### c.       The Court's Resolution.

"Where the differing site conditions claim and a defective specifications claim are so intertwined as to constitute a single claim, that claim will be governed by the specific differing site conditions clause and the cases under that clause." *Comtrol, Inc. v. United States*, 294 F.3d 1357, 1362 (Fed. Cir. 2002). As such, the court is required to adjudicate Meridian's channel and sewer allegations as one claim for a differing site condition.[30]

---

[30] The United States Court of Appeals for the Federal Circuit has stated that:

> Performance specifications "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that

---

> objective or standard of performance, selecting the means and assuming a
> corresponding responsibility for that selection."

*Blake Constr.*, 987 F.2d at 745 (quoting *J.L. Simmons Co. v. United States*, 188 Ct. Cl. 684, 689 (1969)).

> On the other hand, design specifications describe, "in precise detail[,] . . . materials to be employed and the manner in which the work is to be performed." *Id.* Where design specifications are required, "[t]he contractor has no discretion to deviate from the specifications, but is required to follow them as one would a road map." *Id.* (quotation marks and citation omitted). But, as the United States Court of Appeals for the Federal Circuit has observed, "[d]etailed design specifications contain an implied warranty that if they are followed, an acceptable result will be produced." *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1582 (Fed. Cir. 1987). As such, as the United States Court of Appeals for the Federal Circuit has held:

> [T]he distinction between design and performance specifications is not
> absolute . . . . Contracts may have both design and performance characteristics. It
> is not only possible, but likely that a contractor will be granted at least limited
> discretion to find the best way to achieve goals within the design parameters set by
> the contract.

*Blake Constr.*, 987 F.2d at 746 (internal citations omitted); *see also Zinger Constr. Co. v. United States*, 807 F.2d 979 (Fed. Cir. 1986).

> On occasion, the labels "design specification" and "performance specification"
> have been used to connote the degree to which the [G]overnment has prescribed
> certain details of performance on which the contractor could rely. However, those
> labels do not independently create, limit, or remove a contractor's obligations.

*Zinger*, 807 F.2d at 981 (internal citations omitted); *see also Blake Constr.*, 987 F.2d at 746 ("It is the obligations imposed by the specification which determine the extent to which it is 'performance' or 'design,' not the other way around.").

> Returning to the facts of this case, the Contract's Diversion And Control Of Water specification provided, in relevant part:

> Within 10 days after receipt of Notice to Proceed, the Contractor shall submit a
> Diversion and Control of Water Plan showing the method that he proposes to use
> to divert water from the working area. . . .

> The Contractor is responsible for the diversion and control of all runoff entering
> the construction area. The runoff will include water originating from upstream,
> urban runoff, adjacent d[]rainages; and in addition any and all seepage and
> groundwater originating within the work. The work site may be inundated because

of runoff.  The Contractor shall be responsible for protection of work site during times of runoff by his own means and shall be approved by the [CO]. . . .

The location and depth of any bypass drainage ditch or sump shall be subject to Government approval.  Special precautions shall be taken to avoid impairing the permanent subgrade or embankment foundation. . . .

The groundwater will encounter during construction throughout the project reach of the Nogales Creek Channel.  The construction area shall be dewatered prior to commencement or continuation or work, and all subgrades, whether for earth fill, stone, grouted stone, or concrete shall be kept drained and free of water throughout the working period.  Lowering of the groundwater table can be accomplished by installing a series of dewatering wells and well pumps along the channel edges in the upper reaches and by using sump pumps in the lower reaches.  The pumped water shall be directed into the temporary channels used for control of surface water.  The Contractor shall submit the method of dewatering to [CO] for his approval.

Ten (10) calendar days prior to start of the construction, the Contractor shall submit plans showing the proposed methods to dewater each working area and control water from rain, sheet flow, streamflows, and other surface water.  The plans shall show the scheme of operations and a complete layout of drainage pipes, pumps, diversion channels, cofferdams, etc.    The Contractor shall assume full responsibility for the adequacy of his dewatering and control methods.  Prior notice to the [CO] of the Contractor's method of dewatering will in no way release the Contractor from the fulfillment of his obligations or make the Government, in any manner, responsible for any losses due to failure or inadequacy of the dewatering and control method used.

JX7-2–3.

This specification "set[s] forth an objective or standard to be achieved," *i.e.*, dewatering the work area.  *See Blake Constr.*, 987 F.2d at 745; JX7-3 ("The construction area shall be dewatered[.]").  It allows Meridian to "exercise [its] ingenuity in achieving that objective[.]"); *see also* JX7-2 ("[T]he Contractor shall submit a . . . Plan showing the method that he proposes to use to divert water from each working area.").  The specification also placed the responsibility for dewatering on Meridian.  JX7-3 ("The Contractor shall assume full responsibility for the adequacy of his dewatering and control methods.").    And, the Government expressly disclaimed responsibility for failed or inadequate results.  JX7-3 ("Prior notice to the [CO] of the Contractor's method of dewatering will in no way release the Contractor from the fulfillment of his obligations or make the Government, in any manner, responsible for any losses due to failure or inadequacy of the dewatering and control method used.").

The specification repeatedly uses the word "shall" when describing mandatory activities.  JX7-2–3 (providing that: "the Contractor shall submit a Diversion and Control of Water Plan"; "[t]he Contractor shall be responsible for protection of work site"; "[t]he construction area shall

In *Metcalf*, the United States Court of Appeals for the Federal Circuit has stated that:

> [FAR 52.236-2][31] exists precisely in order to "take at least some of the gamble on subsurface conditions out of bidding": instead of requiring high prices that must insure against the risks inherent in unavoidably limited pre-bid knowledge, the provision allows the parties to deal with actual subsurface conditions once, when

---

be dewatered"; "the Contractor shall assume full responsibility for the adequacy of his dewatering and control methods"). But, the specification did not use the word "shall" as to how Meridian was to achieve its objective. Instead, the specification stated, "Lowering of the groundwater table *can be* accomplished by installing a series of dewatering wells and well pumps along the channel edges in the upper reaches and by using sump pumps in the lower reaches." JX7-3 (emphasis added). That specification did not "describe in precise detail the materials to be employed and the manner in which the work [was] to be performed." *Blake Constr.*, 987 F.2d at 745. Instead, it provided Meridian with "discretion to deviate from the specifications." *Id.*

For these reasons, the court has determined that the dewatering specifications were performance specifications and that Meridian was responsible for achieving those requirements.

[31] FAR 52.236-2 provides:

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the [CO] of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) The [CO] shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

(c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required; provided, that the time prescribed in (a) above for giving written notice may be extended by the [CO].

(d) No request by the Contractor for an equitable adjustment to the contract for differing site conditions shall be allowed if made after final payment under this contract.

48 C.F.R. § 52.236-2.

> work begins, "more accurate" information about them can reasonably be uncovered.

*Id.* at 996 (quoting *Foster Constr. C.A. & Williams Bros. Co. v. United States*, 193 Ct. Cl. 587, 613–14 (1970)).

The appellate court continued,

> [f]or that reason, even requirements of *pre*-bid inspection by the contractor have been interpreted cautiously regarding conditions that are hard to identify accurately before work begins, so that "the duty to make an inspection of the site does not negate the changed conditions clause by putting the contractor at peril to discover hidden subsurface conditions or those beyond the limits of an inspection appropriate to the time available."

*Id.* (quoting *Foster*, 193 Ct. Cl. at 615).

Although the contract in *Metcalf* stated that the Government's expansive-soil report was "for preliminary information only," the United States Court of Appeals for the Federal Circuit held:

> We do not think that the language can fairly be taken to shift that risk [of inaccurate information] to Metcalf, especially when read together with the other government pronouncements, much less when read against the longstanding background presumption against finding broad disclaimers "of liability for changed conditions."

*Id.* (quoting *United Contractors v. United States*, 177 Ct. Cl. 151, 165 (1966)).

Therefore, to receive an equitable adjustment for a Type 1 differing site condition,[32]

> a contractor must prove by a preponderance of the evidence that: (1) "a reasonable contractor reviewing the contract documents as a whole would interpret them as making a representation about the site conditions"; (2) "the actual site conditions were not reasonably foreseeable to the contractor, with the information available to the particular contractor outside the contract documents"; (3) "the contractor in fact

---

[32] In this case, the contract incorporates a "differing site conditions" clause, FAR 52.236-2." JX2-107–08. "A Type I differing site condition is [a] 'subsurface or latent physical condition[] at the site which differ[s] materially from those indicated in this contract.'" 48 C.F.R. § 52.236-2(a).

relied on the contract representation"; and (4) "the conditions differed materially from those represented, and the contractor suffered damages as a result."

*CCI, Inc. v. McHugh*, 2015 WL 1600059, No. 2014-1470, at *2 (Fed. Cir. Apr. 10, 2015) (quoting *Int'l Tech. Corp. v. Winter*, 523 F.3d 1341, 1348–49 (Fed. Cir. 2008)). However, "[a] contractor is not eligible for an equitable adjustment for a Type 1 differing site condition[,] unless the contract indicated what the condition would be." *Comtrol*, 294 F.3d at 1363.

In order to qualify as a Type 2 differing site condition,[33]

"the unknown physical condition must be one that could not be reasonably anticipated by the contractor from his study of the contract documents, his inspection of the site, and his general experience[,] if any, as a contractor in the area."

*Randa/Madison Joint Venture III v. Dahlberg*, 239 F.3d 1264, 1276 (Fed. Cir. 2001) (quoting *Perini Corp. v. United States*, 180 Ct. Cl. 768, 780 (1967)); *see also id*. at 1277 ("The Court of Claims has opined that proving a Type 2 differing site condition is more difficult than proving a Type 1 differing site condition, involving a heavier burden of proof and a stiffer test.").

Since Meridian failed to specify whether the alleged differing site conditions were Type 1 or Type 2, the court is obligated to discuss both.

Because the *CCI* test is written in the conjunctive, Meridian must meet all four elements to be eligible for a Type 1 adjustment. First, "a reasonable contractor reviewing the contract documents as a whole would interpret them as making a representation about the site conditions." *CCI*, 2015 WL 1600059, at *2. In this case, the specification stated that "[w]ater in varying quantities may be flowing in natural washes throughout the length of the project, as a result of rainfall or flow from upstream watersheds sources." JX7-2. It also stated that "[t]he runoff will include water originating from upstream, urban runoff, adjacent d[]rainages; and in addition any and all seepage and groundwater originating within the work. The work site may be inundated because of runoff." JX7-3. Thus, a reasonable contractor would interpret the Specification as representing water as a site condition.

Second, *CCI* requires that the actual site conditions "not [be] reasonably foreseeable to the contractor, with the information available to the particular contractor outside the contract documents." *CCI*, 2015 WL 1600059, at *2. "When determining whether site conditions were reasonably foreseeable to the contractor, both the contract and any other information available to the contractor are considered." *Id.* at *3. Therefore, the court should consider what information objectively was *available* to Meridian, not just the information that Meridian knew at the time.

---

[33] A Type 2 differing site condition is an "unknown physical condition[] at the site of an unusual nature, which differ[s] materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." 48 C.F.R. § 52.236-2(a).

*See id.*   In this case, the original plan drawings showed black, saturated soil with no bearing capacity in the boring holes closest to the sewer plan.  JX21-58–59; JX22-1.  And, the work site was in a floodplain, so Meridian should have anticipated saturated soil conditions.  The plan drawings also warned of subsurface saturated soils.  JX25-1.  Therefore, a reasonable contractor would want to investigate whether there were unstable, saturated conditions upstream.  3/23/14 Chickey Narr. at 13 (explaining that the contract and soil samples showed soft soils); *see also* 1/27/14 TR 106–08 (Sutton) (testifying that he considered boring holes B2 and B3 in preparing his bid).  A site visit also would have made these conditions known, because large portions of saturated, alluvial soil were located "100 feet or so" away from where Meridian experienced some of its worst conditions.  3/25/14 TR 1783 (Chickey); JX22-1.  Therefore, based on the information available to Meridian, the actual conditions at the site were reasonably foreseeable.

The third *CCI* inquiry is to determine whether the contractor "in fact rel[ied] on the contract representation."  *CCI*, 2015 WL 1600059, at *2.  The specification stated that "[t]he runoff will include water originating from upstream, urban runoff, adjacent d[]rainages; and in addition any and all seepage and groundwater originating within the work.  The work site may be inundated because of runoff."  JX7-3.  Meridian stated that it relied on the Specification and Contract data.  Pl. 7/18/14 Br. at 66.  If so, it would have expected saturated soil conditions.  To the extent that the specification did not expressly guarantee saturated soil conditions, *e.g.*, "[t]he work site may be inundated," it was incumbent on Meridian to conduct due diligence about the site condition.  *See CCI*, 2015 WL 1600059, at *3 ("[B]oth the contract *and any other information available to the contractor* are considered.") (emphasis added).  Meridian did not do so.

Fourth, *CCI* requires the plaintiff to establish that "the conditions differed materially from those represented, and the contractor suffered damages as a result."  *Id.* at *2.  As previously discussed, the specification provided Meridian with notice that it might encounter a work site inundated with runoff from various sources.  JX7-2–3.  Therefore, the actual conditions—saturated soil—were not materially different from the USACE's representations that the work site "may be inundated."  JX7-3.  Therefore, Meridian failed to meet this requirement.

For these reasons, the court has determined that Meridian failed to establish by a preponderance of the evidence all four *CCI* elements of a Type 1 differing site condition.  As such, Meridian also has failed to establish a Type 2 differing site condition.  *See Randa/Madison*, 239 F.3d at 1277.

In any event, [34]  Meridian's sewer line condition claim is barred by accord and satisfaction.  "[T]he affirmative defense of 'accord and satisfaction requires four elements: (1) proper subject matter; (2) competent parties; (3) a meeting of the minds of the parties; and (4) consideration.'"

---

[34] Although the Government appears to concede a differing site condition in the heading titled, "Meridian And The Army Corps of Engineers Develop Proposals To Install The Sewer Pipe In Light Of The Differing Site Condition" (Gov't 9/18/14 Br. at 19), later in the same brief the Government argued, "As a matter of law, the Government['s] determination that this was a differing site condition was in error[.]"  Gov't 9/18/14 Br. at 55.

*Holland v. United States*, 621 F.3d 1366, 1382 (Fed. Cir. 2010) (quoting *O'Connor v. United States*, 308 F.3d 1233, 1240 (Fed. Cir. 2002)).

First, neither party contests proper subject matter, and the court has determined that this contract action properly is before the court.  Second, it is undisputed that both parties were competent to enter into the relevant agreements: Modifications R7 and R9; and Modifications R10 and R16.  Thus, the first two elements are satisfied.

Third, "[a] meeting of the minds occurs where there are 'accompanying expressions sufficient to make the [claimant] understand, or to make it unreasonable for him not to understand, that the performance is offered to him as full satisfaction of his claim and not otherwise.'" *Holland*, 621 F.3d at 1382 (quoting *Chesapeake & Potomac Tel. Co. v. United States*, 228 Ct. Cl. 101, 109 (1981)).  R16 modified the sewer line contract and contained a mutual release:

> [T]he contract price is increased as indicated above, which reflects all credits due the Government and all debits due the Contractor.  It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the Contractor . . . for all costs and markups directly or indirectly attributable for the change ordered, for all delays related thereto, for all extended overhead costs, and for performance of the change within the time frame stated.

DX669-6.

This release covered "all costs and markups" that were "directly or indirectly attributable" to the sewer line contract change, as well as "for performance."  DX669-6.  Moreover, Meridian was on notice that it was being compensated "in full" for the sewer line.  DX669-6.  As such, the release was "sufficient to make [Meridian] understand . . . that the performance is offered to [it] as full satisfaction of [its] claim[.]"  *Holland*, 621 F.3d at 1382.

Fourth, "[t]o constitute consideration, a performance or a return promise must be bargained for."  RESTATEMENT § 71(1).  Here, the USACE paid an additional $93,838 for a "sewer relocation supplemental soil[] investigation" and to "develop a workplan by licensed Geotechnical Engineer to correct or mitigate for unacceptable subsurface soil conditions," pursuant to R7 and R9.  DX664-6–7; DX665-4.  Meridian also was paid $1,128,729 for soil remediation, pursuant to R10 and R16.  DX669-4.

For these reasons, the court has determined that the Government has satisfied all four *Hollland* elements.  Thus, even if, *arguendo*, the sewer line were a differing site condition, the R16 release and accompanying price increase constituted accord and satisfaction.

### 3.   Whether Plaintiff Is Entitled To Recover Costs Incurred Because Of The Railroad Right-Of-Way Delay (Count 3).

The May 19, 2014 Second Amended Complaint seeks "$0.00 against [the Government]" for "any increase in the cost and time to perform any part of the contract work impacted by the lack of access" to the work site.  2nd Am. Compl. ¶¶ 111, 115.  Therefore, Meridian does not seek

monetary damages for Count 3, and its post-trial briefing did not allege that it was entitled to damages for any right-of-way delay.

For this reason, the court has determined that Meridian is not entitled to recover damages for Count 3.

### 4.    Whether Plaintiff Is Entitled To Recover Costs For Delays Incurred As A Result Of Flood Events (Count 4).

#### a.    Plaintiff's Argument.

Meridian argues that delays due to the USACE's modifications and specification defects "cause[d Meridian] to perform during a period of inclement weather," and therefore, it "is entitled to its additional costs for working in those weather conditions." Pl. 7/18/14 Br. at 69 (citing *Merritt-Chapman & Scott Corp. v. United States*, 208 Ct. Cl. 639, 642–53 (1976) (finding delay caused by rain and flooding compensable under suspension of work clause, where the delay was enhanced by earlier failure of the Government to make construction site available)); *see also* Pl. 10/3/14 Br. at 26–27 ("[The USACE] caused various delays . . . ; . . . those delays prevented [Meridian] from completing the specific work most susceptible to flood damage . . . ; and . . . the incompletion of that work caused substantial damage that would not have occurred if the work had been completed as originally scheduled."). The delays caused by flood damage "actually Meridian in a position that was worse than if [it] had not even started." Pl. 7/18/14 Br. at 69.

Meridian concedes that the November 14, 2007 to January 15, 2008 modifications addressed retrospective injury, but not future flood damage, barring a defense of accord and satisfaction. Pl. 7/18/14 Br. at 72. Moreover, the USACE "failed to assert the accord and satisfaction defense in a timely manner." Pl. 7/18/14 Br. at 72. Therefore, the court should "refuse to bar a claim based upon the defense of accord and satisfaction[, because] the parties continue[d] to consider the claim after execution of a release." *Cmty. Heating & Plumbing v. Kelso Co.*, 987 F.2d 1575, 1581 (Fed. Cir. 1993); *see also id.* (holding that accord and satisfaction did not apply when the Government "continued to negotiate and audit [the Plaintiff's] claims years after they were submitted")).

#### b.    The Government's Response.

The Government responds that Meridian's flood damage claims are barred by accord and satisfaction, because Meridian consented to bilateral Modifications R17 and R8 that collectively extended the Contract by seventy-two days and increased the price by $128,190. Gov't 9/18/14 Br. at 68; *see also* JX132-1; DX183-3–4. In addition, R17 and R8 both contained "complete release" provisions specifying that the modifications included "compensation in full" for "all costs and markups directly or indirectly attributable for the change ordered, [and] for all delays related thereto[.]" Gov't 9/18/14 Br. at 68–69 (citing JX132-2; DX183-4). As such, these releases addressed all costs incurred during the "time period stated," referring to the sixty-day extension, not a retrospective period, as claimed by the Meridian. Gov't 9/18/14 Br. at 69 (citing JX123-2). Meridian also signed other bilateral modifications that, in total, "added 237 calendar days to the [C]ontract" and extended the completion date to account for all flood events. Gov't 9/18/14 Br. at 70. Because each bilateral modification included the same general release, accord and satisfaction

bars all of Meridian's indirect costs associated with the extensions, including all flood damages. Gov't 9/18/14 Br. at 70.

The Government adds that Meridian's released claims were not revived by an August 10, 2009 internal USACE memorandum stating that the Government would pay Meridian $543,868 as an "equitable adjustment" for "flood event damage" and "sub-surface water," because there was no mutuality of intent to contract. Gov't 9/18/14 Br. at 73. In *Community Heating & Plumbing*, the United States Court of Appeals for the Federal Circuit held that there was "no mutuality of intent to contract supporting an accord and satisfaction where neither party treated a claim as released, one party continued to audit the claims, and both parties actively negotiated the purportedly released claim for years after the purported accord." Gov't 9/18/14 Br. at 73; *see also Cmty. Heating & Plumbing*, 987 F.2d at 1581 (holding that accord and satisfaction did not apply when the Government "continued to negotiate and audit [the plaintiff's] claims years after they were submitted")). In this case, Meridian was unaware of the internal USACE memorandum, and therefore, could not rely on it to revive its claims. Gov't 9/18/14 Br. at 73.

Finally, Meridian's claims of flood-based delay fails for lack of causation. The USACE's actions were not the "but for" cause of Meridian's damages due to flooding. Gov't 9/18/14 Br. at 71–72. Meridian's planned construction schedule extended into the monsoon season. Therefore, Meridian elected to work during that time. Gov't 9/18/14 Br. at 70–71.

### c.    The Court's Resolution.

The United States Court of Appeals for the Federal Circuit held in *Community Heating & Plumbing*, 987 F.2d at 1581:

> Discharge of a claim by accord and satisfaction occurs when some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim. However, courts may refuse to bar a claim based upon the defense of accord and satisfaction where the parties continue to consider the claim after execution of a release.

*Id.* at 1581 (internal citations omitted); *see also England v. Sherman R. Smoot Corp.*, 388 F.3d 844, 849 (Fed. Cir. 2004) (same).

Under this standard, the court must undertake a two-part inquiry: (1) whether Plaintiff agreed to "some performance different from that which was claimed as due"; and, if so (2) whether "the parties continue to consider the claim after execution of a release." *Cmty. Heating & Plumbing*, 987 F.2d at 1581.[35]

_____

[35] Meridian's reliance on *Merritt-Chapman* is unavailing. That case interpreted the pre-1960 version of the Suspension Clause. *See Merritt-Chapman*, 208 Ct. Cl. at 648–49 (explaining this history of the clause at issue). "The pre-1960 Suspension of Work Clause does not, by its language, bar recovery because a contractor would have been prevented by other causes from performing its work when the Government's actions did in fact cause its damage." *Id.* at 649–50. In contrast, the post-1960 clause imposes a "sole proximate" requirement on Government action.

On September 21, 2008, the parties executed bilateral Modifications R17 and R8.  JX132-1–2 (R17); DX183-3–4 (R8).  Both included the following "closing statement":

> It is understood and agreed that pursuant to the above, the contract time is extended the number of calendar days stated, and the contract price is increased as indicated above, which reflects all credits due the Government and all debits due the Contractor and its Subcontractors and Suppliers for all costs and markups directly or indirectly attributable for the change ordered, for all delays related thereto, for all extended overhead costs, and for performance of the change within the time frame stated.

JX132-2; DX183-4.

The "closing statement" in Modifications R17 and R8 provides that the Contract price changed in tandem with time extensions.  These changes "reflect[ed] all credits due the Government and all debits due [Plaintiff] . . . for all costs and markups directly or indirectly attributable to the change ordered[.]" JX132-2.  As such, the first part of the accord and satisfaction inquiry is satisfied, because Meridian agreed to "some performance different from that which was claimed as due." *Cmty. Heating & Plumbing*, 987 F.2d at 1581.

But, Meridian contends that the USACE "continued to consider the claims," precluding meeting the second part of the *Community Heating & Plumbing* test.  Pl. 7/18/14 Br. at 72.  Here, Meridian misstates the standard: it is not whether one party considered the released claims, but whether *both parties* considered them.  *See Cmty. Heating & Plumbing*, 987 F.2d at 1581 ("[C]ourts may refuse to bar a claim based upon the defense of accord and satisfaction where the *parties* continue to consider the claim after execution of a release.") (emphasis added).  Meridian points to the USACE's August 10, 2009 draft modification, including an estimate for flood damage.  PX377 (9/2/09 draft modification of $543,868).  But, the May 19, 2014 Second Amended Complaint does not allege, and the record does not support finding, that the USACE's August 10, 2009 internal memorandum was known by Meridian prior to discovery.  *See Cmty. Heating & Plumbing*, 987 F.2d at 1581 (holding that "courts *may* refuse to bar a claim . . . where the parties continue to consider the claim after execution of a release") (emphasis added).  Thus, this case is distinguishable from *Community Heating & Plumbing*, where the Government "administered, reviewed, and negotiated [the plaintiff's] claims on the merits prior to and after execution of the subject contract negotiations[.]" *Id.* at 1581 n.7.  Here, there were no negotiations of Meridian's claims after Modifications R17 and R8, and there is no evidence the parties discussed the matter further.

---

*See id.* at 649 (quoting post-1960 Suspension of Work Clause ("No adjustment shall be made to the extent that performance by the Contractor would have been prevented by other causes even if the work had not been so suspended, delayed or interrupted [by the Government].")).  Thus, although *Merritt-Chapman* allows a plaintiff to seek compensation for Government delays, the plaintiff must prove that Government action was the "sole proximate" cause of its damages.  *Id.* Because *Merritt-Chapman* interpreted the pre-1960 clause, it is not applicable in this case.

Finally, Meridian asserts that the Government waived an accord and satisfaction defense by failing to raise it in a timely manner.  Pl. 7/18/14 Br. at 72; *see also* RCFC 12(b) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required."). In this case, the Government's November 14, 2011 Answer states, "This action is barred in whole or part by the doctrine of accord & satisfaction."  Answer ¶ 326.  Therefore, the Government's affirmative defense of accord and satisfaction was timely.

For these reasons, the court has determined that the doctrine of accord and satisfaction bars Meridian's claim that the USACE is responsible for costs incurred for delays caused by flood events.

### 5. Whether Plaintiff Is Entitled To An Adjustment For The Unpaid Contract Quantities (Count 6).

#### a. Plaintiff's Argument.

Next, Meridian argues that the USACE is liable for unpaid contract quantities and its "failure to [pay] Meridian is a flagrant breach of [the September 21, 2007 C]ontract and good faith and fair dealing."  Pl. 7/18/14 Br. at 74.  The Contract specified anticipated quantities of certain items and stated how Meridian would be paid for those items, *e.g.*, "if the quantity actually used was less than the estimated quantity, [Meridian] would be paid less," and vice-versa.  Pl. 7/18/14 Br. at 73–74 (citing JX11-7; 1/28/14 TR 670–72, 674 (Maximoff)).  When Meridian informed the USACE that additional items were needed, "[a]t no time did the [USACE] advise Meridian that it disagreed with Meridian's calculations, nor has the Corps offered its own calculation to refute Meridian's findings."  Pl. 7/18/14 Br. at 74 (citing 1/28/14 TR at 676–77 (Maximoff); 1/29/14 TR at 685–87 (Maximoff); PX226); *see also* Pl. 10/3/14 Reply at 36 (same).  Nevertheless, Meridian concludes that it is "undoubtedly entitled to an adjustment to the Contract price to compensate it for the estimated quantities that were exceeded in the field," in the amount of $358,913.63.  Pl. 7/18/14 Br. at 74 (citing 1/28/14 TR at 677 (Maximoff); PX394; JX3); *see also* Pl. 10/3/14 Reply at 36 (same).

In fact, the Government's witnesses "conceded at trial that 'Meridian was still owed some money' on the unpaid contract quantities."  Pl. 10/3/14 Reply at 36–37 (citing 3/17/14 Weathers Narr. at 44; 3/24/14 TR at 1422 (Martinez)).  Therefore, the court should treat Meridian's entitlement to the unpaid contract quantities as conceded by the Government.  Pl. 10/3/14 Reply at 37.

#### b. The Government's Response.

The Government responds that the "unit priced quantity work was generally done," but disputes what costs are allowable.  Gov't 9/18/14 Br. at 82.  "[I]t is a straightforward accounting matter relating to unit priced items pursuant to the [C]ontract."  Gov't 9/18/14 Br. at 82.  In any event, Meridian "has been substantially overpaid[, based on] the unit quantity items of the [September 21, 2007 C]ontract in the amount of $326,642.32."  Gov't 9/18/14 Br. at 82 (citing 3/17/14 Weathers Narr. at 40–52).

### c.      The Court's Resolution.

The September 21, 2007 Contract was a unit price contract.   JX2-5–8 (Solicitation explaining that bidding was based on unit prices).   Therefore, Meridian is entitled to payment for items sold.   JX3; JX11; 1/28/14 TR at 670–71, 674 (Maximoff).   The Government conceded at trial that the USACE "still owed some money" to Meridian for certain items.   3/24/14 TR at 1422 (Martinez).   But, the USACE also is entitled to withhold payment:   "[I]f satisfactory progress has not been made, the [CO] may retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved."   JX2-94 (citing 48 C.F.R. § 52.232-5); *see also M. C. & D. Capital Corp. v. United States*, 948 F.2d 1251, 1257 (Fed. Cir. 1991) (authorizing a retention of 10 percent of total price from final payment, pursuant to a retainage clause); *see also Johnson v. All-State Constr., Inc.*, 329 F.3d 848, 854 (Fed. Cir. 2003) (discussing the Government's right to "set-off").

For these reasons, the court has determined that the Government did not breach the September 21, 2007 Contract based on alleged unpaid contract quantities.

### 6.      Whether Plaintiff Is Entitled To Costs For The To Suspension Of Work (Count 7), Channel Fill (Count 8), And Interim Protection (Count 9).

### a.      Plaintiff's Argument.

Without citing any supporting case law, Plaintiff argues that:

> The [USACE's] failure to adjust the Contract price to accurately reflect the costs incurred by Meridian in connection with the suspension, channel fill, and interim protection modifications, and its failure to pay Meridian even those amounts authorized under these modifications, is a breach of contract and of the implied duty of good faith and fair dealing.

Pl. 7/18/14 Br. at 75.

Pursuant to the Contract's Changes Clause and Suspension Clause, Meridian argues that the USACE must compensate it for "substantial increased costs in connection with the suspension, and the channel fill and interim protection work."   Pl. 7/18/14 Br. at 75 (citing 48 C.F.R. § 52.243-4(d)[36] and 48 C.F.R. § 52.242-14(b)[37]).   The record reflects that the USACE issued some

---

[36] FAR 52.243-4, in relevant part, provides:

> If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under th[e C]ontract, whether or not changed by any such order, the [CO] shall make an equitable adjustment and modify the [C]ontract in writing.

48 C.F.R. § 52.243-4(d).

[37] FAR 52.242-14(b), in relevant part, provides:

technically deficient modifications, but promised Meridian that corrective modifications would be forthcoming, the USACE has "maintained that [it] could not, and would not, release any money to . . . [Meridian]." Pl. 7/18/14 Br. at 75 (citing JX180, 185–87; DX649-9; 1/27/14 TR at 37 (Yates); 1/29/14 TR at 841–42, 850–51 (Haworth); 3/27/14 TR at 2109–39 (Haworth)).[38]

### b.    The Government's Response.

The Government responds that "[t]he [USACE] has breached neither the [C]ontract nor an implied covenant of good faith and fair dealing" by withholding payment for suspension of work, channel fill, and interim protection work. Gov't 9/18/14 Br. at 81.

Since these claims concern the USACE's failure to make payment, "only a breach of contract is at issue," not the covenant of good faith and fair dealing. Gov't 9/18/14 Br. at 77–78.

Because Meridian failed to substantiate its final payment request, the USACE "lawfully exercised its right to withhold payment to protect its rights with respect to overpayments." Gov't 9/18/14 Br. at 78 (citing *Johnson*, 329 F.3d at 854 (affirming the Government's right to "set-off" payment)).[39]  The Government acknowledges, however, that Meridian's work was "not entirely paid for" and that an "equitable adjustment of the [C]ontract may be appropriate and payment due . . . provided that Meridian can prove to the [c]ourt during the damages phase of the trial that its costs are reasonable, allocable, and allowable." Gov't 9/18/14 Br. at 82 (internal citation omitted) (citing *Boeing N. Am., Inc. v. Roche*, 298 F.3d 1274, 1280 (Fed. Cir. 2002) (explaining the differences between allocability and allowability); 3/17/14 Weathers Narr. at 53–59 (evaluating and calculating payment due to Meridian)).

---

If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted (1) by an act of the [CO] in the administration of th[e C]ontract, or (2) by the [CO]'s failure to act within the time specified in th[e C]ontract (or within a reasonable time if not specified), an adjustment shall be made for any increase in the cost of performance of th[e C]ontract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the [C]ontract modified in writing accordingly.

48 C.F.R. § 52.242-14(b).

[38] Meridian's October 3, 2014 Reply does not argue that the USACE breached the Contract or the duty of good faith and fair dealing. Pl. 10/3/14 Reply at 37–41. Instead, Meridian rebuts the Government's contentions that the money owed to Meridian for suspension, channel fill, and interim protection work is offset by other overpayments and was not adequately substantiated. Pl. 10/3/14 Reply at 37–41.

[39] The remainder of the Government's September 18, 2014 Brief provides a factual explanation regarding Meridian's alleged failure to substantiate entitlement to payment, including substantial overpayment and allegations as to the USACE's failure to support certain unit priced quantity items. Gov't 9/18/14 Br. at 78–82.

### c.      The Court's Resolution.

Pursuant to the FAR, Meridian is entitled to payment for increased costs incurred due to the CO's changes to or suspension of the Contract. *See* 48 C.F.R. § 52.243-4(d) (Changes Clause); 48 C.F.R. § 52.242-14(b) (Suspension Clause). But, under the Contract, the USACE is entitled to withhold payment only under specified circumstances. JX2-94 (48 C.F.R. § 52.232-5(e)) ("[I]f satisfactory progress has not been made, the [CO] may retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved."); *see also M. C. & D. Capital*, 948 F.2d at 1257 (allowing ten percent of total price from final payment to be withheld, under a Retainage Clause); Gov't 9/18/14 Br. at 854 (discussing the Government's right to a "set-off" payment). In this case, both parties acknowledge that the amount the USACE owes Meridian, if any, should be determined at the damages phase of trial. Pl. 10/3/14 Reply at 38 n.25 (determining whether Meridian's calculations are correct "is a question best reserved for the damages portion of trial"); Gov't 9/18/14 Br. at 82 ("[A]n equitable adjustment . . . may be appropriate . . . provided that [Plaintiff] can prove . . . during *the damages phase of trial* that its costs are reasonable, allocable, and allowable.") (emphasis added) (internal citations omitted).

Therefore, Meridian is ordered to provide the Government with all relevant payment request materials within thirty days and to meet with the Government to discuss payment. If a settlement is not reached, the Government is ordered to show cause within sixty days of receiving Meridian's payment request materials why the court should not find a breach of contract for the unpaid work Meridian has performed, as alleged in Counts 7–9 of the May 19, 2014 Second Amended Complaint.

### 7.      Whether Plaintiff Is Entitled To Costs Regarding The Punchlist (Count 10).

### a.      Plaintiff's Argument.

Meridian also argues that the USACE breached the Contract when it "issued a final punch list containing [eighty-four] outstanding deficiency notices," seventy-four of which were "added after suspension." Pl. 7/18/14 Br. at 76 (citing 1/29/14 TR at 694–95 (Maximoff); JX49-6–14); *see also* Pl. 7/18/14 Br. at 49–50 (explaining the deficiency notice and response procedure). First, "[m]ost of these notices were excessive, and, for the most part, frivolous," and "[n]one . . . were significant enough to render the Project unusable." Pl. 7/18/14 Br. at 76 (1/29/14 TR at 694–95 (Maximoff)); *see also* Pl. 7/18/14 Br. at 50 (same); Pl. 10/3/14 Reply at 42 (citing DX612 (listing, as examples, QA-00027, 31–32, 35)). Second, the Punchlist items were not timely, because "the USACE's 'inspections and listing of 'deficiencies' should have been performed at th[e] time [the relevant increment of work was completed], not four to seven months later." Pl. 10/3/14 Reply at 42–43 (citing JX2-316–17(stating that acceptance inspections would be performed "near the end of any increment of the work")). Third, the USACE relied only on an unidentified photograph concerning the channel crack repair. Pl. 10/3/14 Reply at 43–44 (citing DX651-121[40]). These

---

[40] DX651-121 is an unidentified and undated photograph that appears to show cracks in the channel. The photograph was not discussed at trial, although other photographs contained in DX651 were referred to as being in Mr. Chickey's binder. 3/25/14 TR 1481 (Chickey). For these

minor items do not warrant the excessive Punchlist.  Pl. 10/3/14 Reply at 43–44 (citing *Neal & Co., Inc. v. United States*, 36 Fed. Cl. 600, 632 (1996); *Adams v. United States*, 175 Ct. Cl. 288 (1966)).  Here, like in *Neal* and *Adams*, the Punchlist "contained items [that] could not be repaired . . . or in the very least, did not need to be repaired given the fact that the Project was being deleted and would go unused."  Pl. 10/3/14 Reply at 44.

Therefore, Meridian contends that the USACE breached the Contract and the duty of good faith and fair dealing in issuing the Punchlist.  Pl. 7/18/14 Br. at 76 (citing *N. Star Alaska Hous. Corp. v. United States*, 76 Fed. Cl. 158, 198 (2007) (finding that the "[i]mproper use of extra-contractual inspections," in combination with other actions, "clearly constituted bad faith that breached the Army's duty to cooperate" (citations omitted))).

### b.    The Government's Response.

The Government responds that the Punchlist complied with the Contract and was not excessive.  Gov't 9/18/14 Br. at 75 (citing FAR 52.236-11(a)[41]; JX2-111; JX2-316–17 (requiring a punchlist "near the end of the work")).  The Government further advises the court that an eighty-four item Punchlist, twenty-one of which were added at pre-final inspection, "is about average" and "not overinspection" for a $12 million project.  Gov't 9/18/14 Br. at 75 (citing DX612-6–7; 3/24/14 TR 1495–96 (Slack); *Neal*, 36 Fed. Cl. at 632 (concerning 6,000 item punchlist for thirty housing units); *Adams*, 358 F.2d at 991 (discussing the rejection of at least 200,000 pins)).  Therefore, "[t]he deficiency items were not excessive or frivolous," as they predominantly concerned the cracked flood channel, *i.e.*, the focus of the Project.  Gov't 9/18/14 Br. at 75–76 (citing JX74-2; DX651-121).

But, the Government adds that Meridian cites the incorrect legal test and misstates the rule of *North Star Alaska Housing Corp.*, 76 Fed. Cl. 158 (2007) that involved extra-contractual inspections that prevented repair, whereas "[t]he punch list items here were pursuant to the [C]ontract for the purpose of repair."  Gov't 9/18/14 Br. at 76.  In short, "[t]he punch list here did not breach the [C]ontract."  Gov't 9/18/14 Br. at 76.

### c.    The Court's Resolution.

FAR 52.236-11, in relevant part, provides, "Before taking possession of or using any work, the [CO] shall furnish the Contractor a list of items of work remaining to be performed or corrected on those portions of the work that the Government intends to take possession of or use."   48 C.F.R. § 52.236-11(a).  Although no clear legal test addresses whether a nominally "excessive" Punchlist constitutes a breach of contract in this case, the court will attempt to evaluate the alleged

---

reasons, the court has determined that DX651-121 is inadmissible for lack of foundation.  *See* FED. R. EVID. 901.

[41] FAR 52.236-11, in relevant part, provides, "Before taking possession of or using any work, the [CO] shall furnish the Contractor a list of items of work remaining to be performed or corrected on those portions of the work that the Government intends to take possession of or use." 48 C.F.R. § 52.236-11(a).

number, timing, and nature of the contested Punchlist items under the traditional standards of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

> The Contract provides:
>
> Near the end of the work, or any increment of work established by a time stated in the SPECIAL Clause, 'Commencement, Prosecution, and Completion of Work', or by the specifications, the CQC Manager shall conduct an inspection of the work. A punch list of items which do not conform to the approved drawings and specifications shall be prepared and included in the CQC documentation[.]

JX2-316–17; *see also* 5 U.S.C. § 706 (stating that "the reviewing court shall . . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

As a threshold issue, the court does not consider eighty-four item Punchlist necessarily to be arbitrary and capricious *per se*. 3/24/14 TR 1495–96 (Slack) (stating that the number of Punchlist items was "average"); *cf. Neal & Co.*, 36 Fed. Cl. at 632 (finding that a 6,000-item punch list was "over-zealous"); *Adams*, 358 F.2d at 990–91 (observing that the Government's inspection of 200,000 defective pins "definitely increased plaintiff's costs").

Next, Meridian argues that the October 2008 suspension and February 2009 deletion of remaining work resulted in "increments," requiring the USACE to submit Punchlist items with the Contractor Quality Control documents at the time of the suspension or deletion of work. Pl. 10/3/14 Reply at 42–43 (citing JX2-316–17). But, the Contract in this case refers only to increments *established by* a time stated in the SPECIAL Clause," and this clause does not cause or "establish" increments, based on the future suspension or deletion of work. JX2-316–17 (emphases added); *see also* 48 C.F.R. § 52.211-10 (Commencement, Prosecution, and Completion of Work).[42] In other words, the September 21, 2007 Contract does not *require* that the USACE issue a Punchlist after completion of an "increment" of work. *Compare* JX2-316–17 ("Near the end of the work, *or* any increment of work established by a time stated in the SPECIAL Clause, . . . . [a] punch list of items which do not conform to the approved drawings and specifications shall be prepared[.]" (emphasis added)), *with* JX2-111 (FAR 52.236-11) ("Before taking possession of or using any work, the [CO] shall furnish the Contractor a list of items of

---

[42] FAR 52.211-10, included in the Solicitation, provides:

> The Contractor shall be required to (a) commence work under this contract within 10 calendar days after the date the Contractor receives the notice to proceed, (b) prosecute the work diligently, and (c) complete the entire work ready for use
>
> not later than 274 calendar days. The time stated for completion shall include final cleanup of the premises.

48 C.F.R. § 52.211-10; *see also* JX2-146.

work remaining to be performed or corrected on those portions of the work that the Government intends to take possession of or use.").

In this case, only ten of the eighty-four Punchlist items were identified before the October 2008 suspension of work, but all Punchlist items concerning the Contract were issued by September 2009, *i.e.*, less than six months after the March 24, 2009 lift of the suspension of work and within the seventy-two day extension period authorized in Modification R31.  JX49-6–14; *see also* JX175 (lifting suspension); JX146 (seventy-two day extension).  In sum, the USACE issued the Punchlist items in a timely manner.

The nature of the Punchlist items primarily concerned removal of stones and repairs of integral Project work items.  *See* JX49-6–14 (Punchlist items by QA); DX612 (Punchlist items by QA); JX74-2 (listing "Rework and Repairs" and "Channel Crack Repair RFI 49" as the two Punchlist items as of January 2013); *see also* 1/29/14 TR at 695 (Maximoff) (restating that the forty-seven Punchlist items concerned the removal of loose stones).  In contrast, here it must be noted that Meridian did not present any evidence that the channel was not cracked.

For these reasons, the court has determined that the USACE's punchlist did not breach the Contract or implied duty of good faith and fair dealing.

## 8.      Whether Plaintiff Is Entitled To Recover Costs For The North Bridge VECP (Count 11).

### a.      Plaintiff's Argument.

Meridian argues that "the [USACE] not just encouraged, but required [Meridian] to expend considerable time and expense on design services for the alternative bridge design, . . . constitut[ing] constructive acceptance of Meridian's proposed value engineering change."  Pl. 7/18/14 Br. at 77.  Since Meridian's North Bridge VECP complied with FAR 52.248-3 and was sufficient for the CO to evaluate and accept, Meridian "should be compensated for the expenses it incurred in developing the bridge design."  Pl. 7/18/14 Br. at 77.  Meridian "is not seeking to share in the savings," but is "simply seeking reimbursement for the cost to prepare, and revise, the VECP; things that it did at the behest of, and in reliance on statements made by, the [USACE]."  Pl. 10/3/14 Br. at 45.  The cancellation of all remaining work, including the North Bridge, was not foreseeable and was the sole reason that the North Bridge VECP was not accepted.  Pl. 7/18/14 Br. at 77; Pl. 10/3/14 Reply at 45.

Moreover, the USACE "has taken ownership of [the VECP] design and has the right to use it in the future" if the Project is ever completed.  Pl. 10/3/14 Reply at 45.  As such, the USACE received something of value from Meridian, without making payment, resulting in unjust enrichment.  Pl. 7/18/14 Br. at 77; Pl. 10/3/14 Reply at 45.

### b.      The Government's Response.

The Government responds that a contractor may only share in the savings of a VECP, if the proposal is accepted.  Gov't 9/18/14 Br. at 76 (citing *Ni Indus. v. United States*, 841 F.2d 1104, 1105 (Fed. Cir. 1988) ("If the agency adopts the [VECP], the submitting contractor is entitled to

share in the resulting cost savings."); *John J. Kirlin, Inc. v. United States*, 827 F.2d 1538, 1541 (Fed. Cir. 1987) (holding that a contractor was "not entitled to compensation . . .[,] because its [VECP] was not accepted")).  In this case, although the USACE "came close" to approving the North Bridge VECP, the sewer line issue arose and all remaining contract work was cancelled. Gov't 9/18/14 Br. at 77 (citing 3/25/14 TR at 1585–86 (Underwood)).  Because the VECP was never accepted, Meridian was not entitled to payment, since there are no savings to be shared. Gov't 9/18/14 Br. at 76–77.

Therefore, Meridian's constructive acceptance and unjust enrichment arguments fail. Gov't 9/18/14 Br. at 77.  No constructive acceptance occurred, and the court does not have jurisdiction over Meridian's unjust enrichment claim.  Gov't 9/18/14 Br. at 77.

### c.    The Court's Resolution.

FAR 52.248-3 is incorporated into the Contract and provides that contractors are "encouraged to develop, prepare, and submit [VECP's] voluntarily" and will "share in any instant contract savings[43] from *accepted* VECP's[.]"  48 C.F.R. § 52.248-3(a) (emphasis added); *see also* JX2-124 (incorporating FAR 52.248-3).[44]  In this case, the USACE never accepted the North Bridge VECP before all remaining work on the Project ceased.  3/24/14 TR 1586 (Underwood) (stating that Meridian's final VECP proposal "very likely would have been approved," but was

---

[43] "Instant contract savings" are defined as "the estimated reduction in Contractor cost of performance resulting from acceptance of the VECP, minus allowable Contractor's development and implementation costs[.]"  48 C.F.R. § 52.248-3(b).

[44] FAR 52.248-3(f), governing the sharing of VECP savings, provides:

(f)  Sharing—

(1) Rates.  The Government's share of savings is determined by subtracting Government costs from instant contract savings and multiplying the result by (i) 45 percent for fixed-price contracts or (ii) 75 percent for cost-reimbursement contracts.

(2) Payment.  Payment of any share due the Contractor for use of a VECP on this contract shall be authorized by a modification to this contract to—

(i)     *Accept the VECP*;

(ii)    Reduce the contract price or estimated cost by the amount of instant contract savings; and

(iii)   Provide the Contractor's share of savings by adding the amount calculated to the contract price or fee.

48 C.F.R. § 52.248-3(f) (emphasis added).

never used, because then the North Bridge was eliminated from the Project because of subsequent sewer line problems); 1/27/14 TR 147 (Sutton) (confirming that "[t]he [P]roject was subsequently suspended not long after" Meridian submitted the final VECP proposal). Therefore, as a matter of law, Meridian "is not entitled to compensation in this case because its proposal was not accepted." *John J. Kirlin, Inc.*, 827 F.2d at 1541; *see also* 48 C.F.R. § 52.248-3(f) (providing that a contract must be modified to "accept the VECP" for a Contractor to share in savings).[45]

Meridian also failed to establish that the USCAE "later implement[ed] substantially identical changes in the *same* contract." *John J. Kirlin*, 827 F.2d at 1541 (emphasis in original). In fact, the USACE did not utilize Meridian's North Bridge VECP design to complete the Project or for any other purpose. 3/24/14 TR 1586 (Underwood); 1/27/14 TR 149 (Sutton) (stating only that he "heard reference to [Meridian's VECP design] on projects—*other* arch projects, that it's a good design") (emphasis added). Likewise, the court does not have jurisdiction to grant Meridian relief under its unjust enrichment claim since the USACE did not enter into an implied-in-fact contract or use Meridian's design. *See Cleveland Chair Co. v. United States*, 214 Ct. Cl. 360, 364 (1977) ("Unjust enrichment cannot in itself be the basis for recovery here, for it lacks the consensual element needed to find a contract implied in fact, and only provides support for the remedial device known as a contract implied in law, over which this court has no jurisdiction.")).

For these reasons, the court has determined that the USACE did not breach the Contract by failing to reimburse Meridian for the North Bridge VECP design. If Meridian becomes aware that the USACE misappropriates Meridian's design to complete the Project or in another context, Meridian can file a Complaint in the United States Court of Federal Claims under the Takings Clause of the Fifth Amendment.

### F.    Whether Plaintiff Is Entitled To Recover Preparation Costs For A Request For Equitable Adjustment (Count 12).

#### a.    Plaintiff's Argument.

Meridian also contends that it "is entitled to recover the costs of contract administration," including the "costs associated with the preparation of REAs" prepared by outside consultants. Pl. 7/18/14 Br. at 77 (citing FAR 31.205-33(b)[46]; *see also Tip Top Constr., Inc. v. Donahoe*, 695 F.3d 1276, 1284 (Fed. Cir. 2012) (holding that the Postal Service Board of Contract Appeals "erred in

---

[45] Meridian could have argued that the CO did not comply with FAR 52.248-3(d), because the CO did not explain the reasons for rejecting the VECP in writing. *See* 48 C.F.R. § 52.248-3(d)(2) ("If the VECP is not accepted, the [CO] will notify the Contractor in writing, explaining the reasons for rejection."). But, this argument was not raised and the elimination of remaining work on the Project renders this requirement moot.

[46] FAR 31.205-33, in relevant part, provides, "Costs of professional and consultant services are allowable . . . when reasonable in relation to the services rendered and when not contingent upon recovery of the costs from the Government[.]" 48 C.F.R. § 31.205-33(b); *see also* 48 C.F.R. § 31.205-33(c) (listing unallowable professional and consultant costs); 48 C.F.R. § 31.205-33(d) (listing factors to be considered when determining whether a cost is allowable).

holding that the consultant costs and attorney fees . . . were not genuine contract administration costs[,] because they were solely directed at . . . maximizing [the plaintiff's] monetary recovery") (internal quotations omitted); *see also Bill Strong Enters., Inc. v. Shannon*, 49 F.3d 1541, 1550 (Fed. Cir. 1995) (holding that a contractor's consultant costs were recoverable, because they materially furthered negotiations), *overruled on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1579 (Fed. Cir. 1995)).

If a contractor incurs a cost "'for the genuine purpose of materially furthering the negotiation process, such cost should normally be a contract administration cost allowable under FAR 31.205-33, even if negotiation eventually fails and a CDA claim is later submitted.'" *Tip Top*, 695 F.3d at 1283–84 (quoting *Bill Strong*, 49 F.3d at 1550). In this case, the USACE requested that Meridian prepare the REAs to begin bilateral negotiations and then requested Meridian to submit a single, consolidated REA. Pl. 7/18/14 Br. at 78 (citing PX237; 1/29/14 TR 857–60 (Haworth)). Later, however, Meridian converted the REA to a certified claim. Pl. 7/18/14 Br. at 78 (citing 1/29/14 TR 860 (Haworth)). Because "these REAs were submitted for the genuine purpose of materially furthering the negotiation process, . . . . [Plaintiff] is entitled to payment of the $406,971.07 expended in REA preparation costs." Pl. 7/18/14 Br. at 78.

Moreover, despite the Government's assertions to the contrary, neither *Reflectone* nor *Plano Builders Corp. v. United States*, 40 Fed. Cl. 635 (1998) control here. The Government misreads *Reflectone* "when it argues that [it] stands for the proposition that an REA is commensurate with a claim." Pl. 10/3/14 Reply at 46. Instead, FAR 52.233-1 "define[s] what a 'claim' is" and lists "[s]everal criteria [that] *must* be present to meet the definition of a claim." Pl. 10/3/14 Reply at 46 (emphasis in original). Namely, a claim must be submitted "to the [CO] for a written decision" and it must use the precise language in 48 C.F.R. § 52.233-1(d)(2)(iii).[47] Pl. 10/3/14 Reply at 46 (quoting 48 C.F.R. § 52.233-1(d)(1)). In this case, "the REA submitted by Meridian did not include a demand for formal decision by the [CO]," so the "REA did not include a claim certification." Pl. 10/3/14 Reply at 46 (citing JX177). As such, *Reflectone* is "factually distinguishable." Pl. 10/3/14 Reply at 46 (citing *Reflectone*, 60 F.3d at 1579 ("The submission was certified and requested a CO decision.")). Likewise, *Plano Builders* is not relevant, because Meridian "used its consultant's work . . . during the REA phase, long before a certified claim was submitted." Pl. 10/3/14 Reply at 47 (citing *Plano Builders*, 40 Fed. Cl. at 644 ("This case does not raise, and hence the court does not address, a situation where a contractor employs a consultant's work product during good faith negotiations *before* filing a CDA claim and then, after negotiations fail, relies upon the same work at the time it submits a CDA claim or thereafter.")

---

[47] FAR 52.233-1(d)(2)(iii) provides:

The certification shall state as follows: "I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am authorized to certify the claim on behalf of the Contractor."

48 C.F.R. § 52.233-1(d)(2)(iii).

(emphasis added)).   In sum, *Tip Top* and *Bill Strong* "remain good law and are controlling precedent on the issue of Meridian's REA preparation costs."  Pl. 10/3/14 Reply at 47.

Finally, Meridian's position does not "render FAR 31.205-47(f) meaningless," but instead, "reconciles both [FAR 31.205-33 and FAR 31.205-47] and follows the two [United States Court of Appeals for the] Federal Circuit cases directly on point on the recovery of REA preparation costs."  Pl. 10/3/14 Reply at 48.

### b.    The Government's Response.

The Government responds that Meridian's preparation costs are not recoverable, because they were expended in connection with Meridian's CDA claim.  Gov't 9/18/14 Br. at 84–85.  FAR 31.205-47, in relevant part, provides that "'administrative and clerical expenses,' 'costs of legal services,' and the 'services of accountants [and] consultants' are 'unallowable if incurred in connection with . . . the prosecution of claims or appeals against the Federal Government.'"  Gov't 9/18/14 Br. at 84 (quoting 48 C.F.R. 31.205-47(a), (f)).  Since costs for legal and accounting work between May 2009 and April 2010 were incurred to prepare REAs to satisfy the requirements for a CDA claim, they are not recoverable.  Gov't 9/18/14 Br. at 84 (citing *Reflectone, Inc.*, 60 F.3d at 1578 ("[A] contracting party, submitted a written document to the CO demanding the payment of $266,840 which it asserted the [G]overnment owed. . . .  The submission was certified and requested a CO decision.  Consequently, [this] REA satisfies all the requirements listed for a CDA 'claim' according to the plain language of the first sentence of FAR 33.201."); *see also Plano Builders*, 40 Fed. Cl. at 641 ("The *Reflectone* court held that the only requirements for a 'claim' are found in FAR 33.201, namely 'that it be (1) a written demand, (2) seeking, as a matter of right, (3) payment of money in sum certain.'") (citation omitted); JX76-6; JX76-21–23; JX76-2).

Here, Meridian seeks to recover costs to prepare its April 5, 2010 consolidated REA—that is the same as its CDA claim.  Gov't 9/18/14 Br. at 85 (citing JX33-1-16; JX177-1-17).  "As CDA claim preparation costs are unrecoverable, the costs of preparing a preliminary submission of the same claim as an REA are also unrecoverable.  To hold otherwise renders FAR 31.205-47(f) meaningless."  Gov't 9/18/14 Br. at 85.

Finally, Meridian did not submit the REA costs to further the negotiation process, but instead, "refused to negotiate [C]ontract close out with the [USACE] since approximately May 13, 2009."  Gov't 9/18/14 Br. at 85 (citing 3/24/14 TR at 1284 (Martinez); DX485-1; DX563-1).

### c.    The Court's Resolution.

The United States Court of Appeals for the Federal Circuit has observed that "the law regarding the allowability of legal and consulting fees in the preparation of REA's [has been] confused and unsettled."  *Bill Strong*, 49 F.3d at 1548.

In that case, our appellate court provided the following guidance by identifying:

three distinct categories of legal, accounting, and consultant costs in the contract cost principles: (1) costs incurred in connection with the work performance of a contract; (2) costs incurred in connection with the administration of a contract; and (3) costs incurred in connection with the prosecution of a CDA claim.

*Bill Strong*, 49 F.3d at 1549.

"[C]osts that fall within the first and second categories are presumptively allowable if they are also reasonable and allocable," but "cost[s] incurred in connection with the prosecution of a CDA claim or an appeal against the Government is *per se* unallowable." *Id.* Therefore, the trial court should determine whether certain costs are for contract administration or CDA prosecution, based on whether or not the costs were incurred for "the genuine purpose of materially furthering the negotiation process," *i.e.*, for contract administration purposes. *Id.* at 1550.

Thereafter, the United States Court of Appeals for the Federal Circuit, sitting *en banc*, overruled *Bill Strong*'s view of when a claim arises under the CDA. *See Reflectone*, 60 F.3d at 1574. In this case, the appellate court held that there are three requirements for a "claim" under the FAR: "that it be (1) a written demand, (2) seeking, as a matter of right, (3) the payment of money in sum certain." *Id.* at 1575. FAR 52.233-1(c) defines a "claim" as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in sum certain, the adjustment or interpretation of [C]ontract terms, or other relief arising under or relating to th[e C]ontract." 48 C.F.R. § 52.233-1(c).[48] "Nothing in the common definition

---

[48] Pursuant to FAR 31.205-33(d):

In determining the allowability of costs . . . , the [CO] shall consider the following factors, among others:

(1) The nature and scope of the service rendered in relation to the service required.

(2) The necessity of contracting for the service, considering the contractor's capability in the particular area.

(3) The past pattern of acquiring such services and their costs, particularly in the years prior to the award of Government contracts.

(4) The impact of Government contracts on the contractor's business.

(5) Whether the proportion of Government work to the contractor's total business is such as to influence the contractor in favor of incurring the cost, particularly when services rendered are not of a continuing nature and have little relationship to work under Government contracts.

(6) Whether the service can be performed more economically by employment rather than by contracting.

(7) The qualifications of the individual or concern rendering the service and the customary fee charged, especially on non-Government contracts.

(8) Adequacy of the contractual agreement for the service (e.g., description of the service, estimate of time required, rate of compensation, termination provisions).

of 'claim' . . . requires a pre-existing dispute [as to the amount owed to the plaintiff] before a demand as a matter of right can be a claim." *Reflectone*, 60 F.3d at 1576; *see also id.* at 1583 (holding that the FAR "does not require that a payment of a demand contained in a purported CDA claim be in dispute before being submitted for decision to the CO unless that demand is a 'voucher, invoice or other routine request for payment'"). Applying that definition, the appellate court determined that, since the plaintiff's REA in that case was submitted before the CDA claim, it "satisfie[d] all the requirements listed for a CDA 'claim.'" *Id.* at 1578.

Subsequently, in *Tip Top*, the United States Court of Appeals for the Federal Circuit clarified the relationship between *Bill Strong* and *Reflectone*, as follows:

> In *Reflectone*, we addressed *when* a claim arises for purposes of the CDA and overruled *Bill Strong* on this point. The discussion in *Bill Strong* regarding *whether* a particular cost should be classified as either a contract administration cost or a cost incidental to the prosecution of a claim, however, remains good law.

*Id.* at 1283 n.3 (emphases added).

The United States Court of Appeals for the Federal Circuit then considered whether the plaintiff had "incurred the cost for the genuine purpose of materially furthering the negotiation process" and determined that consultant fees were contract administration costs that could be recovered. *Id.* at 1283–84 (quotation and citation omitted).

In this case, Meridian submitted a consolidated REA comprised of fourteen separate REAs, to the CO on April 5, 2010. JX177-1–19 (Meridian's letter submitting consolidated REA); 1/29/14 TR 858 (Haworth) ("The [USACE] had asked if we would submit a consolidated REA."). On May 20, 2010, the CO stated that a final decision would be made by November 30, 2010. JX189.

Meridian argues that this case is distinguishable from *Reflectone*, because "the REA submitted by [Plaintiff] did not include a demand for a final decision by the [CO], and the REA did not include a claim certification." Pl. 10/3/14 Reply at 46 (citing *Reflectone*, 60 F.3d at 1579 ("The submission was certified and requested a CO decision.")). The United States Court of Appeals for the Federal Circuit, however, has held that there are three requirements for a "claim" under the FAR: "that it be (1) a written demand, (2) seeking, as a matter of right, (3) the payment of money in sum certain." *Reflectone*, 60 F.3d at 1575.

Meridian is correct that the consolidated REA neither explicitly *demanded* payment, nor contained the proper certification provided in FAR 52.233-1(d)(2)(iii). JX177-17 (seeking to "discuss these issues in detail and to enter into good faith negotiations to achieve a global resolution"); *see also* JX177-19 (DFARS 252.203-7002 certification stating, "I certify that the request is made in good faith, and that the supporting data are accurate and complete to the best of my knowledge and belief."). But, exact compliance is not always required. *See Transamerica Ins. Corp. v. United States*, 973 F.2d 1572, 1578 (Fed. Cir. 1992) (holding that "[t]his court will not require contractors to do more than comply as fully and reasonably as possible with the statutory requirements of the CDA when this court has definitively be said that certain 'magic words' need

---

48 C.F.R. § 31.205-33(d).

not be used"); *see also Contract Cleaning Maint.*, 811 F.2d at 592 ("All that is required is that the contractor submit in writing to the [CO] a clear and unequivocal statement that gives the [CO] notice of the basis . . . of the claim.").

Meridian's "Claim Overview" contains the same language and certification, and a similar sum certain. *Compare* JX177-17 (seeking ($7,386,700.03 and to "discuss these issues in detail and to enter into good faith negotiations to achieve a global resolution") *and* JX177-19 (certification), *with* JX33-15–16 (seeking ($7,688,952.05 and to "discuss these issues in detail and to enter into good faith negotiations to achieve a global resolution") *and* JX33-18 (certification). Since Meridian's REA and claim are almost identical and have the same deficiencies, the weight of evidence supports concluding that Meridian's "underlying purpose for incurring [these] cost[s] [was] to promote the prosecution of a CDA claim against the Government[.]" *Bill Strong*, 49 F.3d at 1550; *see also Tip Top*, 695 F.3d at 1283–84 (holding that consultant fees could be recovered if they were "incurred the cost for the genuine purpose of materially furthering the negotiation process") (internal quotation marks and citation omitted).

Finally, Meridian argues that it converted the REA to a claim only after the CO failed to respond by the November 30, 2010 deadline. 1/29/14 TR 858–61 (Haworth). But, this does not evidence that Meridian incurred these costs "for the genuine purpose of materially furthering the negotiation process." *Bill Strong*, 49 F.3d at 1550. It is true that these costs were incurred prior to Plaintiff's April 5, 2010 consolidated REA, and many entries explicitly state that they were incurred for "claim assistance," "claim prep," or "claim preparation." JX76-21–23.[49] It is also true that Meridian's consolidated REA and claim were almost identical. *Compare* JX177-1–17 (REA letter), *with* JX33-1–16 (claim letter). But, the record also reflects that Meridian ceased negotiations in May 2009, well before the submission of the consolidated REA. 3/24/14 TR 1284 (Martinez) ("Put simply, the contractor stopped coming to the table. They just wouldn't respond."); DX485-1 (May 13, 2009 close-out negotiation); DX563-1 (August 10, 2009 letter stating that Meridian "has resisted. After numerous written and verbal requests" to continue close-out negotiations).

For these reasons, the court has determined that the USACE did not breach the Contract by failing to pay Meridian's REA preparation costs.

---

[49] These costs are for the $169,556.66 incurred by Cohen Segalias Pallas Greenhall & Furman P.C. and were incurred concurrently with the other REA preparation costs between May 2009 and April 2010. *Compare* JX76-5–7, *with* JX76-21–23.

**G.      Whether The Government Violated The Duty Of Good Faith And Fair Dealing (Count 14).[50]**

**1.      Plaintiff's Argument.**

Meridian's final argument is that the USACE "effectively deprived Meridian of the benefit of the bargain to be able to build the sewer line without problems. . . . , [amounting to] a breach [of] good faith and fair dealing." Pl. 7/18/14 Br. at 84–85.  Although Meridian and the USACE "had a good working relationship during the initial stages of th[e] Project[,] . . . . the latter stages . . . were marked with a pervasive attitude of non-cooperation and animosity on behalf of the [USACE]," as well as "refus[al] to cooperate."  Pl. 10/3/14 Reply at 48; *see also, e.g.*, 3/27/14 TR 2234–35 (Sutton) (testifying that the USACE intentionally withheld information from Meridian).

Meridian specifically asserts that the USACE breached its implied duty of good faith and fair dealing in at least four ways: (1) "fail[ing] to make proper payment for work performed by Meridian even though the [CO] and Government consultants acknowledged that payment was due"; (2) "improperly addressing the differing site condition it acknowledged to exist at the new sewer line"; (3) "improperly addressing its design error of specifying the wrong type of reinforced concrete pipe for the sewer line"; and (4) "failing to cooperate with Meridian on the independent AMEC investigation."  Pl. 7/18/14 Br. at 79.[51]

---

[50] Meridian lists Count 13 of the May 19, 2014 Second Amended Complaint as "in the alternative" to Counts 1–12.  Because the court has addressed Counts 1–12 above, it does not discuss Count 13.

[51] In the October 3, 2014, Post-Trial Brief, Meridian lists eight ways in which the Government violated its duty of good faith and fair dealing:

> (1) Repeated failure to provide [Plaintiff] with the requested information concerning potential health risks to workers . . . ; (2) failure to fully compensate [Plaintiff] for the differing site conditions . . . ; (3) failure to suspend the Project during a record monsoon year . . . ; (4) refusal to pay for the unpaid contract quantities . . . ; (5) encouraging [Plaintiff] to spend an enormous amount of time and resources constructing a VECP for a bridge that was ultimately deleted; (6) issuance of a punitive punch list requiring frivolous but nonetheless expensive repairs to a Project that would never be used; (7) repeated refusal . . . to pay close to a million dollars undisputedly due and owing [Plaintiff]; and (8) . . . choosing to simply "modify" the [C]ontract and delete all remaining work rather than utilizing the termination for convenience clause[.]

Pl. 10/3/14 Br. at 48–49.

But, Meridian's October 3, 2014 Post-Trial Brief does not cite to the record or any cases in support of its good faith and fair dealing arguments.  In addition, at least four of the eight alleged violations of good faith and fair dealing listed in Meridian's October 3, 2014 Post-Trial Reply

First, the USACE refused to pay Meridian over $800,000 that "it admitted it owed" for over five years.  Pl. 7/18/14 Br. at 80 (citing 3/27/14 TR 2134–35 (Haworth); *see also* Pl. 7/28/14 Br. at 79 (citing *N. Helex Co. v. United States*, 197 Ct. Cl. 118, 124 (1972) (holding that "total failure to pay over many months" is a material breach of contract); *Rumsfeld v. Freedom N.Y., Inc.*, 329 F.3d 1320, 1331 (Fed. Cir. 2003) (holding that failure to make progress payments in order to pressure a plaintiff into a contract modification constitutes a breach of contract)).[52]  This is because as early as June 2008, "lack of funding was a concern [to the USACE] . . . and was certainly affecting Contract administration and how payments were being made."  Pl. 7/18/14 Br. at 80 (citing PX347; PX349; PX7-8; PX7-10).   This included "failures to pay funds due, . . . deletion of necessary work such as the second row of sheetpiling, [and] failure to implement the necessary micro tunneling."  Pl. 7/18/14 Br. at 81.  "The [USACE] effectively forced Meridian to finance the additional cost incurred as a result of deficiencies for which the Government was responsible."  Pl. 7/18/14 Br. at 81.

Second, the Contract "contained a differing site conditions clause requiring a modification to deal with differing site conditions."  Pl. 7/18/14 Br. at 81.  Instead of firm material identified in the borings and test trenches, Meridian encountered "soft, soupy materials" during the sewer line installation.  Pl. 7/18/14 Br. at 81 (citing JX2; 2/21/14 TR 75, 102, 104 (Sutton); PX320).  The USACE, however, did not comply with its "responsibility to investigate an alleged differing site condition, and then issue a modification to deal with the problem."  Pl. 7/18/14 Br. at 83 (citing 48 C.F.R. 52.236-2(b)).  Instead, it "chose a remedial design," *i.e.*, "installation of a sheetpile wall approximately 250 lineal feet from each side of the sewer line."  Pl. 7/18/14 Br. at 82.  But, the USACE, later "delete[d] over half of the sheetpile wall" and "continued to tinker with a 'fix' for the soft, wet, unstable soils."  Pl. 7/18/14 Br. at 82 (citing JX131; PX89; PX96; PX213; PX216; 2/21/14 TR at 386–90 (Branson)).  In sum, the USACE "failed to adequately address the differing site condition it recognized through an appropriate modification."  Pl. 7/18/14 Br. at 82.

Third, the USACE did not respond properly when Meridian reported that the sewer line design specifications were defective.  Pl. 7/18/14 Br. 83.  Instead, the USACE "ignored Meridian's explanation, and summarily directed [it] to install the pipe as per the Specifications."  Pl. 7/18/14 Br. at 83 (citing JX110-10; 2/21/14 TR at 222 (Sutton); 3/25/14 TR 1553–54, 1601–12 (Underwood); 4/28/14 TR 2372 (Mahar)).

---

Brief—with the possible exceptions of reasons 2, 4, and 7 that concern nonpayment and number 6 that concerns the Punchlist—were alleged for the first time in Plaintiff's October 3, 2014 Post-Trial Reply Brief.  Therefore, as a matter of law, these arguments were waived.  *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived. . . .  We find that these mere statements of disagreement . . . do not amount to a developed argument. . . .  Further, arguments raised in footnotes are not preserved.") (citing sources).

[52] As the court noted at trial, "the Government's refusal to release this money could make a difference to the survival of the company."  Pl. 7/18/14 Br. at 80 (citing 3/27/14 TR at 2135 (Haworth)).

Fourth, the USACE "refused Meridian's request for a copy of the [AMEC] results, forcing Meridian to obtain a copy through the Freedom of Information Act" and also "misrepresented AMEC's conclusions concerning the case of the pipe bowing and the salvageability of the pipe." Pl. 7/18/14 Br. at 83 (citing 3/25/14 TR 1609 (Underwood); 4/28/14 TR 2235–36 (Sutton); JX52). The USACE blamed the cracked pipe on Meridian's injection of foam grout, but the cracks actually were caused by the USACE's flawed pipe design.  Pl. 7/18/14 Br. at 84 (citing 1/28/14 TR 401 (Branson); 4/28/14 TR 2227–30, 2235–42, 2370–82 (Sutton)).

## 2.    The Government's Response.

The Government responds that the duty of good faith and fair dealing "must be applied with great care" and "must not be interpreted so broadly as to inhibit a party from maximizing its benefits through aggressive enforcement of its contract rights."  *Solar Turbines, Inc. v. United States*, 26 Cl. Ct. 1249, 1274 (1992), *aff'd*, 114 F.3d 1206 (Fed. Cir. 1997).

As to nonpayment, "because [Plaintiff] claims that the purported breach at issue is of an express duty, *i.e.*, the 'failure to make proper payment for work,' . . . only breach of contract is at issue."  Gov't 9/18/14 Br. at 78.  Moreover, Meridian "misrepresents that the [USACE] admitted it owed over $800,000," because the disputed amount involves the final payment and closeout of the contract and Meridian failed to substantiate its payment request.  Gov't 9/18/14 Br. at 78 (internal quotation omitted).  On June 2, 2009, the USACE "acknowledged 94% completion," but on August 24, 2009, Meridian "submitted its next payment request . . . seeking *all* money remaining upon the contract."  Gov't 9/18/14 Br. at 78 (emphasis in original) (citing DX628-1; DX572-2-7; 3/24/14 TR 1273 (Martinez)).  Meridian, however, "had a duty to provide substantiation for its payment requests," and the USACE "had a right to withhold final payment." Gov't 9/18/14 Br. at 78–79 (citing JX2-93 (48 C.F.R. § 52.232-5); JX2-94 (48 C.F.R. § 52.232-5(e)).  In that regard, there remain two unresolved issues: (1) the "substantial overpayment for work that was not completed or that was incorrectly reported as completed in prior pay estimates" (Gov't 9/18/14 Br. at 79 (citing 3/24/14 TR 1275–77 (Martinez); JX144-2, 3; DX727-1-3)); and (2) the "significant reconciliation" required for unit priced quantity items (Gov't 9/18/14 Br. at 79 (citing 3/17/14 Weather Narr. at 41)); Gov't 9/18/14 Br. at 80 (citing *Wilner*, 24 F.3d at 1401 (holding that a witness's testimony was insufficient to support the court's award to the plaintiff, because the witness did not testify "as to supporting facts"); *Boeing N. Am., Inc. v. Roche*, 298 F.3d 1274, 1280 (Fed. Cir. 2002) (explaining the differences between contractors cost allocability and allowability); 3/24/14 TR 1281–82, 1425 (Martinez); DX572-2–7; 3/17/14 Weathers Narr. at 42–43).[53]

---

[53] The Government also contends that the evidence demonstrates that Meridian's failure to substantiate its payment demands.  Gov't 9/18/14 Br. at 80 (Meridian "provided only its own spreadsheet chart to support its claim, and no underlying supporting evidence.") (citing PX226, at MER-0006258; JX3-7; JX58-5; PX394).  In fact, since May 13, 2009, Meridian "has refused to meet with the Army Corps to reconcile final work percentages, final quantities and negotiate final payment."  Gov't 9/18/14 Br. at 81 (citing 3/24/14 TR 1284 (Martinez); DX485-1; DX563-1; DX16-34; JX2-93).

In fact, the USACE overpaid Meridian for the "unilateral suspension of work, interim protection, and channel fill modification line items." Gov't 9/18/14 Br. at 81; *see also* JX58-5 (Meridian acknowledged overpayment of $418,114); 3/17/14 Weathers Narr. at 52 (calculating overpayment of $326,642.32). Therefore, the USACE properly withheld $746,577.23, "pursuant to its rights of retainage and offset because of remaining overpayments that could not be clawed back and issues relating to quantity overruns." Gov't 9/18/14 Br. at 81.

As to differing site conditions, "there were no differing site conditions that would provide a basis for a breach of contract claim." Gov't 9/18/14 Br. at 83. In fact, Meridian's records indicate that R16 was a settlement of a differing site condition and was "generally suitable and appropriate for the conditions encountered." Gov't 9/18/14 Br. at 83 (citing JX79-362; JX194-25). If Meridian is claiming breach of an implied warranty based on the pipe classification, it cannot claim "sewer costs predating discovery of the wrong pipe classification," because "these costs arise from soil conditions and Meridian's own installation problems." Gov't 9/18/14 Br. at 83 (citing JX66-3; DX358-2).

As to the AMEC results, the USACE was permitted to inspect Meridian's work but was not obligated to share the inspection results. Gov't 9/18/14 Br. at 84 (citing JX2-121–22). In any event, AMEC's conclusions were "consistent with the cited testimony" and included "numerous problems . . . , including Meridian's admitted failure to adequately dewater the trenches and the deflection of the sheetpile wall . . . due to [Plaintiff]'s failure to adequately shore its trenches." Gov't 9/18/14 Br. at 84 (citing JX194-26, 45–46).

### 3.    The Court's Resolution.

The covenant of good faith and fair dealing "imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005). Both the "duty not to hinder and the duty to cooperate are aspects of the implied duty of good faith and fair dealing." *Precision Pine & Timber*, 596 F.3d at 820 n.1. "What is promised or disclaimed in a contract helps define what constitutes 'lack of diligence and interference with or failure to cooperate in the other party's performance.'" *Metcalf*, 742 F.3d at 991 (quoting *Malone v. United States*, 849 F.3d 1441, 1445 (Fed. Cir. 1988)).

The United States Court of Appeals for the Federal Circuit has defined the parameters of the implied duty of food faith and fair dealing as follows:

> [T]he implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions. Although in one sense any "implied" duty "expands" the "express" duties, our formulation means simply that an act will not be found to violate the duty (which is implicit in the contract) if such a finding would be at odds with the terms of the original bargain, whether by altering the contract's discernible allocation of risks and benefits or by conflicting with a contract provision. The implied duty of good faith and fair dealing is limited by the original bargain: it prevents a party's acts or omissions that, though not

proscribed the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value.

*Metcalf*, 742 F.3d at 991.

The implied duty of good faith and fair dealing "depends on the parties' bargain in the particular contract at issue." *Id.* at 994.  But, "a breach of the *implied* duty of good faith and fair dealing does not require a violation of an *express* provision in the contract."  *Id.* (emphasis in original).

As previously discussed, the court has determined that the USACE did not breach the Contract based on the alleged non-payment, differing site conditions, or design specifications. And, Meridian has not demonstrated that the USACE otherwise violated a duty not "proscribed by the [C]ontract expressly."  *Id.* at 991.  Instead, Meridian makes conclusory statements based on the same arguments made in support of its breach of contract claims.  *See* Pl. 7/18/14 Br. at 78– 85.  Therefore, finding that the USACE breached the implied duty of good faith and fair dealing here would "expand [the USACE]'s contractual duties beyond those in the express contract or create duties inconsistent with the [C]ontract's provisions." *Id.*; *see also Century Exploration New Orleans, LLC v. United States*, 745 F.3d 1168, 1179 (Fed. Cir. 2014) ("[Plaintiffs] cannot rely on the implied covenant of good faith and fair dealing to change the text of their contractual obligations."); *Metcalf*, 742 F.3d at 991 ("[T]he implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions. . . .  The implied duty of good faith and fair dealing is limited by the original bargain: it prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value.").

As to the AMEC Report, Meridian contends that the USACE withheld and misrepresented the study's results.  Pl. 7/18/14 Br. at 83–84.  But, the AMEC Report was readily available when it was published on June 5, 2009, less than six months after it was commissioned and three months after AMEC's scope of work was finalized.  JX52-2, 5.  Although Meridian contends that it did not see the video included in the AMEC report until trial, despite a prior Freedom of Information Act request (Pl. 7/18/14 Br. at 28 (citing 3/27/14 TR at 2235–36 (Sutton)), this does not evidence that the USACE acted inconsistently with the purpose of the Contract.  Of course Meridian is correct that the AMEC report also stated that there were many contributing factors responsible for the bowing of the pipe.  JX52-29–36.  But, the AMEC Report concluded that the grouting at least "conceivabl[y] . . . contributed to or exacerbated lateral movements," and the text was available to Meridian.  Under different circumstances the court might exclude the video from the record, but Meridian did not ask for such a ruling at trial, and in any event, the USACE's failure to produce the video before trial was not "inconsistent with the contract's purpose" and did not "deprive [Meridian] of the contemplated value." *Metcalf*, 742 F.3d at 991.

For these reasons, the court has determined that the USACE did not violate the duty of good faith and fair dealing.

IV.     **CONCLUSION.**

For the reasons described herein, the court has determined that the USACE did not breach the September 21, 2007 Contract, as alleged in Counts 1–6 and 10–13 of the May 19, 2014 Second Amended Complaint, or the implied duty of good faith and fair dealing, as alleged in Count 14 of the May 19, 2014 Second Amended Complaint.   But, Meridian is ordered to provide the Government with all relevant payment request materials within thirty days and to meet with the Government to discuss payment.   If settlement is not reached, the Government is ordered to show cause within sixty days of receiving Meridian's payment request materials why the court should not find a breach of contract for the unpaid work Meridian has performed, as alleged in Counts 7–9 of the May 19, 2014 Second Amended Complaint.

**IT IS SO ORDERED.**

_s/ Susan G. Braden_
**SUSAN G. BRADEN,**
**Judge.**

**COURT EXHIBIT A**

**Trial: Tucson, Arizona and Washington, D.C.**
**January 27–30, 2014; March 24–27, 2014; April 28, 2014**

**Meridian's Witnesses**
(In order of appearance)

**Mr. Mark Sutton**, President, Meridian Engineering Company.

    01/27/2014 TR 45–246

**Mr. Mark Branson**, Project Manager of Chula Vista Project, Meridian Engineering Company.

    01/27/2014 TR 247–276; 01/28/2014 TR 373–627

**Mr. David Maximoff**, Quality Control Manager of Chula Vista Project, Meridian Engineering Company.

    01/28/2014 TR 628–677; 01/29/2014 TR 685–795

**Mr. Ted Haworth**, President, Meridian Engineering Company (2003–2012).

    01/29 2014 TR 795–912

## COURT EXHIBIT B

**Trial: Tucson, Arizona and Washington, D.C.
January 27–30, 2014; March 24–27, 2014; April 28, 2014**

**The Government's Witnesses**
(In order of appearance)

**Mr. Terry Childers**, Retired Annuitant, United States Army Corps of Engineers.

   01/29/2014 TR 913–1003; 01/30/2014 TR 1008–1047

**Ms. Julie Martinez**, Resident Engineer of Tucson Office, United States Army Corps of Engineers.

   01/30/2014 TR 1047–1226; 03/24/2014 TR 1232–1463

**Mr. Burt Slack**, Construction Representative, United States Army Corps of Engineers.

   03/24/2014 TR 1464–1523

**Mr. Paul Underwood**, Section Chief of Civil Design Section A, United States Army Corps of Engineers.

   03/25/2014 TR 1528–1626

**Ms. Gwen Meyer,** Project Manager of Chula Vista Project, United States Army Corps of Engineers.

   03/25/2014 TR 1628–1679

**Mr. Stephen Chickey**, Senior Geotechnical Engineer, United States Army Corps of Engineers.

   03/25/2014 TR 1680–1866; 03/26/2014 TR 1871–1982; 04/28/2014 TR 2388–2432

**Mr. Ted Haworth**, President, Meridian Engineering Company (2003–2012).

   03/26/2014 TR 1982–2069; 03/27/2014 TR 2076–2134

**Mr. Stephen Weathers**, Project Manager, Capital Project Management, Inc.

   03/27/2014 TR 2135–2201

**Mr. Mark Sutton**, President, Meridian Engineering Company.

   03/27/2014 TR 2202–2286

**Dr. James Mahar**, Senior Lecturer, Idaho State University, College of Engineering, Department of Geosciences.

   04/28/2014 TR 2298–2388

COURT EXHIBIT C

Chronology

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|------|--------|-----------------------------------------------|-----------------------------------|
| 4/1994 | The USACE issued the Design Memorandum for a flood control project in Nogales, Arizona that included the Chula Vista Project. | JX1-1; 3/25 Tr. (Underwood) 1535:2-23. | |
| 2004 | Congress approved funding for greater flood control project, including Chula Vista Project. | 3/25/2004 Tr. (Meyer) 1632:4-14. | |
| 5/29/2007 | The USACE issued Solicitation No. W912PL-07-B-0005 for the Chula Vista Project. | JX2-2. | |
| 9/21/2007 | Contract Award to Meridian (Base Bid Only) | JX193. | All |
| 9/21/2007 | The USACE awarded Contact No. W912PL-07-C-0025 to Meridian. | JX0193-1. | |
| 10/27/2007 | Meridian Requests Electronic Copies of Drawings, In Accordance with the Contract | JX110-3. | 4 |
| 11/13/2007 | Notice to Proceed – Base Contract | PX386, DX15-1. | All |
| 11/14/2007 | Preconstruction Conference; Meridian Requests Electronic Drawing and Survey Files | PX3. | All, 4 |
| | Weekly Construction Meeting where Mike Fink (USACE) Indicates that there may be Chromium on site | PX133. | 1 |
| 11/19/2007 | Meridian Planned To Stake The Project This Week, but Was Delayed. | PX3-3. | 4 |
| 11/26/2007 | Meridian submits Water Diversion Plan | JX51-1. | 2 & 5 |
| | Meridian submitted water diversion plan, but failed to address groundwater dewatering. | JX0051-8 (water diversion plan); DX0633-2 (indicating no "Dewatering Work Plan" submission); 3/25 Tr. (Chickey) 1707:22-1708:15 (explaining how the water diversion plan does not address dewatering). | |

1

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 11/27/2007 | USACE approves Meridian's Water Diversion Plan | JX51-1. | 2 & 5 |
| | Weekly Construction Meeting where the USACE represents Chromium is a "Non-Issue: | JX113. | 1 |
| | The USACE advised Meridian the results of a chromium-in- soil analysis, concluding "chromium is FAR, FAR less than any applicable water standards, except for drinking water." | DX0018-1; DX0019-1; JX0053-1-2. | |
| 12/4/2007 | Meridian Sends USACE Letter re: Micro Station Drawings, Notifies the USACE That the Delay In Receiving This Information Is Impacting Meridian's Ability to Perform a Proper Site Survey, and Ability to Start Construction Staking. If the Delay Continues, It has the Potential to Impact the Project Schedule and Budget. | PX134. | 4 |
| 12/11/2007 | Weekly Construction Meeting at which Santa Cruz County Representative references hazardous substances (heavy metals and water borne pathogens) | JX110-7. | 1 |
| 12/12/2007 | Meridian submits Request for Information ("RFI") 8 re: additional information about hazardous substances on site | JX110-7. | 1 |
| 12/14/2007 | USACE responds to RFI-0008 sending Specification Section 01355 3.3.4 "Water Quality" | JX110-7. | 1 |
| | USACE Issues Modification R00001, Exercising Option 1 adding 120 days to the Solicitation | JX116. | All |
| 12/19/2007 | Meridian Submits RFI-0010 Re: CAD/Microstation, Requesting Missing Electronic Version of Project Plans | JX110-9. | 4 |
| | Meridian Submits RFI-0011 Re: Sanitary Sewer Pipe, Pointing Out Discrepancy In Class of Pipe Specified In Specifications v. Class of Pipe Specified in Plans | JX110-010. | 5 |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 12/28/2007 | USACE Responds to Meridian's RFI0010, Stating That As-built Drawings were delivered to Meridian's outbox at the USACE' office. | JX110-9. | 4 |
| | The Early Finish date by which Meridian had indicated it would have "check[ed] subsurface flows" at the Chula Vista Project Site. The Late Finish date was January 22, 2008. | JX0028-35. | |
| 1/7/2008 | Meridian submitted its Initial Project Schedule. | JX0028-1. | |
| 1/8/2008 | Meridian Sends USACE Serial Letter (H-00001) re: Survey Control/Design Issues, warning the USACE that the "design condition has and continues to prevent Meridian from reasonably prosecuting the work. . . there remain numerous unresolved conditions…impacting Meridian's ability to plan the work." Meridian reserved its right to seek a request for equitable adjustment in connection with these delays. | PX137. | 4 |
| 1/9/2008-1/14/2008 | Meridian is clears and Grubbs Channel Area and Assembly Diversion and Dewatering System | JX78-526-531. | 2 |
| 1/12/2008 | USACE Sends Meridian Serial Letter C-0002, Response to H-0001, Acknowledging That it Provided Incomplete Information for Survey Criteria | PX138. | 4 |
| 1/14/2008-1/21/2008 | Meridian Commences Excavation in Chanel and continues Assembling Diversion and Dewatering System | JX78-517-526; PX9. | 2 |
| 1/23/2008 | Meridian Submits RFI-0013 Re: Fiber Optic at the Bridge, Outlining Continued Problems with Survey Drawings | JX110-12. | 4 |
| 1/29/2008 | Weekly Construction Meeting When Survey Issues Were Discussed | JX115-1. | 4 |
| 1/31/2008 | Meridian Submits RFI-0014 Re: Statewide Land Surveying, Outlining Continued Problems with Survey Drawings | JX110-13. | 4 |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 2/1/2008 | Meridian Starts Dewatering and Diversion System Across Channel | PX11. | 2 |
|  | Meridian submits initial sewer shoring and sheeting plan. The USACE approved the plan on March 4, 2008. | DX0054-1. |  |
| 2/4/2008 | Meridian Placed and Compacted Dirt (Start of Subgrade Preparation in Base Bid Riprap Section) [*See Map*, **BLUE SECTION** - Base Bid RipRap Work] | JX78-495. | 2 |
| 2/11/2008 | Meridian Installs 4" and 6" Pumps to Dewater Subgrade. Meridian Commences Excavation of Channel from Station 15+75 to 14+25 (Base Bid Concrete Section) [*See Map*, **PURPLE SECTION** - Base Bid Concrete Channel Work] | JX78-483. | 2 |
| 2/18/2008 | Meridian Commences Construction of French Drain Dewatering System (in Base Bid Riprap Section) [*See Map*, **BLUE SECTION** - Base Bid RipRap Work] | JX78-471. | 2 |
| 2/20/2008 | Meridian Commences Subgrade Preparation from Station 15+00 to 14+55 (Base Bid Concrete Section) [*See Map*, **PURPLE SECTION** - Base Bid Concrete Channel Work] | JX78-467. | 2 |
| 2/21/2008 | Meridian Continues Subgrade Preparation in Base Bid Riprap Section [*See Map*, **BLUE SECTION** - Base Bid RipRap Work] | PX14. | 2 |
| 2/25/2008 | Meridian Installs Additional Dewatering Pumps in Base Bid Riprap Section [*See Map*, **BLUE SECTION** - Base Bid RipRap Work]. Meridian Encounters Soft Soils in the Subgrade from Station 14+75 to 15+75 (Base Bid Concrete Section) [*See Map*, **PURPLE SECTION** - Base Bid Concrete Channel Work] | PX16. | 2 |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 2/26/2008 | Meridian Continues Subgrade Preparation from Station 15+40 to 16+00 (Base Bid Concrete Section) [*See Map*, **PURPLE SECTION**  - Base Bid Concrete Channel Work] | PX17. | 2 |
| 2/29/2008 | Boils Appear in Subgrade from Station 12+50 to  9+00 (Base Bid Riprap Section) [*See Map*, **BLUE SECTION**  - Base Bid RipRap Work].  Major slope failure at the channel invert construction site. | PX20; DX57-2. | 2 |
| 3/3/2008 | Meridian Expands French Drain System in Base Bid Riprap Section [*See Map*, **BLUE SECTION**  - Base Bid RipRap Work]and Commences French Drain Construction in Base Bid Concrete Section. [*See Map*, **PURPLE SECTION**  - Base Bid Concrete Channel Work] | JX78-445. | 2 |
| 3/4/2008 | Meridian Submits Shoring & Sheeting Plan | JX54. | 5 |
|  | USACE Approves Meridian Shoring & Sheeting Plan | JX54. | 5 |
| 3/10/2008 | Meridian sends USACE Serial Letter 07285-006 (H- 0005) re: Slope failure/Springs/Clay Layer (including Notice of Differing Site Conditions in  Channel) | JX55. | 2 |
| 3/11/2008 | Meridian authorized  ConformaTech., Inc. to take soil samples at finished  subgrade-elevation within the rectangle channel  invert area for purpose of determining in-place soil properties. | JX56. | 2 |
| 3/18/2008 | Meridian sends USACE Serial Letter 07285-008 (H- 0007) re: Laboratory Test Results of Invert Sub-  Grade Material (from ConformaTech., Inc.  investigation). | JX56. | 2 |
| 3/20/2008 | Meridian Excavates Jack and Bore Pit at Station  283+50 | PX24. | 5 |
| 3/25/2008 | Meridian sends USACE Serial Letter 07285-010 (H- 0009) re: Additional Water Migrating Into Work  Area (including notice of Differing Site Conditions) | JX57. | 2 |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 4/1/2008 | USACE sends Meridian Serial Letter C-0008 in response to Ltr. 07285-010 (H-0009) re: Additional Water Migrating Into Work Area; notes all dewatering is Meridian's responsibility, references change in Pipe to be Codified in Modification R00003 | JX159. | 2 |
| 4/3/2008 | Meridian Encountered Groundwater When Trench Boxes were 15 feet deep | PX30. | 5 |
| 4/7/2008 | Meridian starts to install the geotextile and filter materials for the RipRap test section, thereby Construction (post-subgrade preparation) of Base Bid RipRap Section begins [*See Map*, **BLUE SECTION** - Base Bid RipRap Work] | JX78-365-367. | 2 |
| 4/8/2008 | Meridian Excavates Jack and Bore Pit at Station 281+46, Manhole 68A [*See Plaintiff's Demonstratives B, C* For Station and Manhole Locations] | PX32. | 5 |
|  | Groundwater Begins To Fill Manhole Boxes in Sewer Excavation From Underground Stream | PX32. | 5 |
| 4/9/2008 | Meridian Places Geotextile in the Channel Invert [Bottom] from Station 16+02 to 14+50 (Base Bid Concrete Section) (Completion of Subgrade Preparation in Base Bid Concrete Channel) [*See Map*, **PURPLE SECTION** - Base Bid Concrete Channel Work] | PX78-359. | 2 |
| 4/14/2008 | USACE Instructs Meridian to Stop All Work on the East Side of the Riprap Channel, because an RFP would issue to add an access ramp. | PX35-2. | 4 |
| 4/15/2008 | Meridian begins to build Channel Invert Forms between Stations 16+02 and 14+50 (Base Bid Concrete Section) [*See Map*, **PURPLE SECTION** - Base Bid Concrete Channel Work] | JX78-353. | 2 |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 4/15/2008 | USACE Issues RFP-0005, Requesting Meridian Provide an Estimate Relating to the Addition of a Reinforced Concrete Access Ramp ion the Flood Control Channel. | JX160. | 4 |
| 4/17/2008 | USACE Issues Modification R00003 Increasing Sub Drain Pipe Size from 4" to 8" | JX118. | 2 |
|  | Meridian Sends USACE Serial Letter 07285-015 (H- 0018) re: Analysis of Project Delays and Basis of Delay Claims (Including Outline of the specific ways in which the site survey delayed Project performance.) Meridian requested an equitable adjustment to the Contract in connection with those delays | PX146. | 4 |
|  | Meridian abandoned jack-and-bore method of sewer pipeline installation because it encountered "unexpected rock-like soils." Meridian submitted a request for equitable adjustment for the rocks, which was denied. | DX0102-1; DX0100-1. |  |
| 4/18/2008 | Meridian Submits VECP addressing reconstruction of the north bridge. | JX50-15-16. | 11 |
| 4/22/2008 | Meridian Commences Placement of Riprap on Channel Invert at Station 9+00 (Base Bid Riprap Section) [*See Map,* **BLUE SECTION**  - Base Bid RipRap Work] | PX38. | 2 |
| 4/24/2008 | Meridian Starts Placement of Concrete in Channel Invert [Bottom] from Station 16+02 to 15+42 (Base Bid Concrete Section) [*See Map,* **PURPLE SECTION** - Base Bid Concrete Channel Work] | PX39. | 2 |
| 4/25/2008 | Meridian Submits Proposal in Response to 4/15/08 RFP-5. Meridian noted that the proposed addition of this item has had a negative impact on the project schedule. | PX147. | 4 |
| 4/28/2008 | Meridian Starts Placement of Concrete in Channel Walls from Station 15+42 to 14+82 (Base Bid Concrete Section) [*See Map,* **PURPLE SECTION**  - Base Bid Concrete Channel Work] | PX40. | 2 |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 5/1/2008 | USACE Sends Meridian Serial Letter C-0013, Acknowledging Receipt of VECP | JX50-27. | 11 |
| 5/6/2008 | USACE Requests, and Meridian Submits, Revised Proposal re RFP-5, addition of Access Ramp. Meridian noted that the delays associated with finalizing this proposed additional work negatively impacted the Project schedule; specifically, Meridian advised the USACE that there had been delays to the work associated with the sub- grade of the channel slopes, and the 18' stone protection near the new access ramp. | JX163. | 4 |
| 5/7/2008 | Meridian Places Channel Invert [Bottom] from Stations 14+82 to 14+42 (Base Bid Concrete Section) [*See Map*, **PURPLE SECTION**  - Base Bid Concrete Channel Work] | PX78-293. | 2 |
| 5/8/2008 | USACE Issues Modification R0006, Which Added New Proposed Access Ramp in Flood Control Channel and increased the contract price by $69,963.  However, Modification R00006 was undefinitized, and, using Meridian's May 6, 2008 proposal (JX163), the parties continued to negotiate terms for the definitized modification until approximately May 29, 2009. | JX121. | 4 |
| 5/9/2008 | Meridian notes on Daily Report that "Meridian's earthwork crew is now unable to proceed with anymore contract work for the Base Bid pending a decision on the access ramp…" | PX45. | 4 |
|  | Railroad Track Settling at Station 281+52, Cease Jack and Bore Excavations [*See Plaintiff's Demonstratives B, C* For Station and Manhole Locations] | PX45. | 5 |
|  | Meridian sends USACE Serial Letter 07285-025 re: Notice of Changed Site Condition (including Notice of Differing Site Condition in Sewer Excavation) | DX131-1; DX440-3. | 5 |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 5/9/2008 | Meridian encountered saturated underground soil conditions at the sewer line "close to [the Union Pacific Railroad] rails." According to Meridian, the "substantial subsurface water flows [were] entering from the east trench wall . . . between station 282+58 and station 281+46." | | |
| 5/14/2008 | USACE Issues RFP-0008 Asking for Proposals for Provision of Geological Engineering Services | JX165. | 5 |
| | The USACE issued a Request for Proposal for a soils investigation between stations 277+17 and 282+30. | JX0165-1. | |
| 5/15/2008 | USACE Sends Meridian Serial Letter C-0016, responding to Letter H-0018, Acknowledging that Meridian's REA Concerning Survey Delays had merit. | JX166. | 4 |
| | USACE Issues Modification R00007, Directing Meridian to Obtain Geotechnical Soil Investigations; Meridian Engages Kleinfelder to conduct geotechnical soils investigation and to develop a workplan to address the saturated soil conditions. | JX122. | 5 |
| 5/30/2008 | Pursuant to Negotiations Ongoing Since Issuance of Modification R00006 on 5/8/08, Meridian submits a revised proposed cost and schedule of values outlining the costs associated with the access ramp work and delays caused by same. Meridian requests $89,776.14, and notes that the impact associated with the proposed addition of the access ramp resulted in 12 calendar days of delay. | PX389-18-19. | 4 |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 5/30/2008 | Kleinfelder completed its geotechnical investigation of the sewer line and issued a draft report detailing the subsurface soft soil and saturated conditions at the sewer line. | DX0175-4; <br><br> DX0175-10-11 (references to artesian conditions); <br><br> DX0175-16 (subsurface profile with findings); <br><br> DX0283-18 (color copy of subsurface profile from May 30 report). | |
| 6/3/2008 | USACE and Meridian Engage In Discussions Concerning Options for Soft Subsurface Soil Remediation in Sewer Line Relocation | DX176; DX0174-2 (referencing a conference call to discuss methods for constructing the sewer); DX176-1 (list of proposals). | 5 |
| 6/4/2008 | USACE Sends Meridian Serial Letter C-0019, Providing Comments to VECP | JX50-29. | 11 |
| 6/5/2008 | USACE Issues Modification R00008, Definitizing R00006, deleting Access Ramp Work | JX123; PX389. | 4 |
| | Meridian Commences Cut & Cover Installation of Sewer Line at Station 287+96 | PX52. | 5 |
| | The USACE issued an RFP for two methods for remediating the saturated soil at the sewer line, including one method utilizing two rows of sheet piling. | DX0184-1, 2. | |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 6/5/2008 | The USACE and Meridian agreed to and executed bilateral Modification R00008/AD007-1 to definitize R00006/AD007, and deleted work for a new access ramp, and to increase the contract price by $89,776 and to extend the contract schedule by 12 calendar days. Modification R0008 contained a mutual release. | DX0183-3, 4. | |
| 6/10/2008 | Meridian submitted proposal to address the "soft soil remedial work." Its proposal for sheet piling installation was for $1,444,202.36. | DX0195-1, 3. | |
| 6/18/2008- 6/20/2008 | Meridian Excavates Chanel from Station 16+00 to 17+22 (Option 1 Concrete Section) [*See Map*, **LIME GREEN SECTION** - Option 1 Concrete Channel Work] | JX78-178-187. | 2 |
| 6/20/2008 | USACE Issues Modification R00010, Adding the Installation of Sheet Piling by Giken between Stations 279+90 and 282+00. [*See Plaintiff's Demonstratives B, C* For Station and Manhole Locations] | JX125. | 5 |
| | Modification R00010 paid Meridian $937,009 for its two- sheet-pile solution for pipe installation, and gave Meridian the discretion to implement another solution for the soil condition. Modification R00010 was subject to definitization in a later modification. | DX0666-6, 7. | |
| 6/24/2008 | Base Bid Rip Rap Section Work (other than tie in to concrete section) completed [*See Map*, **BLUE SECTION** - Base Bid RipRap Work] | JX78-167-169. | 2 |
| 6/26/2008 | Meridian's Original Planned Date to Complete Channel Invert Work | Tr. 112:9- 114:19, 115:3- 117:16, 634:25- 635:7; JX28-52 (Activity ID 14800). | 4 |
| | Meridian Starts Subgrade Preparation from Station 16+02to 16+97 (Option 1 Concrete Section) [*See Map*, **LIME GREEN SECTION** - Option 1 Concrete Channel Work] | JX78-161. | 2 |

11

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 6/27/2008 | Flood Event | PX53. | 4 |
| | The parties also agree to and execute bilateral Modification R00009/AD010- 1 to definitize Modification R00007/AD010, relating to Meridian's geotechnical investigation. Modification R00009 paid Meridian an additional $23,107 to complete its investigation and prepare a workplan to address the subsurface saturated condition. Modification R00009 contained a mutual release. | JX0124-2. | 5 |
| 7/3/2008 | Meridian Places Concrete in Channel Bottom (Base Bid Concrete Section) [*See Map*, **PURPLE SECTION** - Base Bid Concrete Channel Work] | PX54. | 2 |
| 7/6/2008- 7/11/2008 | Flood Events | PX56; PX57; PX58; PX59; PX60. | 4 |
| 7/10/2008 | Kleinfelder Issues Report Pertaining to Soil Conditions in Sewer Line Excavation Area | PX209. | 5 |
| 7/14/2008 | Flood Event | PX61. | 4 |
| | The parties agreed to and executed bilateral Modification R00011/AD012, which paid Meridian $24,216 for geotechnical testing at the North Bridge in connection with VECP and extended the contract schedule by 3 calendar days. Modification R00011 contained a mutual release. | DX0667-5-7; JX126 | 11 |
| 7/21/2008 | Installation of Sheet Pile Wall Commences [*See Plaintiff's Demonstratives B,* For Sheetpiling location (indicated by blue line)] | JX78-107. | 5 |
| 7/29/2008 | Performance of Base Bid Channel Section Channel Walls Begins when Meridian places for Rt Channel Wall Stations 14+42 to 14+82 (Base Bid Concrete Section) [*See Map*, **PURPLE SECTION** - Base Bid Concrete Channel Work] | JX78-90-91. | 2 |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 8/3/2008-8/8/2008 | Flood Event, with Intermittent Additional Flooding | PX62; PX63; PX64; PX65; PX66. | 4 |
| 8/11/2008 | Kleinfelder Issues Report Pertaining to Soil Conditions in Channel Excavation Area, Bridge Area | JX167. | 2, 11 |
| 8/12/2008-08/21/2008 | Flood Event | PX67; PX68; PX69; PX70; PX71; PX72; PX73; PX74. | 4 |
| 8/12/2008 | Meridian's subcontractor Giken notified Meridian that it encountered boulders that were slowing its sheetpile installation, and requested additional funds. Meridian sought additional funds from the Army USACE, that wew denied, because boulders were a known condition.<br><br>Giken abandoned the project having installed only one row of sheet pile wall. | DX0228-1;<br><br>1/30 Tr. (Martinez) 1178:11-25. | |
| 8/13/2008 | Meridian and the USACE Engage in Discussions Concerning Costs Associated with R00010 | PX212. | 5 |
| 8/20/2008 | Installation of Sheet Pile Wall Terminated | PX73. | 5 |
| 8/22/2008-08/23/2008 | Flood Events | PX75; PX76. | 4 |
| 8/25/2008-8/26/2008 | Flood Events | PX77; PX78. | 4 |
| Late August 2008-Early September 2008 | Meridian Encounters Soil Conditions Consistent with The Soil Conditions Represented in the Solicitation. | JX78-1-76; PX78; PX79; PX80; PX81; JX79-362-377; Plaintiff's Demonstrative E. | 5 |
| 8/27/2008-9/9/2008 | Flood Events | PX79; PX80; PX81; PX82; PX83; PX84; PX85; PX86; PX87-3; PX88- 3. | 4 |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 9/04/2008 | The parties agreed to and executed bilateral **Modification R00012/AD014**, that accounted for weather delays in July 2008, and extended the contract schedule by 9 calendar days. R00012 contained a complete release. | JX0127-2. | |
| 9/5/2008- 9/11/2008 | Meridian Encountered Soupy Material at Station 282+15 in Sewer Excavation, High Groundwater and Soft Soils, That Slowed Production; Meridian Notes in Daily Reports Ground Oversaturated and Unstable, and Slowing Production [*See Plaintiff's Demonstratives B, C* For Station and Manhole Locations] | PX85; PX86; PX87; PX88; PX89; PX90; PX91. | 5 |
| 9/9/2008 | USACE Issues Modification R00016, definitizing R00010 and Deleting the Second Row of Sheet Piling | PX392-4-6. | 5 |
| 9/10/2008- 9/26/2008 | Flood Event | PX89; PX90; PX91; PX92; PX93; PX94; PX95; PX96; PX97; PX98; PX99; PX100; PX101; PX102. | 5 |
| 9/10/2008 | Meridian Follows USACE' Suggestion to Create a Firm Foundation for the Sewer Line by Pouring Concrete in the Bottom of the Trench; this Method was Not Successful. | PX89. | 5 |
| 9/11/2008 | USACE' Representatives Acknowledge that USACE Understands the Problems Meridian Is Having with Groundwater | PX90-1. | 5 |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 9/12/2008 | Meridian approached the USACE for recommendations regarding a stable foundation for the sewer pipe in the area of the saturated soils. USACE Geotechnical Engineer Stephen Chickey met with Meridian Project Manager Mark Branson, Quality Control Manager David Maximoff, and employee Dominic Baudoin, to discuss a recommendation. Mr. Chickey drew an image on a whiteboard, recommending excavation below the pipe grade per the specifications and using woven geotextile fabric and gravel to create a stable pipe bedding. | 3/25 Tr. (Chickey) 1841:12-1842:20; 3/26 Tr. (Chickey) 1883:17-22; DX0651-128 (whiteboard photograph). | |
| | A bilateral **Modification R00013/AD016**, was executed that accounted for weather delays in May and June 2008 extended the contract schedule by 4 calendar days. R00012 contained a mutual release. | JX0128-2. | |
| 9/15/2008 | The parties agreed to and executed bilateral Modification R00017/AD013 for costs and delays "directly or indirectly attributable" to flawed survey data, which increased the contract price by $108,377 and extended the schedule by 60 calendar days. Modification R00017 contained a mutual release. | JX0132-2; PX387. | 4 |
| 9/19/2008 | Meridian Attempts to Implement 9/12/08 USACE Sketch and Install Pipe by Creating a Foundation of 3-inch Rock Between 2 Layers of Geotextile Fabric, Directly on the Soft Clay in the Bottom of the Trench | PX96; PX213. | 5 |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 9/19/2008 | The parties agreed to and executed bilateral Modification R00016/AD011- 1 to definitize Modification R00010/AD011 to address the saturated soil condition. Modification R00016 accounted for the deletion of one row of the two-sheet-pile pipe installation methodology by reducing the total amount due to Meridian for the soil remediation. Accordingly, Modification R000016 paid Meridian an additional $191,720 for a total compensation of $1,128,729 for the soil condition. Modification R00016 extended the contract schedule by 20 calendar days and contained a complete release. | JX0131-1, 3. | |
| 9/22/2008 | USACE Circulates Memorandum re: Geotechnical Recommendations for Chula Vista Channel Sewer Relocation; Circulates Sketch of Proposed Method of Installation | PX214. | 5 |
| | The USACE issued the Koplin Recommendation Memorandum, formalizing Mr. Chickey's September 12 recommendation for creating a stable foundation for the sewer pipe in light of the saturated soils. | DX0263-1-3. | |
| | Bilateral **Modification R00015/AD017** was executed re: weather delays in August 2008, and extended the contract schedule by 12 calendar days. R00012 contained a mutual release. | JX0130-1, 2. | |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 9/23/2008 | USACE Instructs Meridian to Try A Different Method of Performance that is a Variation of Sketch Attached to 9/22 MFR, as Memorialized in Sketch of Stephen Chickey. Pursuant to this plan, Meridian was to Backfill the Pipe with a Granular Material Called Chat in Lieu of Sand. (Tr. 394:2-13; PX216). From there, Meridian was to Put Lightweight Aggregate on Top of That and Then Cap it with Native Material (the Specifications originally called for the dewatering of two to three feet below the bottom of the excavation). The USACE agreed to allow the sewer construction to proceed in the wet soil, without completely dewatering as the original Specifications required. | PX216; Tr. 394:21-396-3; PX100. | 5 |
| | Mr. Chickey spoke with Meridian Project Manager Mark Branson and Quality Control Manager David Maximoff. Mr. Maximoff's notes indicated that he understood the Koplin Recommendation to permit installation of the sewer pipe underwater and for the use of "any rock" for bedding. Later copies of these same pages crossed out some of these earlier notes and noting "trench to be completely dewatered," per Mr. Maximoff. | DX0440-107; DX0255-1. | |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 9/24/2008 | Meridian began installing sections of the sewer pipe between Manholes 68A1 and 68A in water, i.e., without fully dewatering the installation trench, as required by the plans and specifications.<br><br>Meridian's Quality Control Reports indicated that the "[g]round water continues to be an issue in this areas with the water level being approximately .67" above the top of the pipe." Meridian represented that the "pipe is being installed per USACE Memo CESPL-ED (1110) [Koplin Recommendation] and the accompanying sketch." | JX0079-321, 317, 313, 309, 305 (Quality Control Reports for 9/24/2008-9/30/2008) (quotations appear on all pages).<br><br>DX0651-127; 1/29 Tr. (Maximoff) 757:16-22; 3/26 Tr. (Chickey) 1883:1-16; 1884:7-1885:4; 1886:24-1888:2. | |
| | Bilateral **Modification R00018/AD018** was executed to provide $578,009 for revisions to the north bridge design, and to extend the contract schedule by 27 calendar days. Modification R00018 contained a mutual release. | JX0133-1, 2. | |
| 9/25/2008 | Bilateral **Modification R00019/AD019** was executed to add 75 linear feet of channel invert and wall to the construction, and to increase the contract price by $1,198,500 and extend the contract schedule by 90 calendar days. Modification R00019 contained a mutual release. | JX0134-1, 2. | |
| 9/26/2008-10/3/2008 | Flood Waters Begin to Recede, but Work Remains Decayed Trough October 3, 2008 | PX104; PX105; PX106; PX107; PX108. | 4 |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 10/3/2008 | Meridian discovered that the installed sewer pipe was out-of-alignment— "that several joints in the pipe run were not installed properly due to the excessive amounts of subsurface water in the working area causing difficulties in the placement." Meridian explained it will "rework the affected areas." | JX0079-294 (10/3/2008 Quality Control Report). | |
| 10/12/2008 | Flood event | PX112. | |
| 10/15/2008 | Meridian Completes Placement of Concrete in Channel Walls and Invert (Base Bid Concrete Section) [*See Map*, **PURPLE SECTION** - Base Bid Concrete Channel Work] | PX114. | 2 |
| 10/20/2008 | Meridian Completes (re-)Installation of Reinforced Concrete Pipe at Station 281+46 to 281+52, MH68A [*See Plaintiff's Demonstratives B, C* For Station and Manhole Locations] | PX115. | 5 |
| | Meridian Commences Installation of Geotextile and Filter Rock Stations 16+02 to 16+77 [Completion of Subgrade Preparation] (Option 1 Concrete Section) [*See Map*, **LIME GREEN SECTION** - Option 1 Concrete Channel Work] | PX115. | 2 |
| | Meridian Commences Installation of Ductile Iron Pipe at Station 281+46, MH68A [*See Plaintiff's Demonstratives B, C* For Station and Manhole Locations] | PX115. | 5 |
| 10/27/2008- 10/30/2008 | Meridian Places Concrete in Channel Bottom (Invert) from Station 16+02 to 16+97 (Option 1 Concrete Section) [*See Map*, **LIME GREEN SECTION** - Option 1 Concrete Channel Work] | JX79-208 -221. | 2 |
| 10/28/2008 | Railroad Track Settling at Station 281+25 - Suspend Sewer Line Installation [*See Plaintiff's Demonstratives B, C* For Station and Manhole Locations] | PX119. | 5 |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 10/28/2008 | To install sections of the sewer pipe next to the sheet pile wall, Meridian overexcavated to the side of its shoring boxes, that eliminated lateral shoring for the sheet pile wall.<br><br>On October 28, 2008, the installed sheet pile wall deflected approximately one foot near the UPRR trestle bridge, resulting in subsidence of the UPRR trestle bridge adjacent to the construction.<br><br>UPRR acknowledged that the "displacement has occurred as a direct result of the adjacent sewer line replacement construction and apparent failure of the project contractor to adhere to agreed upon shoring plans." UPRR ordered Meridian to shut down excavations and to submit a new shoring plan. | DX0282-2 (Army USACE e-mail);<br><br>DX0291-2 (Ltr from law firm representing UPRR);<br><br>DX0277-1 (UPRR handwritten order). | |
| 11/1/2008 | Performance of the Option 1 Channel Section, Channel Invert, completed when Meridian placed 342 CY of 5000 psi concrete on east half of the channel invert stations 16+20 to 16+97 (Option 1 Concrete Section)  [*See Map*, **LIME GREEN SECTION** - Option 1 Concrete Channel Work] | PX120-1-3. | 2 |
| 11/4/2008 | Performance of Option 1 Channel Section, Channel Walls, work begins when Meridian places 31 cy of 5,000 PSI concrete for the Lt channel wall stations 16+02 to 16+33. (Option 1 Concrete Section) [*See Map*, **LIME GREEN SECTION** - Option 1 Concrete Channel Work] | JX79-191-194. | 2 |
| 11/4/2008-11/7/2008 | Meridian Places Concrete in Left Channel Walls from Station 1616+02 to 16+97 (Option 1 Concrete Section) [*See Map*, **LIME GREEN SECTION** - Option 1 Concrete Channel Work] | JX79-177-192. | 2 |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 11/07/2008 | Meridian retained Kleinfelder to prepare a new shoring plan and submitted the plan to the USACE and UPRR. According to this plan, Meridian was to dig "a short (less than 6 ft) excavation. . . south (downstation) of the shoring boxes." Then, Meridian was to use an excavator to "immediately *slide* the shoring boxes into this excavation[,] *thus providing lateral support to the adjacent soils.*" *Id.* (emphasis added). Finally, "a separate excavator will add specified fill materials at the back side, thus providing continuing lateral support behind the shoring boxes." *Id.*<br><br>According to Kleinfelder's plan, the sheet piles would "resist [subsurface] water pressure, particularly over the short time period that is expected to complete the sewer line installation." | DX0297-11, 13. | |
| 11/14/2008-11/25/2008 | Meridian Continues Placement of Concrete in Right Channel Walls (Option 1 Concrete Section) [*See Map*, **LIME GREEN SECTION** - Option 1 Concrete Channel Work] | JX79-118-158. | 2 |
| 11/14/2008 | The USACE became aware that Meridian was not complying with the November 7 shoring plan, and ordered Meridian to submit a new shoring plan.<br><br>Meridian submitted an Addendum to its November 7 shoring plan. The addendum plan acknowledged that Meridian deviated from its earlier shoring plan because "sloughing of the adjacent soils and deformation of the sheet pile wall toward the excavation continues to be problematic." Accordingly, the Addendum plan proposed to "hammer" shoring boxes into place one after the other, removing the shoring boxes only after the box in front of it was in place. | 3/24 Tr. (Martinez) 1241:7-21; DX0304-1; DX0301-2, 3. | |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 11/17/2008 | The USACE discovered that Meridian failed to follow the Addendum shoring plan and continued to overexcavate to the side of its shoring boxes. The USACE suspended work and required a new remedial action plan. | 3/26 Tr. (Chickey) 1878:23-1880:1;<br><br>DX0309-1, 2. | |
| 11/25/2008 | Meridian submitted a Kleinfelder remedial action plan that stated that "Meridian field personnel completing the work did not follow the work plan as outlined in Addendum 1 and actually were closer to following the work plan outlined in the original report."<br><br>Kleinfelder's remedial action plan indicated that it "believes that the work plan outlined in Addendum 1 will still be successful, if followed more carefully." | DX0324-3, 4. | |
| 11/26/2008 | Resume Installation of Sewer Line | PX123. | 5 |
| | Flood Event | PX123. | 4 |
| 12/5/2008 | Meridian Continued Placement of Concrete in Channel Walls from 16+00 to 16+29 (Option 1 Concrete Section, Channel Walls Completed) [*See Map*, **LIME GREEN SECTION** - Option 1 Concrete Channel Work] | PX125. | 2 |
| 12/12/2008 | Meridian notified the USACEof sewer pipe movement near Manhole 68A at station 281+46 and station 282+10, and acknowledged leakage at pipe joints and both longitudinal and transverse cracks. Meridian also acknowledged "inject[ing] polyurethane grout to the outside of the pipe to stop the infiltration of water into the pipe." | DX0331-1. | |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 12/15/2008 | Meridian's Quality Control Report stated that "[USACE Quality Assurance representative] Burt Slack informed Meridian that the section of [reinforced concrete pipe  sewer line between [Manhole 68B and Manhole 68C] *meet all of the final acceptance criteria and was accepted by the USACE.*"<br><br>The Army USACE' Quality Assurance Report from the same day, however, denies this.  "*QC report states that QA Burt Slack did not have problem in the above area which is wrong.  Pipe line had dip about 2-inch in 3-section of pipe.*" | DX0333-1 (Quality Control Report for 12/15/2008) (emphasis added); DX0334-1 (Quality Assurance Report for 12/15/2008) (emphasis added). | |
| 12/18/2008 | Meridian sent USACE Serial Letter 07285-056 Re VECP Arch Culvert Bridge Revisions, Making Revisions Suggested in Kleinfelder 8/11/08 Report | JX50-234. | 11 |
| 12/18/2008-12/19/2008 | Flood Event | PX127; PX128. | 4 |
| 12/18/2008 | USACE Sends Meridian Serial Letter C-0025, instructing Meridian to Suspend All Work in Area of Sewer Line Relocation | JX171. | 5 |
| 1/16/2009 | The pipe investigation concluded that the sewer pipe was out of alignment between manholes 68A and 68A-1, and that the pipe segments separated at the joints.  Hanson Pipe also noted that the class of pipe that was installed was incorrect for the volume of fill that covered the pipe. | DX0358-1, 2. | 5 |
| 1/20/2009 | Meridian Completes Transition Channel from 12+50 to 13+00 (Base Bid Concrete Section) [*See Map*, **PURPLE SECTION** - Base Bid Concrete Channel Work] | PX129. | 2 |
| 1/23/2009 | Arizona Department of Environmental Quality ("ADEQ") question USACE's Choice of Pipe, States that USACE Should consider retaining a Local A/E Familiar with Soil Conditions in Area of Project Site. | PX361. | 5 |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 1/23/2009 | USACE Acknowledges Design Error with Regard to Pipe and requests that ADEQ be kept "In the Loop on Any Potential Redesign" | PX361. | 5 |
| 1/27/2009 | USACE Sends Meridian Serial Letter C-0033, Instructs Meridian to Suspend All Work in Channel and determine whether the sewer pipe could be salvaged. | JX172. | 2 |
| 1/28/2009 | Meridian Encounters Soft Soils at Station 277+44 [*See Plaintiff's Demonstratives B, C* For Station and Manhole Locations] | JX80-130. | 5 |
| 1/30/2009 | Meridian Completes Riprap Channel by Grouting of Riprap at Transition Section at Station 12+50 (Base Bid Riprap Section) [*See Map*, **BLUE SECTION** - Base Bid RipRap Work] | PX130. | 2 |
| 2/3/2009 | USACE Adds Three Deficiencies to Punchlist | JX49-7. | 10 |
|  | The USACE issued unilateral **Modification R00021/AD021** and increases the contract price by $23,572 to drill additional geotechnical borings, and to extend the contract schedule by 14 calendar days. | JX0136-1, 2. |  |
| 2/5/2009 | The USACE denied Meridian's payment request #13 for $397,531.70, and reduced Meridian's payment by $308,274.88, stating the sewer pipe was not properly installed and certain punch list items were not completed. | DX0378-1. |  |
| 2/9/2009 | USACE Sends Meridian RFP-0015, Requesting Proposal for Site Suspension and Demobilization. But, the USACE instructed Meridian that it was required to continue its dewatering efforts that it had to maintain a minimum crew of one project manager, one safety manager, two foremen and four laborers for security. | JX162. | 7 |
| 2/10/2009 | Meridian Sends USACE Serial Letter 07285-63, re: Revised "North Bridge" Arch Culvert Design | JX50-26. | 11 |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 2/12/2009 | Meridian Sends USACE Serial Letter 07285-64 (H- 0055), Provides USACE with Response to RFP-15 | JX173. | 7 |
| 2/24/2009 | The USACE issued unilateral **Modification R00022/AD022** to suspend the contract and provide Meridian $169,315.52 for suspension costs, subject to negotiation and definitization in a later modification | DX0671-4; JX137. | 7 |
| 3/13/2009 | The USACE issued unilateral **Modification R00020/AD020** to account for weather delays in September, October, November, and December 2008, and extended the schedule by 5 calendar days. Unlike previous weather delay modifications, the USACE issued R00020 unilaterally, because Meridian declined to execute the modification. | JX0135-1, 2. | |
| 3/19/2009 | The USACE retained an architect-engineering company, AMEC Geomatrix, to assess the sewer pipe. AMEC issued a draft report. | DX0427-1. | |
| 3/24/2009 | USACE sends Meridian Serial Letter C-0046, lifting Suspension | JX174. | 7 |
| | The USACE issued unilateral Modification R00023/AD024/AD025 to add work relating to backfilling the existing channel excavation, and to delete 75 linear feet of channel construction from the contract. R00023 deleted 90 calendar days from the contract schedule, and deleted $590,947 from the contract. | DX0672-4; JX138. | 8 |
| 3/26/2009 | USACE adds One Deficiency to Punch List | JX49-8. | 10 |
| 3/31/2009 | USACE sends Meridian RFP-0021, Requesting Cost Estimate for Interim Protection Work | JX176. | 9 |
| 4/2/2009 | USACE adds Six Deficiencies to Punch List | JX49-8-9. | 10 |
| 4/9/2009 | USACE Adds One Deficiency to Punch List | JX49-9. | 10 |
| 4/10/2009 | Meridian Sends USACE Serial Letter 07285-91, requesting compensation for quantity overruns associated with certain bid line items | PX226. | 6 |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 4/15/2009 | Meridian Sends USACE Serial Letter 07285-097 (H0087), responding to 3/31/09 RFP-21, Providing Cost Estimate Proposal for Interim Protection Work | JX178. | 9 |
| 4/16/2009 | USACE Adds One Deficiency to Punch List | JX49-9. | 10 |
| 4/22/2009 | The USACE discovered overpayments for uncompleted work, so the Project Manager began clawing back some of these overpayments through adjustment of work percentages in the USACE's RMS system and downward adjustment of the amount available under the contract for unpaid contract line items. | 3/24/2014 Tr. (Martinez) 1276:3-14. | All |
|  | The USACE issued unilateral Modification R00025/AD027/AD028 to add $1,141,225 to the contract for interim protection plan work, and to delete the remaining work pursuant to Option 1 of the contract. R00025 also deleted $4,070,225.73 from the contract to account for the deleted work. Modification R00025 deleted a net $2,292,000.73 from the contract. | JX0140-1-3. |  |
| 4/23/2009 | USACE Adds One Deficiency to Punch List | JX49-9. | 10 |
| 4/28/2009 | At a weekly construction meeting, the USACE informed Meridian that it would not consider Meridian's Value Engineering proposal for a bridge design in light of the suspension of the project. Meridian demanded compensation for the costs incurred for the design. The USACE explained that any costs that Meridian expended in connection with the value engineering design was Meridian's responsibility. | DX0468-2-3. |  |
| 4/30/2009 | USACE Adds One Deficiency to Punch List | JX49-9. | 10 |
| 5/1/2009 | Meridian Sends USACE Serial Letter 07285-102 (H- 0094), updating response to 3/31/09 RFP-21, Providing Cost Estimate Proposal for Interim Protection Work | PX230. | 9 |

26

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 5/6/2009 | Meridian Sends USACE Serial Letter 07285-105 (H- 0096), informing USACE that the Modifications issues were insufficient to compensate Meridian for costs incurred and that Requisite Funding was missing in RMS System | JX180. | 7, 8, 9 |
| | Meridian submitted a pay request for pay estimate #15, claiming 92% work completion and seeking compensation of $959,942.72. | DX0484-9. | |
| 5/7/2009 | USACE Adds Two Deficiencies to Punch List | JX49-9-10. | 10 |
| 5/11/2009 | USACE Issues Modification R0028, correcting R00025, decreasing amount of Contract Price Increase for Interim Protection Work from $1,141,225.00 to $516,516.64 | JX143. | 9 |
| 5/12/2009 | Meridian Sends USACE Serial Letter 07285-106 re: Direct Costs Related to Suspension of Work, providing USACE with Estimate of Suspension Costs | PX231. | 7 |
| 5/13/2009 | The USACE rejected Meridian's pay request #15. Project Engineer explained that he would meet with Meridian's Project Manager at the construction site on May 18, 2009 to "verify quantities and percentage of work completed to determine credits and debits." | DX0482-1. | |
| 5/14/2009 | The USACE Adds One Deficiency to Punch List | JX49-10. | 10 |
| 5/19/2009 | The USACE Adds Two Deficiencies to Punch List | JX49-10. | 10 |
| 5/21/2009 | The USACE Adds One Deficiency to Punch List | JX49-10. | 10 |
| 5/27/2009 | The USACE Adds Five Deficiencies to Punch List | JX49-10-11. | 10 |
| 5/28/2009 | The USACE Adds Three Deficiencies to Punch List | JX49-11. | 10 |
| 6/2/2009 | The USACE and Meridian failed to agree on the amount owing upon pay request #15. Accordingly, the USACE unilaterally issued pay estimate #15, that acknowledged 94% contract completion, and paid Meridian $640,146.52. | DX0628-1. | |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 6/5/2009 | AMEC released its final report evaluating the sewer pipeline installed by Meridian prior to suspension. | JX52; JX0194-3. | 2, 5 |
| 6/8/2009 | The USACE and Meridian conducted a pre-final inspection of the Chula Vista Project. Construction Representative identified 21 deficiencies, which he listed on a punch list. | DX0612-6, 7. | |
| 6/21/2009 | USACE Adds Twenty-One Deficiencies to Punch List | JX49-11-12. | 10 |
| 7/10/2009 | USACE Adds One Deficiency to Punch List | JX49-12. | 10 |
| 7/30/2009 | USACE Issues Modification R00030, definitizing R00023, deleting 75ft of Channel Added by Modification R00019 and adding Channel Fill and Compaction Work | JX145. | 8 |
| | USACE Issues Modification R00031, definitizing R00022, adding $476,630 to the Contract Price in connection with Suspension Costs. | JX146. | 7 |
| | The USACE and Meridian failed to agree upon a final definitization price for the addition of channel backfill work, and deletion of 75 linear feet of channel construction. The USACE issued unilateral Modification R00030/AD024-1/AD025-1, which added a net $6,466 to the contract, and definitized R00023/AD024/AD025. | JX0145-1, 2. | |
| | The USACE and Meridian failed to agree upon a final definitization price for the suspension of work. Accordingly, the USACE issued unilateral Modification R00031/AD0022-1 to add $476,630 to the contract to compensate Meridian for suspension costs and definitize Modification R00022/AD022. Modification R00031 also extended the contract schedule by 72 calendar days. | JX0146-1, 2. | |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 7/31/2009 | Meridian Sent USACE Serial Letter 07285-128 (H- 0116) re: Invoices for AD022, AD025, AD027, and Contract Quantity Overruns, Providing USACE with new Estimates of Suspension Costs, Channel Fill Work Costs, Interim Protection Costs, and Contract Overrun Costs | JX183. | 6, 7, 8, 9 |
| 8/3/2009 | The USACE and Meridian failed to agree upon a final definitization price for the addition of interim protection work. Accordingly, the USACE issued unilateral **Modification R00029/AD029** that reduced the value of the contract by a net $549,133.27, and definitized Modification R00025/AD025. | JX0144-2. | |
| 8/11/2009 | The USACE and Meridian failed to agree upon a final definitization price for geotechnical test borings. Accordingly, the USACE issued unilateral **Modification R00032/AD021-1** to definitize R00021/AD021.  Modification R00032 increased the contract price by $1,734. | JX0147-1, 2. | |
| 8/24/2009 | Meridian submitted pay request no. 16, for final payment of all funds it understood remained upon the contract at the time, $767,597.73.<br><br>Meridian declined to meet-and-confer with the USACEto discuss final payment for close-out and provide supporting data for all remaining quantities. | DX0572-2-7;<br><br>3/24 Tr. (Martinez) 1284:6-16. | |
| 9/2/2009 | USACE Internally Circulates Draft Modification R00033/AD033 for "Flood Event Damage and Subsurface Water" | PX377. | 2, 4, 5, 14 |
| 9/10/2009 | USACE Sends Meridian Serial Letter C-0081, advising Meridian that the issuance of a unilateral modification for the Interim Protection Work did not preclude the parties from continuing to seek a bilateral agreement. | JX186. | 9 |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 9/10/2009 | USACE Sends Meridian Serial Letter C-0082, advising Meridian that the issuance of a unilateral modification for the Channel Fill Work did not preclude the parties from continuing to seek a bilateral agreement. | JX187. | 8 |
| | USACE Sends Meridian Serial Letter C-0083, advising Meridian that the issuance of a unilateral modification for the Suspension Costs did not preclude the parties from continuing to seek a bilateral agreement. | JX185. | 7 |
| 9/15/2009 | USACE Adds Twenty-Four Deficiencies to Punch List | JX49-12-14. | 10 |
| | The USACE performed a final inspection of the Chula Vista Project site and issued its final punch list, listing all uncorrected items. | DX0612-7-9 | |
| 10/26/2009 | USACE Conducts After Action Review | PX7. | 2, 5, 14 |
| 4/2/2010 | Meridian submitted its consolidated request for equitable adjustment for its claims. | JX0177-1. | <u>All</u> |
| 5/20/2010 | USACE Acknowledges Receipt of REA, Indicates COFD will be issued no later than November 30, 2010 | JX189. | All |
| | The USACE acknowledged receipt of the REA and indicated that it would render a decision by 11/30/2010. | JX0189-1. | |
| 1/07/2011 | Meridian re-submitted the REA as a certified claim. | JX0033-1. | |
| 1/18/2011 | At Request of USACE, Meridian Converts REA to Certified Claim | JX34; JX35; JX36; JX37; JX38; JX39; JX40; JX41; JX42; JX43; JX44; JX45; JX46; JX47; JX48; JX49; JX50. | All |

| Date | Events | Evidentiary Support/Exhibit/ Trial Testimony | Relevant to Sec. Am. Compl. Count |
|---|---|---|---|
| 6/23/2011 | USACE sends Meridian Letter, informing Meridian that "$746,577.23 remains available to pay for undisputed amounts for work that has been performed and that was required by the Contract." USACE invites Meridian to "submit another pay request if it so chooses." | PX237. | All |
| 7/14/2011 | Meridian submits a revised Payment Request No. 16, requesting payment of the $746,577.23 that the CO had stated remained "available to pay for undisputed amounts." | JX190. | All |
| 7/29/2011 | Meridian Files Complaint, Initiating Action 11- 492C, *Meridian Engineering Company v. United States* | | |

## COURT EXHIBIT D

